**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Wilson C. Freeman (No. 036953)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-5025
Joseph.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Wilson.Freeman@azag.gov
*Attorneys for Plaintiffs the State of Arizona*
*and Mark Brnovich, Arizona Attorney General*
*(additional counsel listed below)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona; State of Idaho; State of Indiana; State of Nebraska; State of South Carolina; Mark Brnovich, in his official capacity as Attorney General of Arizona; <br><br> Plaintiffs, <br> v. <br> Martin J. Walsh in his official capacity as U.S. Secretary of Labor; U.S. Department of Labor; U.S. Department of Labor, Wage & Hour Division; Joseph R. Biden in his official capacity as President of the United States; Jessica Looman in her official capacity as Acting Administrator of the U.S. Department of Labor, Wage & Hour Division, <br><br> Defendants. | No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      In March of 2021, the United States Senate decisively rejected the Biden Administration's proposal to include an increase in the minimum wage to $15 per hour in the coronavirus relief package. It wasn't particularly close, failing by a vote of 42-58.[1] Undeterred by this resounding rejection, the President issued Executive Order 14026 on April 27, 2021, titled "Increasing the Minimum Wage for Federal Contractors." The order and its implementing rule seek to impose a sweeping nationwide minimum wage and overtime requirements on vast swaths of the U.S. economy (collectively, "Contractor Minimum Wage Mandate" or "Mandate").

2.      That Mandate will apply to industries as disparate as law enforcement, whitewater rafting, fast food restaurants, and universities—including many organizations that are not federal contractors at all. In essence, Defendants intend to apply the Contractor Minimum Wage Mandate to all businesses that they can even plausibly squeeze within their contracting authority—and many others beyond any defensible interpretation of that authority.

3.      But the United States is not a dictatorship. Notwithstanding the President's conviction that he—and not Congress—knows what the appropriate minimum wage should be, he can only act consistent with the law as set out by Congress. Defendants claim the authority to make these sweeping changes, covering over 500,000 businesses that employ *one-fifth* of the entire U.S. labor force, under the federal procurement statute. But this statute—which allows the President to build a system ensuring that federal procurement is economical and efficient—does not come close to affording the authority claimed by the government. On the contrary, Congress has repeatedly and consistently reserved to itself the issue of regulating wages in the private economy. Congress thus has enacted a host of

---

[1] *See* Emily Cochrane & Catie Edmondson, *Minimum wage increase fails as 7 democrats vote against the measure.*, New York Times (Mar. 5, 2021), https://www.nytimes.com/2021/03/05/us/minimum-wage-senate.html

laws which speak directly to the question of fair wages, especially in federal contracting, and none of these statutes suggest that Congress intended the President to be able to simply announce wage floors at will for a host of organizations including those only disparately connected with actual procurement.

4.      Moreover, the statutes at issue at most give the administration power to act for the purpose of ensuring an "economical and efficient system for" procurement. 40 U.S.C. § 101. But the Contractor Minimum Wage Mandate intentionally makes procurement *less* efficient by deliberately making federal contracting more expensive (given the additional wage costs). And Defendants do so in service of desired *social* ends rather than efficiency-based ones, which is not a permissible basis for regulation under the governing statutes.

5.      In addition to lacking statutory authority and violating separation-of-powers and federalism principles, Defendants have simply failed to justify their broad transformation of the economy as being the result of reasoned decision-making. Ultimately, the administration makes little secret why it wants to impose a $15 minimum wage—which just so happens to be, to the penny, their proposal rejected in Congress—and expand overtime requirements: social engineering by executive fiat. This lies outside the President's authority to make an efficient system for procurement. Nor do Defendants' pretextual rationales provide a basis for sustaining their actions. The Mandate should be enjoined and set aside.

## PARTIES

6.      Plaintiff State of Arizona is a sovereign state of the United States of America.

7.      Plaintiff State of Idaho is a sovereign state of the United States of America.

8.      Plaintiff State of Indiana is a sovereign state of the United States of America.

9.      Plaintiff State of Nebraska is a sovereign state of the United States of America.

10.     Plaintiff State of South Carolina is a sovereign state of the United States of America.

11.     Plaintiff Mark Brnovich is the Attorney General of the State of Arizona. He is the State's chief legal officer and has the authority to represent the State in federal court.

12.     Defendant United States Department of Labor (DOL) is a federal agency.

13.     Defendant United States Department of Labor, Wage & Hour Division is a component of the Department of Labor.

14.     Defendant Martin J. Walsh is the Secretary of Labor. Secretary Walsh is sued in his official capacity.

15.     Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

16.     Defendant Jessica Looman is the acting head of the United States Department of Labor's Wage and Hour Division. Defendant Acting Administrator Looman is sued in her official capacity.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction under 5 U.S.C. §§ 702–703 and 28 U.S.C. §§ 1331, 1346, and 1361.

18.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, and 28 U.S.C. §§ 2201-2202.

19.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) two Plaintiffs reside in Arizona and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

**ALLEGATIONS PERTAINING TO THE STATES**

20.     Plaintiff States file this suit to vindicate their sovereign, quasi-sovereign, and proprietary interests.

21.     Arms of the Plaintiff States routinely contract with the federal government. For example, all three state universities in Arizona are federal contractors, and their total federal revenue in fiscal year 2021 was $1,207,926,800—*i.e.*, over one billion dollars. All three universities would be subject to the Contractor Minimum Wage Mandate. On information and belief, one of more of those universities pays wages less than $15/hour for some workers.

22.     Many arms, agencies, and subdivisions of the Plaintiff State are similarly covered by the Mandate, including Sheriffs, law enforcement agencies, and other state agencies with employees who perform traditional governmental functions. *See also Kentucky v. Biden*, __F.4th__, 2022 WL 43178 at *5 (6th Cir. Jan. 5, 2022) (holding that states had standing to challenge federal contractor vaccine mandate because "they and their state agencies are themselves federal contractors that will become subject to the contractor mandate but for the district court's injunction. For instance, state universities, state departments of health, and jails reliant on the states' coffers all contract extensively with the federal government."). On information and belief, many pay wages to some employees that are less than $15/hour.

23.     The Civil Rights Division of the Office of the Arizona Attorney General is also a federal contractor under Defendants' expansive interpretation of that term.

24.     These arms, agencies, and subdivisions of the Plaintiff States expect to continue pursuing government contracts in the future. *See Kentucky*, 2022 WL 43178 at *6 (explaining that federal government's argument that states lack standing to challenge federal contractor vaccine mandate "inexplicably discounts the virtual certainty that states will either bid on new federal contracts or renew existing ones. By engaging in such prolific federal contracting, the federal government has engendered substantial state

reliance interests in securing future contracts. It is unreasonable, given those reliance interests, to expect states or their agencies to disavow their prior history of contracting and to decline to seek future such opportunities. And that point only underscores the states' injury.").

25.     Plaintiff States have extensive outdoor recreational opportunities. For example, Arizona has a variety of outdoors activities on the roughly 28 million acres of federal lands in the State, like those around Grand Canyon National Park.

26.     As of January 1, 2022, Arizona has a minimum wage of $ 12.80, pursuant to a 2016 law. The current minimum wages for Idaho and Indiana are $7.25/hour, while Nebraska has a minimum wage of $9/hour. The Contractor Minimum Wage Mandate displaces and preempts these minimums for many employers. South Carolina does not have state-specific minimum wages.

27.     Arizona, Idaho, Indiana, and Nebraska all permit employers to take a tip credit (of up to $3.00/hour, $3.90/hour, $5.12/hour, and $7.87/hour respectively). The Mandate will, over the next two years, displace and preempt this for many employers.

28.     The Mandate thus inflicts sovereign injury upon Plaintiff States, who have set their own minimum wage policies within their borders, which will be preempted and displaced by the mandate. *See Kentucky*, 2022 WL 43178 at *9 ("The contractor mandate thus likely implicates states' power to make and enforce policies and regulations, as well as states' traditional prerogative to superintend their citizens' health and safety.").

29.     The minimum wage imposed by the Contractor Minimum Wage Mandate will cost Plaintiff States directly by requiring State contractors to pay higher wages and overtime, thus increasing their labor costs and threatening their business models.

30.     The Mandate will cost Plaintiff States in tax revenue by greatly increasing the labor costs for companies in the State. Those businesses in turn will have lower

taxable income, and hence pay less in taxes to the state treasury. That decreased revenue will cause the Plaintiff States proprietary injury.

31.     The Mandate will cause some businesses to dismiss employees to decrease labor costs. The increased unemployment from fired employees will likely increase the burden on the Plaintiff States' unemployment insurance funds, and it will inflict economic disruption on the States' economies as a whole. *See also Kentucky*, 2022 WL 43178 at *9 (holding that "the states likely have a quasi-sovereign interest in defending their economies from the alleged negative ramifications of the contractor mandate").

32.     The Contractor Minimum Wage Mandate imposes substantial compliance costs on the Plaintiff States, which must not only review and adapt any contracts it may have but must also consider how the revision works alongside its own minimum wage laws and enforcement procedures.

33.     Even for employers that exclusively pay wages in excess of $15/hour, they will incur costs to ensure compliance with the Contractor Minimum Wage Requirement. That will include record-keeping costs and costs incurred to adjust for inflation adjustments made each year.

34.     The Plaintiff States and their arms, agencies, and subdivisions are thus "object[s] of the [governmental] action at issue." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quotation marks omitted). "In many if not most cases" a petitioner's standing is self-evident, especially "if the complainant is 'an object of the action (or forgone action) at issue[.]'" *Id.* at 899-900. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). Similarly, because the Arizona Division of Civil Rights, a component of the Office of the Attorney General, is regarded by the federal government as a federal contractor, it too is an object of the Mandate and the Arizona Attorney General has standing to challenge that Mandate.

**LEGAL BACKGROUND**

**A.** __The Procurement Act__

35.     In the period after World War II, Congress passed the Federal Property and Administrative Services Act (the "Procurement Act") to "provide the Federal Government with an economical and efficient system for" procurement. 40 U.S.C. § 101. As one Court summarized, the purpose of this Act was to address the "lack of centralized coordination of procurement efforts" and to fix the fact that "many agencies entered duplicative contracts…creating a massive post-war surplus." *Kentucky v. Biden*, 2022 WL 43178 at *13 (citing James F. Nagle, *A History of Government Contracting* 411 (2d ed. 1999)). The Procurement Act thus aimed to "centralize" procurement responsibility and to prevent agencies from "unnecessary buying." *Kentucky*, 2022 WL 43178 at *13 (citing S. Rep. 1413 at 3).

36.     Accordingly, the stated purposes of the Procurement Act are to "to provide the [f]ederal [g]overnment with an economical and efficient system" for certain enumerated activities, including "[p]rocuring and supplying property and nonpersonal services," "establish[ing] … pools or systems of transportation of [g]overnment personnel," and "manag[ing] of public utility services." 40 U.S.C. § 101.

37.     To effectuate these purposes, the Procurement Act permits the President to "prescribe policies and directives that the President considers necessary to carry out" the Act. Such policies must "be consistent with" the Act. 40 U.S.C. § 121(a).

38.     Such policies (and regulations established pursuant to them) are not valid unless there is "a nexus between the regulations and some delegation of the requisite legislative authority by Congress," and "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979). *See also Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) ("We wish to emphasize the

importance to our ruling today of the nexus between the wage and price standards and likely savings to the Government.").

39.    There is no such nexus when such policies are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). There is also no such nexus when such policies are imposed on subcontractors or others who have "no direct connection to federal procurement" and thus do "not lie 'reasonably within the contemplation of'" the Procurement Act. *Id.* at 171–72.

40.    The Procurement Act "does not write a blank check for the President to fill in at his will." *Kahn*, 618 F.2d at 793. Rather, the Procurement Act "instead grants the President specific, enumerated powers to achieve specific, enumerated goals in administering the federal procurement system." *Kentucky v. Biden*, 2022 WL 43178 at *14 n.14.

41.    The Procurement Act does not confer on the President the power to impose policies that "conflict with another federal statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996).

**B.    <u>Major Questions Doctrine</u>**

42.    Under the Major Questions Doctrine, courts will not assume that Congress has assigned to Executive Branch questions of "deep economic and political significance" unless Congress has done so expressly. *See Alabama Ass'n of Realtors v. HHS ("Alabama Realtors")*, 141 S. Ct. 2485, 2489 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.") (cleaned up); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

43.    Similarly, the Court has required Congress to use "exceedingly clear language" to "alter the balance between federal and state power and the power of the Government over private property." *Alabama Realtors*, 141 S. Ct. at 2489.

44.     The authority to set minimum wages in the national economy, particularly for the employees of federal contractors, is one that Congress has always exercised, and reserved to, itself.

45.     The Contractor Minimum Wage Mandate, however, purports to set a minimum wage for nearly one-fifth of the U.S. economy. Under the Major Questions Doctrine, such power could be delegated to the executive branch only in "exceedingly clear language." *Id.* No such language exists in the statutes at issue here.

**C.      The Non-Delegation Doctrine**

46.     Pursuant to Article I, Section 1 of the U.S. Constitution, Congress is vested with the legislative power. "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935).

47.     Congress, therefore, must articulate an "intelligible principle" to guide the Executive that not only sanctions but also defines and cabins the delegated legislative power. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

48.     In applying the nondelegation doctrine, the "degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *See Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021).

49.     The Procurement Act only confers upon the executive branch authority to "provide" for "an economical and efficient system for" procurement. 40 U.S.C. § 101. If the Procurement Act's delegation of authority to the executive branch is so sweeping that it permits the federal government to set minimum wages for broad portions of the U.S. economy unilaterally, that delegation is unconstitutional under the Nondelegation Doctrine.

**D.      Administrative Procedures Act**

50.     The Administrative Procedure Act ("APA") provides for judicial review of agency action. *See* 5 U.S.C. § 701 *et seq.* Under the APA, a federal court reviewing agency

action "shall" "hold unlawful and set aside agency action, findings, and conclusions" which the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706.

51.     Furthermore, federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (cleaned up). In other words, "agency action is lawful only if it rests on a consideration of the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up).

52.     Review of agency action is "deferential," but the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Department of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)).

53.     "When an agency changes its position, it must (1) display awareness that it is changing position, (2) show the new policy is permissible under the statute, (3) believe the new policy is better, and (4) provide good reasons for the new policy." *Center for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (cleaned up). Furthermore, agencies must provide "a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (cleaned up). Courts should conduct a "searching and careful" analysis of the agency's decision-making process, and may not supply a reasoned basis for the agency's decision when one is not provided. *Id.*

54.     As set forth below, the Contractor Minimum Wage Mandate is "arbitrary [and] capricious" and "not in accordance with law." 5 U.S.C. § 706(2).

**E.     Nonstatutory Cause of Action**

55.     "Courts have long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (citation omitted).

56.     This is true also for actions challenging executive actions as ultra vires: "when Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced. The passage of the APA has not altered this presumption. Prior to the APA's enactment courts had recognized the right of judicial review of agency actions that exceeded authority, and nothing in the subsequent enactment of the APA altered that doctrine of review to repeal the review of ultra vires actions. When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir.), *vacated on other grounds* 2021 WL 2742775 (U.S. July 2, 2021) (cleaned up). Thus, "review is ordinarily available when an agency exceeds its delegation of authority." *Id*. (citing *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1325–26 (D.C. Cir. 1996)).

57.     When challenging "the President's statutory authority to issue [an] executive order," if "a plaintiff is unable to bring his case predicated on either a specific or a general statutory review provision, he may still be able to institute a non-statutory review action." *Id*. at 892 (quoting *Reich*, 74 F.3d at 1327). This is because "the responsibility of determining the limits of statutory grants of authority is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." *Id*. (quoting *Reich*, 74 F.3d at 1327) (cleaned up). And even where a statute "expressly limit[s] judicial review . . . court[s] retain[] the ability to review whether [an agency] exceeded the authority delegated by the statute" because "the presumption of judicial review is particularly strong where an agency is alleged to have acted beyond its authority." *Id*. (quoting *Dart v. United States*, 848 F.2d 217, 219, 223-34 (D.C. Cir. 1988)).

58.     Furthermore, sovereign immunity does not bar most claims for equitable relief against executive agencies because Congress "largely eliminat[ed] the federal sovereign immunity defense" when it amended 5 U.S.C. § 702 in 1976. *E. V. v. Robinson*,

11

906 F.3d 1082, 1091-1092 (9th Cir. 2018); *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989).

**F.    Federal Wage Statutes**

59.    A host of federal statutes govern minimum and fair wages expressly (unlike the Procurement Act, which does not address minimum wage rates specifically at all). Many of these statutes are dedicated specifically to the question of compensation of workers on federal contracts.

60.    Enacted in 1938, the Fair Labor Standards Act (FLSA) requires nearly all employers in the United States to pay a minimum wage and overtime to covered nonexempt employees. 29 U.S.C. § 201 et seq.

61.    The current minimum wage under the FLSA is $7.25 per hour. 29 U.S.C. § 206(a)(1)(C). Overtime at time-and-a-half is required after 40 hours of work in a workweek. 29 U.S.C. § 207(a)(2)(C).

62.    The FLSA also entitles employers to take a tip credit toward their minimum wage obligation for tipped employees equal to the difference between the required cash wage ($2.13) and the federal minimum wage. 29 U.S.C. § 203(m).

63.    That credit reflects Congress's determination that it is appropriate to offset minimum wage requirements by a tip credit (which the Mandate contravenes).

64.    The Davis-Bacon and Related Acts apply to any federal government contract in excess of $2,000 for the construction, alteration or repair of public buildings or public works and requires that employers pay at least the locally prevailing wages. *See* Fact Sheet #66: The Davis Bacon and Related Acts (DBRA), Wage & Hour Division, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs66.pdf (discussing 29 U.S.C. § 3141 et seq.).

65.    The McNamara-O'Hara Service Contract Act (SCA) covers contracts in excess of $2,500 entered into by federal agencies that have as their principal purpose furnishing services in the United States. The SCA states, among other things, that such

contracts must pay at least locally prevailing wages. *See* Fact Sheet #67: The McNamara-O'Hara Service Contract Act (SCA), Wage & Hour Division, https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs67.pdf (discussing 41 U.S.C. § 351 et seq.).

66.     The Walsh-Healey Public Contracts Act (PCA) applies to contracts in excess of $15,000 for the manufacturing or furnishing of materials, supplies, articles, or equipment to the federal government and sets forth minimum wage, maximum hours, and safety and health standards for such contracts. *See Walsh-Healey Public Contracts Act*, Wage & Hour Division,  https://www.dol.gov/agencies/whd/government-contracts/pca (discussing 41 U.S.C. § 35).

67.     All of these enactments provide compelling evidence that Congress intended to reserve for itself authority to set minimal wage policies, particularly in the federal contracting sphere.

**G.    State Sovereignty And State Employees**

68.     The FLSA was originally enacted with an exemption for States acting as employers. *See Maryland v.* Wirtz, 392 U.S. 183, 185-86 (1968).

69.     However, in 1966 the FLSA was amended to remove this exemption for certain workers, *id.*, and amended again in 1974 to cover virtually all public employees employed by States and their various subdivisions. *See National League of Cities v. Usery*, 426 U.S. 833, 836 (1976).

70.     The Court, in *National League of Cities*, concluded that "[o]ne undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime." *National League of Cities*, 426 U.S. at 845. Following that reasoning, the Court concluded that Congress could not, consistent with the Tenth Amendment, abrogate that sovereignty. *Id.* at 852.

71.     The Supreme Court reversed course and overturned *National League of Cities* nine years later, in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 557 (1985). Following *Garcia* and the 1974 and 1985 amendments to the FLSA (Pub. L. No. 93–259, 88 Stat. 55 (codified at 29 U.S.C. § 201 *et seq*.); Pub. L. No. 99–150, 99 Stat. 787 (codified at 29 U.S.C. § 201 *et seq.*)), the FLSA governs the wages paid to state employees. *See, e.g.*, 29 U.S.C. § 203(e)(2)(C) (defining "employee" expressly to include individuals employed "by a State, political subdivision of a State, or an interstate governmental agency").

72.     Despite *Garcia* holding that the Constitution did not provide substantive protection to State sovereignty with respect to its management of its public employees, the Supreme Court has long recognized an important state sovereign interest in a state's relationship to its employees. *See, e.g.*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 558 (1985) (Powell, J., dissenting) (citing cases).

**H.      The FLSA and Preemption**

73.     The FLSA only sets a "floor" for the minimum wage. States and municipalities can set their minimum wages higher than the figure in the FLSA. 29 U.S.C. § 218(a).

74.     In addition, states and municipalities have a variety minimum wages above the floor set by the FLSA.

75.     Arizona has a minimum wage of $12.80 per hour. A.R.S. § 23-363(B). Idaho and Indiana have minimum wages of $7.25 per hour. Idaho Code § 44-1502; Ind. Code § 22-2-2-4(c). Nebraska has a minimum wage of $9.00 per hour. Neb. Rev. Stat. § 48-1203.

## STATEMENT OF FACTS

**A.   Prior Agency Actions**

### a. 2014 Policy

76.    On February 12, 2014, President Obama issued EO 13658, *Establishing a Minimum Wage for Contractors*, which directed the Secretary of Labor to issue regulations establishing a federal minimum wage for "federal contractors and subcontractors." 79 Fed. Reg. 9,851, 9,852-53. In this EO, the President relied on the Federal Property and Administrative Services Act (the Procurement Act) as the source of his authority. *Id.* at 9,851 (citing 40 U.S.C. 101).

77.    On October 7, 2014, the Wage & Hour Division issued a final rule implementing EO 13658. *See Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634. The rule created regulations set out in 29 C.F.R. § 10.1 *et seq.* The rule required that all federal contractors and subcontractors would have to implement a $10.10 per hour minimum wage and pay overtime. 29 C.F.R. §§ 10.5(a), 10.24(a).

78.    DOL's rule relied exclusively on the Procurement Act. 79 Fed. Reg. at 60,664 (citing 40 U.S.C. §§ 101, 121(a)).

79.    Both the EO and the final rule asserted that the minimum wage would improve economy and efficiency in Government procurement because the minimum wage would "increase[] [worker] morale and productivity and the quality of their work, lower[] turnover and its accompanying costs, and reduce[] supervisory costs." 79 Fed. Reg. at 60,634.

80.    The rule, by its own terms, applied only to employers who were already governed by the FLSA, the DBA, or the SCA. 29 C.F.R. § 10.3(a)(2). The Rule asserted that these statutes set only wage "floors," so it was not inconsistent to establish a higher minimum wage rate through the Procurement Act. 79 Fed. Reg. at 60,664

81.    DOL's notice accompanying the rule stated that the scope of the minimum wage was intended to be "all-encompassing." 79 Fed. Reg. at 60,640. Accordingly, the rule

covered workers performing "in connection" with a covered contract and extended to almost all contracts (and "contract-like instruments") with the federal government.

82.     This included employers who were not "contractors" in the traditional sense, but merely had contracts "in connection with Federal property or lands and related to offering services." 29 C.F.R. § 10.3(a). *See also* 79 Fed. Reg. 60,655 (explaining that "the determination of whether an agreement qualifies…does not turn on whether such agreements are characterized as 'contracts' for other purposes.").

83.     It also extended to workers who may not have been directly employed on a government contract, as long as they were employed "in connection" with such a contract (but excluded FLSA-covered workers performing "in connection with covered contracts for less than 20 percent of their work hours"). *See* 29 C.F.R. § 10.4.

84.     This rule has never been subject to court challenge or review.

**b.  <u>Exemption For Seasonal Recreational Services On Federal Lands</u>**

85.     On May 25, 2018, President Trump issued EO 13838, titled "Exemption from EO 13658 for Recreational Services on Federal Lands." *See* 83 Fed. Reg. 25,341. The EO explained that outfitters and guides operating on federal lands often conducted "multiday recreational tours" which often entailed "substantial overtime hours." *Id.* Furthermore, seasonal recreational workers generally have irregular work schedules with a high incidence of overtime pay. *Id.* These factors led to the conclusion that EO 13658 should not apply to contracts entered into "in connection with seasonal recreational services or seasonal recreational equipment rental." *Id.*

86.     DOL formalized this exemption in a final rule published in the Code of Federal Regulations on September 26, 2018, which carved out seasonal recreation from the requirements of EO 13658. *See Minimum Wage for Contractors; Updating Regulations To Reflect Executive Order 13838*, 83 Fed. Reg. 48,537.

**B.     The New Mandate**

87.     On April 27, 2021, President Biden issued EO 14026, *Increasing the Minimum Wage for Federal Contractors*, raising the previous wage floor to $15/hour. 86 Fed. Reg. 22,835. The EO also revoked the exemption created by President Trump for recreational services and announced the end of employers' ability to take a tip credit for tipped workers beginning in 2024. No explanation whatsoever was offered in the EO for these two changes.

88.     On November 23, 2021, DOL issued its final rule (the "Rule") implementing the minimum wage for federal contractors, effective January 30, 2022. *See* 86 Fed. Reg. 67,126. The rule requires any federal "contractor" to pay employees a minimum wage of $15 per hour and overtime wages if employees work more than 40 hours per week. *Id.* at 67,227. This wage is subject to yearly increases determined by DOL. *Id.*

89.     The Rule relies for its authority exclusively on the President's asserted unilateral ability under the Procurement Act to enact any policy he believes will lead to improved economy and efficiency in Government procurement. *Id.* at 67,129.

90.     The Rule applies to all "contract-like instruments," including "lease agreements," "licenses, permits, or other types of agreement." *Id.* at 67,227. Like its predecessor, the Rule covers organizations that are not contractors in the conventional sense, as they are licensees or permitees and are not party to procurement contracts. *Id.* at 67,134-36.

91.     The Rule covers all workers who perform their job "in connection with" covered contracts. *Id.* at 67,140. The only meaningful exemption is for workers who perform work in connection with a covered contract for less than 20% of their work hours. *Id.* at 67,164.

92.     DOL estimated the rule would affect more than 500,000 private firms. *Id.* at 67,194. DOL estimated that the rule would result in "transfers of income from employers to employees in the form of higher wage rates" in the amount of "$1.7 billion per year over

10 years." *Id.* at 67,194. In addition to these transfers, DOL estimated average direct employer costs of $2.4 million, comprised of regulatory familiarization costs and implementation costs. *Id.*

93.     DOL acknowledged that, with respect to traditional procurement contracts, costs would likely pass through to the government itself, increasing government expenditures. *Id.* at 67,206.

94.     With respect to non-procurement contracts, DOL acknowledged that such employers would not be able to pass the cost through to the government, and the cost would either be passed on to consumers or would lead to companies going out of business. *Id.* at 67,152-53.

95.     The alleged improved economy and efficiency, which are the lynchpin of the rule's stated justification, was not quantified by the DOL. *Id.* at 67,212. In fact, DOL did not actually present any direct evidence whatsoever on how contractor minimum wages impacted procurement economy and efficiency, in spite of the fact that six years had elapsed since the imposition of the minimum wage in 2015. *Id.*

96.     Instead, the evidence that DOL relied upon as supporting its claimed benefits was demonstrably inapposite: DOL relied on literature (1) addressing *voluntary* wage increases made by firms, (2) with no direct connection to the $15/hour actual wage being imposed, (3) outside the context of government contracting, and (4) heavily in the restaurant context. *Id.* ("Department notes that the literature cited in this section does not directly consider a change in the minimum wage equivalent to this final rulemaking (e.g., for non-tipped workers from $10.60 to $15). Additionally, much of the literature is based on voluntary changes made by firms.").

97.     In many cases DOL acknowledged the literature was divided, while barely discussing contrary studies. *Id.* at 67,214. DOL did not at all attempt to explain why firms had to date failed to implement higher wages given these alleged benefits.

98.     DOL also considered and relied on benefits, such as reduced poverty and income inequality, with absolutely no relationship to the stated purpose of increasing economy and efficiency in government contracting. *Id.* at 67,214-15.

99.     Ultimately, DOL did not provide any substantive justification for anything in the EO; for example, DOL did not explain reversing course entirely for the outdoors recreation industry, did not provide any justification for phasing out the tip credit, and provided no reasoning whatsoever for its chosen $15/hour wage (which just happens to match precisely the Administration's proposal that the Senate decisively rejected).

100.    DOL also failed to consider alternatives to any of the measures adopted in the Rule and completely ignored any reliance interests that might have existed in the previous wage rates.

101.    DOL's analysis of the benefits of the Rule was perfunctory, and no attempt was made whatsoever to compare benefits to costs, to evaluate the effect of billions of dollars in transfers, or to consider how the wage might have different impacts in different regions or industries.

102.    Instead, DOL generally asserted that it had no discretion to "deviate from the explicit terms of the Executive order" and blanket rejected all comments going to the content of the EO as "not within the scope of this rulemaking action." *Id.* at 67,129; 67,180.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of the Procurement Act – Minimum Wage Mandate

### (Asserted Under 40 U.S.C. §§ 101 and 121)

103.    The allegations in the preceding paragraphs are reincorporated herein.

104.    There is a nonstatutory cause of action to challenge unlawful procurement-related actions by the President. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996). This claim is asserted under both the APA's cause of action and that nonstatutory cause of action.

105.    Congress did not confer authority under the Procurement Act upon the President or any other executive branch official to regulate the minimum compensation of the employees of contractors and other entities with "contract-like instruments."

106.    Generally speaking, the President's authority under the Procurement Act is limited to "implement[ing] systems making *the government's* entry into contracts less duplicative and inefficient" not to "enhance [the] personal productivity" of the employees of government contractors. *Kentucky v. Biden*, 2022 WL 43178, at *13.

107.    This authority does not permit the President to "do essentially whatever he wants so long as he determines it necessary to make federal contractors more economical and efficient." *Id.* at *14 n.14. The President can only employ specific powers to achieve the specific enumerated goals in the Procurement Act—and those powers do not include the imposition of wage floors in the pursuit of anti-poverty goals.

108.    Defendants thus have no authority under the Procurement Act to impose the Contractor Minimum Wage Mandate even if that mandate were "economical and efficient" (which it is not and thus which constitutes an independent statutory violation).

109.    Further evidence that Congress did not intend the Procurement Act to be a vehicle for regulating contractor wages is that Congress has a host of other statutes governing wages, even specifically wages in the context of federal contracting. Thus, Defendants' attempt to regulate those wages through the Procurement Act—a completely different statute—is contrary to the "express or implied will of Congress." *See Medellin v. Texas*, 552 U.S. 491, 524-25 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-38 (1952) (Jackson, J., concurring)).

110.    In addition, if Congress had intended the Procurement Act to be a repository for authority for the President to regulate minimum wages for 500,000 + firms employing one-fifth of the U.S. workforce, it would have done so expressly. *See Alabama Realtors*, 141 S. Ct. at 2489 ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.") (cleaned up).

111.   If the President's interpretation of the Procurement Act were correct, it would work a substantial alteration in the federal-state balance and intrude on traditional state authority over their own employees. Previous statutes which imposed minimum wages and wages on state employees and preempted traditional State authority in this area did so expressly—indeed, that was their purpose. *See, e.g.*, 29 U.S.C. § 203(e)(2)(C) (defining "employee" expressly to include individuals employed "by a State, political subdivision of a State, or an interstate governmental agency"). The Procurement Act, however, says nothing of the sort—indicating no intent to intrude on this balance.

112.   Furthermore, there is no nexus between the Contractor Minimum Wage Mandate and the Procurement Act's purpose of providing an "economical and efficient system" of procurement. 40 U.S.C. § 101. In fact, the EO and the Rule will have a deleterious effect on the economy and efficiency of procurement by increasing the government's labor costs without producing meaningful economy or efficiency benefits.

113.   DOL's perfunctory analysis gives no reason to believe otherwise. And while DOL may be correct that it had no authority to alter the content of the EO, by failing to provide a meaningful substantive justification for its provisions, DOL demonstrated that the EO fails to come close to even accomplishing its stated goals of enhancing economy and efficiency.

114.   Finally, many of the specific requirements of the EO and the Rule bear no relationship to the establishment of an economical and efficient procurement system whatsoever.

115.   In particular, the Mandate purports to regulate conduct which has no connection to the procurement or supply of goods and/or services, such as the activity of permitees and licensees on federal land, the activity of workers who are not working on federal contracts, and the activity of sub-contractors with no direct connection to federal procurement.

116.   In addition, Congress through various statutes (*e.g.*, Davis-Bacon Act, etc., *supra* ¶¶65-68) has required that the federal government pay minimum wages that are set by *locally prevailing* wages. The Mandate, however, violates this explicit policy choice of Congress by instead setting contractor wages on a nationwide basis regardless of local prevailing conditions.

117.   This conflict between Congress's determination that minimum wages for many federal contracts should be set *locally* is now much more acute given the dramatic hike in the minimum wage cause by the Rule. At $10.10/hour, these conflicts might have been incidental and more tolerable. At $15/hour, the Mandate clearly contravenes Congress's specific enactments and does so purely by relying on a "wafer-thin reed on which to rest such sweeping power." *Alabama Realtors*, 141 S. Ct. at 2489.

118.   Accordingly, under the Procurement Act the President lacked authority to issue EO 14026 and DOL lacked authority to issue the Rule.

119.   This Court should accordingly declare that the Contractor Minimum Wage Mandate is unlawful. It should further enjoin and/or vacate both EO 14026 and the Rule.

## COUNT II

### Agency Action Not in Accordance with Law and in Excess of Authority

### (Asserted Under 5 U.S.C. § 706)

120.   The allegations in the preceding paragraphs are reincorporated herein.

121.   Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory ... authority, or limitations, or short of statutory right." See 5 U.S.C. § 706(2)(A), (C).

122.   The Ninth Circuit has recognized that "under certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act." *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997). *See also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (permitting procedural and substantive

challenge under APA to agency rule which worked in combination with presidential proclamation); *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020) (holding agency implementation of executive order reviewable).

123.    The Rule and the EO both conflict with existing federal statutory law which regulates the wages of federal contractors.

124.    The Contractor Minimum Wage Mandate also conflicts with the FLSA, which permits employers to take a tip credit, by prohibiting them from taking advantage of this statutory entitlement. 29 U.S.C. § 203(m).

125.    In addition, the only authority the agency invokes is the Procurement Act, and for the reasons stated above, the Final Rule conflicts with the Procurement Act.

126.    Accordingly, the Rule and the EO are unlawful and should be set aside and/or enjoined.

## COUNT III

### Arbitrary and Capricious Agency Action in Violation of the APA

### (Asserted Under 5 U.S.C. § 706)

127.    The allegations in the preceding paragraphs are reincorporated herein.

128.    Pursuant to the Administrative Procedure Act, agency action that is "arbitrary [or] capricious" is unlawful and must be set aside by a court of competent jurisdiction. 5 U.S.C. § 706(2)(A).

129.    The Ninth Circuit has recognized that "under certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the Administrative Procedure Act." *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997). *See also E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 770 (9th Cir. 2018) (permitting procedural and substantive challenge to agency rule under APA which worked in combination with presidential proclamation).

130.    Neither the Rule nor EO 14026 provide meaningful explanations for a host of decisions. This alone is fatal under the APA. *See Haaland*, 998 F.3d at 1067 (court may not supply reasoned basis for agency's action that agency has not itself given).

131.    For example, both the Rule and EO 14026 ignore the costs of the increase in the minimum wage and do not evaluate the impact of any transfers.

132.    Neither the Rule nor EO 14026 justify reversing course on seasonal recreational activity with reference to the substantial justification provided in EO 13838.

133.    Neither the Rule nor EO 14026 considers or discusses any alternatives to the plan of a blanket national $15 minimum wage. In particular, neither Rule nor EO 14026 considers alternative minimum wages that are either lower or higher.

134.    Neither the Rule nor EO 14026 attempts to conduct a real analysis of whether the blanket $15 minimum wage would accomplish its stated goals of increasing economy and efficiency of government contractors. This is evident from the $15 figure itself, which was chosen—not to maximize benefits or minimize cost—but instead for its connection to a decade long activist campaign for a $15 minimum wage. *See, e.g.*, Fight For $15, https://fightfor15.org/about-us/.

135.    Neither the Rule nor EO 14026 analyze meaningfully the potential of the Mandate to exacerbate inflation at a time when the rate of inflation is at a 40-year-plus high.

136.    Agencies must provide reasoned analysis for their decisions. They must consider and discuss alternatives, and "cogently explain" why it makes a particular choice from among those alternatives. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). They must provide reasoned analysis for changing course. *Id.* at 57. The agency has not done any of this here, in any respect.

137.    Accordingly, the Rule and the EO are unlawful and should be set vacated and/or enjoined.

**COUNT IV**

**Violation of the Procurement Act – Breadth of Mandate**

**(Asserted Under 40 U.S.C. §§ 101 and 121)**

138.    The allegations in the preceding paragraphs are reincorporated herein.

139.    Defendants only have statutory authority to establish an "economical and efficient system for" procurement. 40 U.S.C. § 101. By its terms that authority is limited to the system under which *the federal government* procures goods and services. It is not a sweeping grant of authority to regulate the systems of government contractors writ large.

140.    *A fortiori*, Defendants' authority under Section 101 cannot extend beyond contracts to acquire goods and services. The Mandate, however, purports to extend to all "contract-like instruments," as well as to most workers performing "in connection" with covered contracts. The Mandate further applies where the federal government leases land or office space *to* private entities, even though the government does not "procure" anything in such contracts.

141.    This expansive view of Defendants' authority embodied in the Rule/Mandate thus substantially exceeds their actual authority under Section 101 and is unlawful.

**COUNT V**

**Non-Delegation**

142.    The allegations in the preceding paragraphs are reincorporated herein.

143.    Article I, § 1 of the Constitution provides that "All legislative Powers herein granted shall be vested in a Congress of the United States."

144.    "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935).

145.    Congress did not bestow upon the President authority to issue a federal minimum wage requirement for contractors and other entities with a "contract-like instrument" with the federal government.

25

146.   Alternatively, if Congress did give the President such authority, it would be an unlawful delegation of legislative authority, because there would be essentially no limitation on what the President could do to organizations that have a contractual nexus with the government.

147.   Accordingly, the Rule and the EO are unlawful and should be enjoined.

**COUNT VI**

**Violation of Spending Clause**

148.   The allegations in the preceding paragraphs are reincorporated herein.

149.   Article I of the U.S. Constitution enumerates the powers of Congress.

150.   Article I, § 8, cl. 1 empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

151.   While Congress may provide conditional grants to the states under the Spending Clause, those conditions are subject to several limitations, including that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981))

152.   The power to impose conditions on States rests with Congress alone. Only those conditions unambiguously imposed by the statutory text alone may potentially bind the States. The executive branch may not create any additional conditions. *See, e.g.*, *Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc); *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021).

153.   The Procurement Act does not give the President authority to condition federal contracts on the States surrendering authority over key sovereign interests like their relationships with their public employees. But if the Act did bestow such authority, it does so without providing clear notice to States that acceptance of federal contracting funds will require them to pay a minimum wage set by the federal government.

154.    To be sure, the Executive Branch may have authority to set some provisions of contracts to ensure the contracts are performed efficiently. But the Procurement Act provides no clear notice to States that accepting federal contracting funds will require them to surrender their sovereignty over the wages that they pay their own workers. Nor does Congress have any power under the Spending Clause to impose a condition such as the Contractor Minimum Wage Mandate.

155.    Accordingly, the Rule and the EO are unlawful and should be vacated and/or enjoined.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment:

A.  Enter a declaratory judgment that the Rule and the EO 14026 are unlawful.

B.  Hold unlawful and set aside the Rule and the EO.

C.  Grant preliminary and permanent injunction prohibiting Defendants and those acting in concert with them from enforcing the Rule and the EO against any federal contracting agency, subcontractor, or employer anywhere in the United States.

D.  Granting any and all other such relief as the Court finds appropriate.

RESPECTFULLY SUBMITTED this 8th of February, 2022.

**MARK BRNOVICH**
**ATTORNEY GENERAL**
By s/ Drew C. Ensign
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    Wilson C. Freeman (No. 036953)
    Office of the Arizona Attorney General
    2005 N. Central Ave
    Phoenix, AZ 85004-1592
    Phone: (602) 542-5025
    Joseph.Kanefield@azag.gov
    Beau.Roysden@azag.gov
    Drew.Ensign@azag.gov
    Wilson.Freeman@azag.gov

*Attorneys for Plaintiffs the State of Arizona and*
*Mark Brnovich, Arizona Attorney General*

By s/ Brian Kane
    Brian Kane*
    Chief Deputy Attorney General
    Office of the Idaho Attorney General
    700 W. Jefferson Street, Ste. 210
    P.O. Box 83720
    Boise, ID 83720
    Telephone: (208) 334-2400
    Email: Brian.Kane@ag.idaho.gov

*Attorney for Plaintiff State of Idaho*

By s/ Thomas M. Fisher
    Thomas M. Fisher*
    Solicitor General
    Office of the Indiana Attorney General
    IGC-South, Fifth Floor
    302 West Washington Street
    Indianapolis, IN 46204-2770
    Telephone: (317) 232-6255
    Email: Tom.Fisher@atg.in.gov

*Attorney for Plaintiff State of Indiana*

By s/ James A. Campbell
James A. Campbell (No. 26737)
Solicitor General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
Phone: (402) 471-2682
Email: Jim.Campbell@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

By s/ Thomas T. Hydrick
Thomas T. Hydrick*
Assistant Deputy Solicitor General
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, SC 29211
Phone: (803) 734-4127
Email: thomashydrick@scag.gov

*Attorney for Plaintiff State of South Carolina*

* Pro hac vice application forthcoming