1
2

**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

3
4

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)

5

Drew C. Ensign (No. 25463)
Robert J. Makar (No. 33579)

6

2005 N. Central Ave
Phoenix, AZ 85004-1592

7

Phone: (602) 542-8540
Joseph.Kanefield@azag.gov

8

Beau.Roysden@azag.gov
Drew.Ensign@azag.gov

9

Robert.Makar@azag.gov

10

*Attorneys for Plaintiffs Mark Brnovich and*
*the State of Arizona*

11

*(additional counsel listed below)*

12

13

14

**UNITED STATES DISTRICT COURT**

15

**DISTRICT OF ARIZONA**

16

No.  2:22-cv-00213-JJT

17
18
19

State of Arizona; State of Idaho; State of Indiana; State of South Carolina; Mark Brnovich, in his official capacity as Attorney General of Arizona;
           Plaintiffs,

**MOTION FOR A PRELIMINARY INJUNCTION**

20

        v.

21
22
23
24
25
26

Martin J. Walsh in his official capacity as U.S. Secretary of Labor; U.S. Department of Labor; U.S. Department of Labor, Wage & Hour Division; Joseph R. Biden in his official capacity as President of the United States; Jessica Looman in her official capacity as Acting Administrator of the U.S. Department of Labor, Wage & Hour Division,
           Defendants.

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................................ii

INTRODUCTION.........................................................................................1

STATEMENT OF FACTS..............................................................................4

      A.   Previous Rulemakings..................................................................4

      B.   EO 14026 And The Challenged Rule..........................................4

LEGAL STANDARD ....................................................................................5

ARGUMENT ...............................................................................................6

  I.   The States Have Standing .......................................................................6

  II.  The Rule Violates The Procurement Act .................................................9

      A.   The Procurement Act Must Be Understood Narrowly Under Constitutional Avoidance And Major Question Doctrine .............10

      B.   The Rule Exceeds The Scope Of The Procurement Act ................12

      C.   The Rule Lacks The Requisite "Close Nexus" To An Efficient and Economical System Of Procurement ...........................................15

      D.   The Rule Conflicts With Existing Statutes Concerning Federal Contractors And Minimum Wages....................................................19

  III. The Rule Violates The APA....................................................................21

      A.   The Department Failed To Consider Alternatives Adequately And Failed To Supply Justifications For Its Decisions..........................21

      B.   The Department's Conclusion That The Rule Would *Increase* The Efficiency Of Governmental Contracting Is Arbitrary And Capricious .......25

  IV. The States Will Suffer Irreparable Harm If The Rule Is Not Enjoined.................26

  V.  The Remaining Requirements For Injunctive Relief Are Satisfied Here..............27

CONCLUSION ..........................................................................................27

i

# TABLE OF AUTHORITIES

**CASES**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ...................................................................................... 11

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) .................................................................................. 27

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) ...................................... 11, 14, 15, 17, 18

*Alabama Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) ............................................................................ 10, 27

*Alaska v. U.S. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ...................................................................... 27

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
  458 U.S. 592 (1982) ....................................................................................... 8

*Arizona Recovery House Ass'n v. Arizona Dep't of Health Services*,
  462 F. Supp. 3d 990 (D. Ariz. 2020) .......................................................... 26

*Brnovich v. Biden*,
  No. 21-01568, 2022 WL 252396 (D. Ariz. Jan. 27, 2022) ............... 2, 7, 9, 12, 14, 18

*Center for Biological Diversity v. Haaland*,
  998 F.3d 1061 (9th Cir. 2021) ................................................................ 21, 22

*Chamber of Commerce v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ................................................................ 21, 23

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ...................................................................................... 20

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ...................................................................................... 15

*City Of Albuquerque v. U.S. Dep't Of Interior*,
  379 F.3d 901 (10th Cir. 2004) ..................................................................... 12

*Department of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ............................................................................ 22, 26

*DHS v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ................................................................................. 24

*Doe #1 v. Trump*,
  984 F.3d 848 (9th Cir. 2020) ....................................................................... 27

*Donovan v. Vance*,
  No. 4:21-CV-5148, 2021 WL 5979250 (E.D. Wash. Dec. 17, 2021) ........... 2

ii

*East Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ..................................................................26

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*,
   485 U.S. 568 (1988) ..............................................................................11

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ..............................................................................20

*Feds for Med. Freedom v. Biden*,
   No. 3:21-CV-356, 2022 WL 188329 (S.D. Tex. Jan. 21, 2022) ...................2

*Florida v. Nelson*,
   No. 21-cv-2524 (M.D. Fl. Dec. 22, 2021) ..................................................2

*Garcia v. San Antonio Metro. Transit Auth.*,
   469 U.S. 528 (1985) ................................................................................9

*Georgia v. Biden*,
   No. 1:21-CV-163, 2021 WL 5779939 (S.D. Ga. Dec. 7, 2021)...........2, 19

*Georgia v. President*,
   No. 21-14269 (11th Cir. Dec. 17, 2021) ....................................................2

*Gomez v. Trump*,
   485 F. Supp. 3d 145 (D.D.C. 2020) ........................................................23

*Kentucky v. Biden*,
   23 F.4th 585 (6th Cir. 2022)...............................1, 7, 9, 12, 13, 14, 18

*Liberty Mut. Ins. Co. v. Friedman*,
   639 F.2d 164 (4th Cir. 1981) ...............................................13, 14, 18

*Louisiana v. Biden*,
   No. 21-CV-3867, 2021 WL 5986815, (W.D. La. Dec. 16, 2021)..................2

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................................7

*Missouri v. Biden*,
   No. 4:21-CV-1300 (E.D. Mo. Dec. 22, 2021) ............................................2

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................3

*Nat'l Urb. League v. Ross*,
   977 F.3d 770 (9th Cir. 2020) ..................................................................24

*National R.R. Pass. Corp. v. Nat'l Ass'n of R.R. Pass.*,
   414 U.S. 453 (1974) ..............................................................................20

*New Mexico v. Dep't of Interior*,
   854 F.3d 1207 (10th Cir. 2017)...............................................................20

*NFIB v. OSHA,*
  142 S. Ct. 661 (2022) .................................................................................... 10

*San Francisco v. U.S. Citizenship & Immigration Services,*
  981 F.3d 742 (9th Cir. 2020) ........................................................................ 26

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002) ........................................................................ 7

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ........................................................................................ 6

*Teva Pharms. USA, Inc. v. FDA,*
  441 F.3d 1 (D.C. Cir. 2006) .......................................................................... 24

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994) ...................................................................................... 26

*Tiger Lily, LLC v. HUD,*
  5 F.4th 666 (6th Cir. 2021) ........................................................................... 11

*University of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ........................................................................................ 5

*Utility Air Regulatory Group v. EPA,*
  573 U.S. 302 (2014) ...................................................................................... 10

*Winter v. NRDC,*
  555 U.S. 7 (2008) ............................................................................................ 6

**STATUTES**

29 U.S.C. § 218(a) ............................................................................................ 11

40 U.S.C. § 101 *et seq.* ...................................................................... 1, 4, 10, 13

40 U.S.C. § 101(1) ........................................................................................... 15

40 U.S.C. § 102(8) ........................................................................................... 13

40 U.S.C. § 102(9)(A)(i)-(ii) ..................................................................... 13, 14

40 U.S.C. § 121(a) ..................................................................................... 10, 15

40 U.S.C. § 3142 ......................................................................................... 2, 20

40 U.S.C. § 3142(b) ......................................................................................... 20

40 U.S.C. § 6703(1) ......................................................................................... 20

41 U.S.C. § 6502(1) ..................................................................................... 2, 20

41 U.S.C. § 6702(a) ..................................................................................... 2, 20

5 U.S.C. § 706(2) ............................................................................................... 3

5 U.S.C. § 706(2)(A) ....................................................................................... 21

## REGULATIONS

29 C.F.R. § 10.2 ...................................................................................................... 4

29 C.F.R. § 23.20 .................................................................................................. 12

29 C.F.R. § 23.210 ................................................................................................ 13

29 C.F.R. § 23.30(a)(1) ......................................................................................... 12

29 C.F.R. § 23.40(f) .............................................................................................. 13

79 Fed. Reg. 9,851 (Feb. 12, 2014) ........................................................................ 4

83 Fed. Reg. 25,341 (May 25, 2018) ................................................................. 4, 23

83 Fed. Reg. 48,537 (Sept. 26, 2018) ................................................................ 4, 23

86 Fed. Reg. 22,835 (Apr. 27, 2021) ................................................................. 4, 23

86 Fed. Reg. 67,126 (Nov. 24, 2021) ..................... 1, 3, 4, 5, 6, 7, 8, 10, 12, 16, 21, 22, 25

## OTHER AUTHORITIES

Alan Manning, *The Elusive Employment Effect of the Minimum Wage*, 35 J. Econ. Perspectives 1 (2021) ............................................................................................ 8

David Neumark & Peter Shirley, *Myth or Measurement: What Does the New Minimum Wage Research Say About Minimum Wages and Job Loss in the United States?* NBER Working Paper No. w28388 (Jan 27, 2021), https://bit.ly/3KS8ODt ............................ 8

James F. Nagle, *A History of Government Contracting* 411 (2d ed. 1999) ...................... 14

Renee Haltom, *Sticky Wages*, Econ Focus (2013), available at https://www.richmondfed.org/~/media/richmondfedorg/publications/research/econ_focus/2013/q1/pdf/jargon_alert.pdf ..................................................................... 26

S. Rep. No. 798, 89th Cong., 1st Sess., 3 (Oct. 1, 1965) .................................... 20

*Webster's New International Dictionary* 1974 (2d ed. 1959) ............................... 13

**INTRODUCTION**

The States of Arizona, Idaho, Indiana, and South Carolina (collectively, the "States") move for a preliminary injunction enjoining the enforcement of the Department of Labor's ("DOL" or the "Department") rule implementing Executive Order 14026, *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24, 2021) ("Rule" or "Mandate"). Because the Rule exceeds the Executive Branch's authority under the Procurement Act and violates the Administrative Procedure Act ("APA"), it should be preliminarily enjoined and ultimately vacated.

In March of 2021, the U.S. Senate decisively rejected the Biden Administration's proposal to increase the minimum wage to the $15 per hour. It wasn't particularly close: failing by a vote of 42-58. Complaint ¶1 & n.1. Undeterred by this this resounding rejection, the President issued EO 14026 shortly thereafter. The order, along with the Department's implementing rule, seek to impose a sweeping nationwide minimum wage and overtime requirements on vast swaths of the U.S. economy (collectively, "Minimum Wage Mandate" or "Mandate"). Indeed, it will affect *one-fifth* of the U.S. workforce, including numerous *State* employees. That minimum wage? Without hint of shame, it is $15 per hour—the *very same* wage that Congress rejected *to the penny*.

The Administration justifies this brazen end-run around Congress's authority by pointing to the Procurement Act, 40 U.S.C. §101 *et seq.*, which grants the President limited authority to adopt policies necessary to put together a system for efficient and economical acquisition of goods and services. This post-World War II statute was created to ensure that government procurement is efficient and non-duplicative. It was never intended to give the President a license to regulate the economy to achieve desired social equity aims by fiat whenever Congress proves uncooperative. This is the same statute the Administration used to justify their federal contractor vaccine mandates, which several courts—including this one—have ruled unlawful (including in 6 of 6 challenges by States). *See, e.g.*, *Kentucky v. Biden*, 23 F.4th 585, 608 (6th Cir. 2022); *Brnovich v. Biden*, No. 21-01568, 2022 WL

1

252396, at *17 (D. Ariz. Jan. 27, 2022).[1]

As with the contractor vaccine mandates, the Procurement Act confers no authority for the minimum wage mandates, which is simply being used as a convenient cudgel to aggrandize executive power at the expense of Congress and the States. And unlike vaccine mandates, where there was at least an arguable Congressional silence, here Congress has spoken to the precise issue that the Rule seeks to address. Federal contractors are already subject to specific and complex statutory wage schemes, set forth in statutes like the Davis Bacon Act ("DBA"), the Walsh-Healey Public Contracts Act ("PCA") and the Service Contract Act ("SCA"). 40 U.S.C. §3142; 41 U.S.C. §§6502(1); 6702(a). The EO and Rule conflict directly with those schemes in many localities for many roles. Nothing in the Procurement Act, which predates the SCA, provides authority to displace other, far-more-specific statutes with the President's own conception of appropriate wage levels. Nor are Defendants being particularly subtle here: despite occasional fig-leaf protests to the contrary, Defendants intend to mandate a minimum wage to achieve social-justice ends, rather than any actual gain in *efficiency* in contracting—which is further belied by the fact that they are intentionally *increasing* the wage costs of their contractors, and hence the federal government's costs in acquiring goods and services from them.

To make matters worse, Defendants promulgated this rule under the mistaken belief they need not bother to explain any of its decisions, or consider any alternatives. As the Department explained, it deliberately and expressly disavowed any meaningful attempt to analyze alternatives because it felt bound by the EO: "due to the prescriptive nature of Executive Order 14026, the Department does not have the discretion to implement alternatives that would violate the text of the Executive order, such as the adoption of a

---

[1] *See also Georgia v. Biden*, No. 1:21-CV-163, 2021 WL 5779939, at *10 (S.D. Ga. Dec. 7, 2021) (issuing nationwide injunction) *stay denied Georgia v. President*, No. 21-14269 (11th Cir. Dec. 17, 2021); *Louisiana v. Biden*, No. 21-CV-3867, 2021 WL 5986815, at *1 (W.D. La. Dec. 16, 2021); *Missouri v. Biden*, No. 4:21-CV-1300 (E.D. Mo. Dec. 22, 2021); *Florida v. Nelson*, No. 21-cv-2524 (M.D. Fl. Dec. 22, 2021). A district court in Texas denied a preliminary injunction not on the merits but as duplicative with the existing nationwide injunction. *Feds for Med. Freedom v. Biden*, No. 3:21-CV-356, 2022 WL 188329, at *8 (S.D. Tex. Jan. 21, 2022). *But see Donovan v. Vance*, No. 4:21-CV-5148, 2021 WL 5979250 (E.D. Wash. Dec. 17, 2021) (non-state challenge).

higher or lower minimum wage rate, or continued exemption of recreational businesses." 86 Fed. Reg. at 67,216.

But unquestioningly following executive orders cannot supplant the Departments' *statutory* obligations under the APA, which mandates reasoned decision-making, not blind obedience. Defendants explicitly *admit* to violating that obligation, but contend that they are excused from compliance because the President commanded them to do so. The APA, however, has no such "just following orders" exception.

Under the APA, agencies must consider and discuss alternatives, and "cogently explain" why they make a particular choice from among those alternatives. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983). They must also provide reasoned analysis for changing course and consider resulting costs and relevant reliance interests in the prior rules. *Id.* at 57. DOL's repeated, explicit, and unequivocal admissions that it performed *none* of these analyses is fatal under the APA.

Indeed, this Court blessing Defendants' actions here would render the APA a paper tiger. And if DOL's legal reasoning were actually correct, it is unclear why DOL did not dispense with notice-and-comment procedures entirely: why bother to take comments at all if it was always and completely bound to follow the EO without question or deviation? To be sure, the APA typically would not prevent an agency from selecting the President's favored alternative *after* analyzing a range of options adequately. But it cannot skip that analysis entirely simply because the President told the agency what his preference was.

Defendants' abdications of their duties under the APA to consider alternatives meaningfully renders this Court's performance of its duties under the APA all the more essential. This Court should accordingly enjoin, "hold unlawful and set aside" the Rule as violating the APA. 5 U.S.C. §706(2). That is particularly so as the Rule inflicts serious harms on the States, all of whom are, in one capacity or another, federal contractors, and all of whom pay wages less than $15 an hour.

Notably, the Rule has already been partially enjoined by the Tenth Circuit, *see* Makar Decl. Ex. A, and this Court should preliminarily enjoin the remainder.

1

2

**STATEMENT OF FACTS**

3

**A.  Previous Rulemakings**

4

The Federal Government first adopted a minimum wage for "contractors" in 2014,

5

when President Obama issued EO 13658. This EO directed the Department to establishing

6

a minimum wage for "federal contractors and subcontractors." 79 Fed. Reg. 9,851, 9,852-

7

53 (Feb. 12, 2014). The President relied on the Procurement Act as the source of his

8

authority to impose this wage. *Id.* at 9,851 (citing 40 U.S.C. §101 *et seq.*). This rule applied

9

to all new "contract[s] or contract-like instruments," an intentionally all-encompassing

10

definition. 29 C.F.R. §10.2. The minimum wage was set at $10.10, and, perhaps given the

11

small increase over the $7.25/hour minimum wage for all workers, this Rule was never

12

challenged in court.

13

In 2018, President Trump issued EO 13838. *See* 83 Fed. Reg. 25,341 (May 25,

14

2018). That order explained that outfitters and guides operating on federal lands often

15

conducted "multiday recreational tours" which often entailed "substantial overtime

16

hours." *Id.* at 25,341. Furthermore, it explained that seasonal recreational workers

17

generally have irregular work schedules with a high incidence of overtime pay. *Id.* For

18

those reasons, it explained that the $10.10 minimum wage set of EO 13658 should not

19

apply to contracts involving "seasonal recreational services or seasonal recreational

20

equipment rental." *Id.* DOL formalized this exemption in a final rule, *see* 83 Fed. Reg.

21

48,537 (Sept. 26, 2018), which was never challenged in court.

22

**B.  EO 14026 And The Challenged Rule**

23

In April 27, 2021, President Biden issued EO 14026, *Increasing the Minimum Wage*

24

*for Federal Contractors*, raising the contractor minimum wage to $15/hour. 86 Fed. Reg.

25

22,835 (Apr. 27, 2021). The EO also revoked the EO 13838 exemption for recreational

26

services and further announced the end of employers' ability to take a tip credit beginning

27

in 2024. On November 23, 2021, DOL issued its final rule implementing this EO. *See* 86

28

Fed. Reg. 67,126. The rule requires any federal "contractor" to pay employees a minimum

wage of $15 per hour and overtime wages if employees work more than 40 hours per week. *Id.* at 67,227. This wage is subject to yearly increases determined by DOL. *Id.*

The Rule, like its predecessor, relies exclusively for its authority on the President's asserted unilateral ability under the Procurement Act to enact any policy he believes will lead to improved economy and efficiency in Government procurement. *Id.* at 67,129. The Rule applies to all "contract-like instruments," including "lease agreements," and "licenses, [and] permits." *Id.* at 67,225. Like its predecessor, the Rule covers organizations that are not contractors in the conventional sense, as they are not party to procurement contracts, such as outdoors recreation businesses, as long as such organizations operate on federal land. *Id.* at 67,134-36.

DOL estimated the rule would affect more than 500,000 private firms. *Id.* at 67,194. DOL further estimated that the rule would result in "transfers of income from employers to employees in the form of higher wage rates" in the amount of "$1.7 billion per year over 10 years." *Id.* at 67,194. This did not estimate overtime costs, analyzing only transfers due to the increase in base wage rate. *Id.* In addition to these transfers, DOL quantified direct employer costs of $2.4 million, comprised of regulatory familiarization costs and implementation costs. *Id.*

DOL's analysis of both the benefits and costs of the Rule was perfunctory, and no attempt was made whatsoever to compare benefits to costs, to evaluate the effect of billions of dollars in transfers, or to consider how the wage mandate might impact differently in different regions or industries. Instead, DOL generally asserted that it had no discretion to "deviate from the explicit terms of the Executive order" and categorically rejected all comments going to the substance of the EO or the legality or wisdom of the proposed Rule as "not within the scope of this rulemaking action." *Id.* at 67,180, 67,129.

### LEGAL STANDARD

Plaintiffs seek a preliminary injunction under Rule of Civil Procedure 65(a) for the purpose of "preserv[ing] the relative positions of the parties until a trial on the merits can be held." *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the moving party,

a plaintiff can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I.   The States Have Standing

To seek injunctive relief, a plaintiff "must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted).

Here the States have three main interests harmed by the Rule, each establishing injury-in-fact: proprietary, quasi-sovereign, and sovereign interests.

***Proprietary Injury – Wage and Compliance Costs.*** Arms of the Plaintiff States routinely contract with the federal government. For example, all three state universities in Arizona are federal contractors, and their total federal revenue in fiscal year 2021 was $1,207,926,800—*i.e.*, over one billion dollars. Makar Decl. Ex. B. All three universities would be subject to the Contractor Minimum Wage Mandate. Many of these universities have jobs which pay less than $15 an hour. Makar Decl. Ex. C. Similarly, other arms of the state also pay below $15 an hour. Makar Decl. Ex. D. The Rule, therefore, will increase State labor costs by requiring the States to pay additional moneys in wages.

Idaho's universities serve as a concrete example. Idaho State University, for example, reports numerous employees working on or in connection with federal contracts who make less than $15 per hour—making clear that the Mandate will cause increased labor costs. *See* Christensen Decl. ¶¶5-8. Indeed, the Rule itself acknowledges that it will result in increased labor costs in the form of wages of "$1.7 billion per year over 10 years," which DOL acknowledges "may be an underestimate." 86 Fed. Reg. at 67,194. There is thus no reason to doubt that a substantial portion of those costs will fall on States.

The Rule also imposes direct costs on the States in terms of familiarization costs, implementation costs, compliance costs, and recordkeeping costs. 86 Fed. Reg. 67,204-208. The Plaintiff States and their arms, agencies, and subdivisions are thus "object[s] of the [governmental] action at issue," making their standing typically "self-evident." *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). *See also Brnovich*, 2022 WL 252396 at *12 ("The Contractor Mandate regulates the State, and the State has standing to challenge that regulation."). The Rule itself "quantified two direct employer costs: (1) Regulatory familiarization costs and (2) implementation costs": "estimate[ing] regulatory familiarization costs to be $13.4 million," while "total Year 1 implementation costs were estimated to equal $3.8 million." 86 Fed. Reg. at 67,204-05. In addition, the Rule acknowledged that there may be "compliance costs, increased consumer costs, and reduced profits," which the Department "has not quantified … because it would require making many assumptions for which adequate data are not available." *Id.* at 67,206.

This injury is ripe now. These arms, agencies, and subdivisions of the States have contracts up for renewal soon and expect to continue pursuing government contracts in the future. The Sixth Circuit has found standing present on that basis, recognizing "the virtual certainty that states will either bid on new federal contracts or renew existing ones." *Kentucky*, 23 F.4th at 595.

***Proprietary Injury – Tax Revenues/Unemployment Expenditures.*** The Rule will also decrease the tax revenues collected by the States. Wage costs by businesses are almost invariably deductible expenses, and those affected businesses will thus pay less in taxes to the States. And while the amount may be partially offset by increased taxable income from workers, that offset will only be partial, because business taxes are almost always higher than personal income taxes. For example, Arizona's tax rate on corporate income is 4.9%, while its top tax rate for personal income is 4.5%, and workers making a $15/hour wage would likely in either a 2.59% or 3.34% marginal tax bracket. Makar Decl. Ex. E; *see also* Icaza Decl. ¶¶7-12. Similarly, the unemployment that the Rule acknowledges it may cause

will increase the States' expenditures on their unemployment insurance programs.[2] This unemployment is likely to be especially severe in the tourism and outdoors industry, where, as the Rule acknowledges, the costs of the Mandate cannot be passed on to the federal government (since the impacted businesses are not actually "contractors" billing the federal government). In such industries, disemployment effects are likely to be more pronounced. *See* 86 Fed. Reg. at 67,212 (explaining that "employment effects" may be more severe among such companies since they "might be more limited in their ability to pass costs along to the Federal government, may have impacts more in line with the CBO's analysis."). States—like Arizona and Idaho—with especially prominent outdoors and tourism industries, are likely to be particularly injured by this aspect of the Rule. *See, e.g.*, Vazquez Decl. ¶¶6-8.

**Quasi-Sovereign Injury.** The States also have a quasi-sovereign interest in protecting businesses and employees in the States that might wish to contract with the federal government or might be otherwise impacted by the Rule. *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607-08 (1982) (States have "quasi-sovereign interest[s] in the health and well-being—both physical and economic—of [their]

---

[2]  The evidence cited in DOL's analysis supports the view that disemployment will result from the Rule, although DOL unpersuasively attempts to discount or refute this evidence, concluding that disemployment overall will be "small." For example, DOL's analysis cites a single 2019 paper studying international effects for the weak proposition that "[t]he consensus among a substantial body of research is that disemployment effects *can be small* or non-existent." 86 Fed. Reg. 67,211 (emphasis added). However, even this weak claim is not supported by the remainder of the economic literature cited in the section, including a 2021 paper from economists David Neumark and Peter Shirley, which reviewed 30 years of literature on the minimum wage and concluded that most of the studies showed that an increase would have disemployment effects, as well as a 2021 CBO study forecasting 1.4 million job losses from a nationwide $15 minimum wage. *Id.* at 67,212 (citing David Neumark & Peter Shirley, *Myth or Measurement: What Does the New Minimum Wage Research Say About Minimum Wages and Job Loss in the United States?* NBER Working Paper No. w28388 (Jan 27, 2021), https://bit.ly/3KS8ODt.

Furthermore, even the papers favored by DOL admit that there are limits to how high a minimum wage can go before disemployment would result, and nothing in DOL's analysis even considers where that line might be. *See, e.g.*, Alan Manning, *The Elusive Employment Effect of the Minimum Wage*, 35 J. Econ. Perspectives 1, 22-23 (2021). Ultimately, regardless of whether the disemployment effects are "small" or large, or offset by other benefits for workers, DOL's analysis expressly admits that these effects exist in some markets, which is sufficient for standing purposes.

residents in general."). State businesses face the same impacts inflicted on State government contractors. And with respect to employees, as stated above, the Rule expressly admits that the minimum wage may cause unemployment, because as minimum wages rise, economic theory often predicts that unemployment will result. The States have an interest in protecting their residents from these risks. *See Kentucky*, 23 F.4th at 601 (holding that "the states likely have a quasi-sovereign interest in defending their economies from the alleged negative ramifications of the contractor mandate").

***Sovereign Injury.*** Finally, the States have significant sovereign interests imperiled by the Rule. As of 2022, the minimum wages of Arizona, Nebraska, Idaho and Indiana are $12.80, $9.00, $7.25, and $7.25/hour, respectively, while South Carolina does not have a minimum wage. The Rule displaces and preempts these minimums for many employers. Furthermore, Arizona, Idaho, Indiana, and Nebraska, all permit employers to take a tip credit (of up to $3.00/hour, $3.90/hour, $5.12/hour, and $6.87, respectively). The Mandate ultimately displaces all of these laws for a substantial portion of the economy. *See Kentucky*, 23 F.4th at 599 ("The contractor mandate thus likely implicates states' power to make and enforce policies and regulations, as well as states' traditional prerogative to superintend their citizens' health and safety.").

The Rule also interferes with the States' relationships with their own employees, which the Supreme Court has long recognized that this is a separate and important sovereign interest. *See, e.g.*, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 558 (1985) (Powell, J., dissenting) (collecting cases). *See also Brnovich*, 2022 WL 252396 at *12 ("Because the Contractor Mandate clearly conflicts with Arizona's laws and governance policies … the State has Article III standing to challenge its legality.").

*     *     *     *     *

Each one of these interests independently suffices for standing. Collectively, they eliminate any doubt as to the States' Article III standing here.

## II.   The Rule Violates The Procurement Act

The Procurement Act was enacted in 1949 to "provide the Federal Government with

1   an economical and efficient system for ... (1) Procuring and supplying property and
2   nonpersonal services, ... (2) using available property[,] (3) disposing of surplus
3   property[,]... [and] (4) [engaging in] records management." 40 U.S.C. §101 *et seq*. Section
4   121(a) grants the President authority to "prescribe [such] policies and directives that the
5   President considers necessary to carry out" the Procurement Act. *Id.* at §121(a). Any
6   policies under this section must, however, "be consistent with" the Act. *Id*.

7       Because the Rule violates the Procurement Act, the States are likely to prevail on
8   their challenge to it.

9   **A. The Procurement Act Must Be Construed Narrowly Under Constitutional**
    **Avoidance And Major Question Doctrine**
10

11      In evaluating whether the Rule and EO are consistent with the Procurement Act, it
12  is crucial to consider the scope of agency authority through the lens of the major questions
13  doctrine and the principle of constitutional avoidance. These concepts both significantly
14  constrain Defendants' authority under the Procurement Act.

15      Under the major questions doctrine, the Supreme Court has repeatedly required that
16  Congress "speak clearly when authorizing an agency to exercise powers of 'vast economic
17  and political significance.'" *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489
18  (2021) (quoting *Utility Air Regulatory Group v. EPA,* 573 U.S. 302, 324 (2014)); *see also*
19  *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022). The Supreme Court's "precedents require
20  Congress to enact exceedingly clear language if it wishes to significantly alter the balance
21  between federal and state power and the power of the Government over private property."
22  *Alabama Realtors*, 141 S. Ct. at 2489 (citation omitted)*.* The Procurement Act has no such
23  "exceedingly clear" language.

24      The significance of this Rule is not reasonably disputable. DOL estimates transfers
25  of over $1.7 billion annually, excluding overtime payments entirely (which are likely
26  substantial). 86 Fed. Reg. at 67,194. This is in addition to the various costs occasioned by
27  the rule: familiarization costs, implementation costs, recordkeeping and compliance costs,
28  disemployment effects, and increased government expenditures. *Id.* at 67,204-11.

Furthermore, the Rule infringes on traditional state power. Wage regulation—particularly regulation of *state employee* wages—has long been a state prerogative, subject only to the federal floor in the FLSA. *See* 29 U.S.C. §218(a) (preserving State and municipal authority to impose minimum wages higher than the federal floor). And, as stated above, States have long had a sovereign interest in managing their own employees. While the federal government can intrude—in the FLSA, DBA, PCA and SCA has intruded—upon these sovereign interests, it can *only* do so with clear statutory language. Accordingly, the agency's authority to promulgate the Rule here under the Procurement Act is subject to the same clear statement standard the Court applied in *Alabama Realtors*.

In addition to the major questions doctrine, the rule must be construed to avoid constitutional concerns. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 575 (1988) (A court must "construe [a] statute to avoid [serious constitutional] problems unless such construction is plainly contrary to the intent of Congress."). Under the Constitution, only Congress is vested with legislative power. "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529-30 (1935). If the Procurement Act is read to allow the President to micro-manage one fifth of the non-federal workforce, with the only limitation being that he must assert that such actions make contractors more "economical" or "efficient," this would be an unconstitutional non-delegation, because the power would lack an "intelligible principle," especially given the scope of the power conferred. *See Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021).

Courts applying these principles to the Procurement Act have repeatedly adopted narrow interpretations of the statute due to constitutional avoidance principles. Most prominently, the D.C. Circuit analyzed non-delegation concerns at length in construing the Procurement Act, explaining that it was important that the Act was not understood to "write a blank check for the President to fill in at his will." *AFL-CIO v. Kahn*, 618 F.2d 784, 793 (D.C. Cir. 1979) (en banc); *see also id.* at 811 (MacKinnon, J., dissenting) ("[A]ssuming

that Congress did indeed intend to grant the President the power to impose mandatory wage and price standards on government contractors, the terms it used to do so do not provide a constitutionally sufficient standard for delegating legislative authority."). *See also City Of Albuquerque v. U.S. Dep't Of Interior*, 379 F.3d 901, 914 (10th Cir. 2004) ("We think Executive Order 12,072's directions concerning the consideration of locations within the central business area are sufficiently related to the Act to be a valid exercise of the Act's delegated authority.").

In the context of the contractor vaccine mandate, the Sixth Circuit reasoned expressly that accepting the very same expansive interpretation would grant the President *carte blanche* to regulate federal contractors however he wished, which "certainly [] present[ed] non-delegation concerns." *Kentucky*, 23 F.4th 585, 607 n.14. In the same context, this Court raised the same concerns, observing that the government's "broad view of the President's authority under §121(a) raises serious constitutional questions [under non-delegation doctrine]." *Brnovich*, 2022 WL 252396 at *19-*20.

Accordingly, both the major questions and the constitutional avoidance doctrines require this Court to construe the Procurement Act narrowly.

### B. The Rule Exceeds The Scope Of The Procurement Act

In contrast, the Rule's avowed purpose is to extend "broadly." 86 Fed. Reg. 67,133. The Rule's definition of "contract" exemplifies this, reaching "*all* contracts and *any* subcontracts of *any* tier … including *any* procurement actions, lease agreements, cooperative agreements, provider agreements, intergovernmental service agreements, service agreements, licenses, permits, or *any other type* of agreement." 29 C.F.R. §23.20 (emphasis added). It further is not limited to contracts "that may be covered under any Federal procurement statute." *Id.* The Rule further explains explicitly that it applies to "procurement contract[s] ... covered by the Davis-Bacon Act," "contract[s] for services covered by the Service Contract Act," "contract[s] for concessions" and contracts "entered into with the Federal Government in connection with Federal property or lands and related to offering services." *Id.* §23.30(a)(1).

It also covers workers broadly, to include "any person engaged in performing work on or in connection with" a covered contract. *Id*. §23.20. This includes all workers who work at least 20% of their work hours in a given workweek on or in connection with a covered contract. *Id.* §23.40(f). The Rule also covers subcontractors. *Id.* §23.210. This means the Rule covers, for example, outdoor recreational businesses that only pay the government for the right to operate in national parks, and do not provide *any* goods or services to the government. It also reaches employees who effectively are not working on government contracts, but are merely working a small percentage of their time "in connection" with such contracts.

By its plain text, the Procurement Act does not authorize such sweeping assertions of authority. Section 121(a) is clear that the President may only promulgate such policies and directives as "necessary to carry out" the Act and that his directives must be "consistent with" the Act. In turn, the purpose of the Act is to "provide the Federal Government with an economical and efficient system" for the following "activities:" (1) procuring and supplying property and nonpersonal services; (2) using available property; (3) disposing of surplus property; and (4) records management. 40 U.S.C. §101 *et seq.*

Each of these terms has a specific, defined meaning. For example, the definition of "Nonpersonal services" means "contractual services … other than personal and professional services." 40 U.S.C. §102(8). And the definition of "property" expressly excludes "land reserved or dedicated for national forest or national park purposes" and property in "the public domain." 40 U.S.C. §102(9)(A)(i)-(ii). Similarly, although "procurement" is not defined in the Act, it also has a well-settled meaning. The Sixth Circuit in *Kentucky* defined "procure" as "to bring into possession, to acquire; gain; get; to obtain by any means, as by purchase or loan." *Kentucky*, 23 F.4th at 604 (quoting *Webster's New International Dictionary* 1974 (2d ed. 1959) (cleaned up)).

Subcontractors are also not mentioned in the statutory text, and at least one court has concluded that subcontractors have "no direct connection to federal procurement." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). The Fourth Circuit

13

rejected the government's argument that the Procurement Act conferred on the President the authority to impose affirmative action mandates on subcontractors, holding "that application of the Executive Order to plaintiffs is not reasonably within the contemplation of any statutory grant of authority." *Liberty Mut. Ins. Co.*, 639 F.2d at 168.

These limitations on the President's Procurement Act authority are all consistent with the history and purpose of the Act. Enacted shortly after the end of World War II, the Procurement Act was in response to a recommendation from the Hoover Commission that the government "streamline and modernize its procurement and property management process." *Brnovich*, 2022 WL 252396 at *16 (citing *Kahn*, 618 F.2d at 787-88). During the war, a lack of centralization had led to duplicative contracts and great inefficiencies. *Kentucky*, 23 F. 4th at 606 (citation omitted)). The law was intended to "centralize" and introduce flexibility into government contracting to fix these problems, not to provide the President with an "open-ended" grant of authority to reshape a large portion of the national economy however he saw fit. *Kahn*, 618 F.2d at 787-88.

Altogether, this language and this history indicate that the broad scope of the Rule exceeds the authority conferred in the Procurement Act. Whatever policies and directives the President can promulgate to effectuate the creation of the efficient procurement system, there is no way these directives can reach employees, contracts and subcontracts that are not involved in the *government's acquisition* of goods or services. In particular, contracts in which the only thing the government acquires is a *check*—like contracts for outdoors recreation on federal lands, where the licensee is only paying royalties for the privilege— cannot possibly relate to this "system" for *procurement*. Nor can these outdoors recreational contracts fit into the language dealing with property management, since the definition of "property" expressly excludes federal lands. 40 U.S.C. §102(9)(A)(i)-(ii). Similarly, employees that don't work on procurement contracts and subcontractors cannot be shoehorned in the statutory scope; governing such employees has nothing to do with providing "the Federal government" with efficient and centralized contracting, and a mere attenuated relationship to such efficiency is not sufficient.

The Procurement Act allows for the creation of a "system" to centralize and create efficiencies in government procurement of goods and services. However, since Defendants are attempting to use this authority to end-run Congress and repair social ills, they are stretching the scope of this authority far beyond what is "necessary" to accomplish these goals. 40 U.S.C. §121(a).

### C. The Rule Lacks The Requisite "Close Nexus" To An Efficient and Economical System Of Procurement

Even for the parts of the Rule fitting within the proper scope of the Procurement Act—*i.e.*, regulating *actual procurement* of goods and services and not mere payments—imposition of a minimum wage on such contracts exceeds the President's statutory authority. The Supreme Court's test for whether regulations are permissible under the Procurement Act is whether there is a "nexus" with "some delegation of the requisite legislative authority by Congress ... reasonably within the contemplation of that grant of authority." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 306 (1979). The Court went on to explain that for there to be a valid "grant of legislative authority to a federal agency" to promulgate regulations, "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* at 308. This limitation stems from the statutory terms; the Act limits the President to taking actions he "considers necessary" for "economical and efficient" "[p]rocuring and supplying property." 40 U.S.C. §§101(1); 121(a). Ultimately, only programs which have the "likely direct and immediate effect of *holding down* the Government's procurement costs" have such a nexus. *Kahn*, 618 F.2d at 793 (emphasis added). This narrow reading is further compelled by the constitutional and major-questions concerns discussed above. *Supra* §II.A.1.

Here, there is no reason to believe that an enormous increase in the contractor minimum wage will have the "direct and immediate effect of *holding down* the Government's procurement costs." *Kahn*, 618 F.2d at 792 (emphasis added). Indeed, it would be astonishing if *increasing* the labor costs for all government contractors could have any effect other than *increasing* the federal government's acquisition costs. Higher

labor costs for contractors will of course lead to *higher* government expenditures. DOL's own Regulatory Impact Analysis acknowledges as much: "contractors [could] pass along part or all of the increased cost to the government in the form of higher contract prices" *increasing* government expenditures. 86 Fed. Reg. at 67,206. And DOL's own estimates anticipate at least $1.7 billion in annual costs to contractors (excluding additional overtime costs) along with millions of dollars in annualized compliance costs. *Id.* at 67,206-09. Nothing in DOL's analysis even attempts to show that these costs will not almost entirely be passed on to the government. The effect will thus be *increasing*—not "holding down"—contracting costs, contravening the entire purpose of the Procurement Act.

The Department hopes—with unmistakable ideological blinders—that these costs and transfers will, in the long run, be "mitigated or offset by efficiency gains and other benefits." *Id.* at 67,171. Specifically, DOL cites "improved government services, increased morale and productivity, reduced turnover, reduced absenteeism, increased equity, and reduced poverty and income inequality for Federal contract workers" as benefits to the Rule. *Id.* at 67,212. Many of these benefits are utterly unconnected to the goal of holding down government procurement costs, thereby lacking any conceivable nexus.

Even for those wish-casted benefits that are potentially relevant, DOL declined to estimate or demonstrate the existence of any of these benefits, citing a lack of quality data. Instead, the "evidence" that DOL relied upon as supporting its claimed benefits was demonstrably inapposite: DOL relied on literature (1) addressing *voluntary* wage increases made by firms, (2) with no direct connection to the $15/hour actual wage being imposed, (3) outside the context of government contracting, and (4) heavily in the restaurant context. *Id.* ("Department notes that the literature cited in this section does not directly consider a change in the minimum wage equivalent to this final rulemaking (e.g., for non-tipped workers from $10.60 to $15."). Additionally, much of the literature is based on *voluntary* changes made by firms, where the business itself expects resulting efficiency gains.

Importantly, to the extent these benefits *would* decrease costs and create savings for firms, DOL nowhere even attempts to explain why firms have failed to take up these

benefits themselves. Indeed, this rationale reflects Defendants' enormous economic arrogance: businesses are supposedly pervasively failing to pay wages that would result in higher efficiency (and thus higher profits) *for those businesses*, but the federal government will save the businesses from their own economic ignorance by imposing putatively more efficient wages that only the federal government knows are efficiency-maximizing (which amazingly just happen to be the same for every business in the United States, no matter what their economic circumstances or local conditions are). These highly speculative and counter-intuitive claims do not satisfy the APA—or even the laugh test.

But even if these utterly unsupported benefits exist, they cannot form the basis of the "close nexus" required. *Kahn*, 618 F.2d at 792-93. These benefits are simply too attenuated from actual government procurement costs, and permitting them to suffice would allow the Executive Branch to exploit the Procurement Act to advance nearly any domestic policy priority it wished over much of the national economy. For example, nothing would prevent the government from making the same arguments to assert that the Procurement Act permits a mandatory paid leave system, employer drug testing, racial diversity quotas, or anything else which the President could argue would increase the efficiency of the businesses that contract with the government.

The D.C. Circuit's decision in *Khan* itself illustrates acute awareness of this manifest danger. There, the President issued an order establishing wage and price controls, requiring that contractors that were at a certain threshold certify they were not imposing price and wage increases of more than 0.5% and 7%, respectively. *Id.* at 786. Although the D.C. Circuit noted the possibility that contracts would not be awarded to low bidders, the Court concluded that the "direct and immediate effect" of price *ceilings* would be that government acquisition costs would *decrease*. *Id.* at 792 (emphasis added). Considering the issue *de novo* and without deference, the D.C. Circuit simply considered what the "direct and immediate" impact would be. *Id.* Applying that same "direct and immediate" standard here, there is no question that the direct and immediate effect of a rule which commands *higher* wage costs would be to increase the government's acquisition costs.

The *Kahn* court went on to explain the narrowness of its holding: *i.e.*, a rule that was clearly structured to *reduce* acquisition costs was permissible. The court emphasized "the importance … of the nexus between the wage and price standards and *likely savings* to the Government. As is clear from the terms and history of the [Procurement Act] and from experience with its implementation, our decision today does not write a blank check for the President to fill in at his will." *Id.* at 793 (emphasis added). *See also id.* at 797 (explaining that opinion was "narrow" and was predicated on the "close nexus" between the rule and the goal of the Procurement Act "to secure economy and efficiency in federal procurement") (Tamm J., concurring); *cf. id.* at 797 (MacKinnon, J. dissenting) (no statutory authority for order; statute would have nondelegation problem otherwise).

The Fourth Circuit adopted the same "close nexus" requirement in *Liberty Mutual Insurance Co. v. Friedman*, which rejected the applicability of affirmative action requirements to workers compensation subcontractors. 639 F.2d at 170-71. That court in *Liberty Mutual*, like the D.C. Circuit in *Khan*, refused to permit the government's say-so to establish the requisite close nexus; instead, without substantial factual findings showing a "demonstrable relationship" between affirmative action and cost reduction, the Fourth Circuit held that any increase in the cost of federal contracts that could be attributed to postulated discrimination by insurers was "simply too attenuated" to suffice. *Id.* at 171.

The vaccine mandate cases further demonstrate that attenuated, speculative benefits cannot constitute the requisite close nexus to economy and efficiency. In those cases, the government argued that a requirement that contractor employees be vaccinated against COVID-19 would "decrease worker absence, save labor costs on net, and thereby improve efficiency in federal contracting." *Brnovich*, 2022 WL 252396 at *17. Courts have almost uniformly rejected these justifications because of the lack of a strong connection to *procurement*. *See, e.g.*, *Kentucky*, 23 F.4th at 608 (concluding that goal of "reducing absenteeism" could not justify vaccine mandate under procurement authority); *Brnovich*, 2022 WL 252396 at *17 (concluding that "policies promulgated under the Procurement Act must relate—more than incidentally—to *procurement*."); *Georgia*, 2021 WL 5779939,

at *10 (holding that vaccine mandate not "reasonably related" to the purposes of the Procurement Act). But if anything, a vaccine mandate has a stronger nexus to procurement efficiency than the increased minimum wage, since a vaccine mandate might have done what it was advertised to do—decrease illness and absenteeism—and thereby might possibly have *decreased* procurement costs. In contrast, the wage hike mandated by the Rule, in doing what it is designed to do, is sure to *increase* government costs, squarely contravening the efficiency-increasing purpose of the Procurement Act.

The government's cost-reduction rationale here is both counter-intuitive and pretextual makeweight. It even contravenes Defendants' own evidence. In the Rule, DOL actually forecasts billions of dollars of transfers from employers to employees and acknowledges they cannot even attempt to forecast any corresponding offsets because of the uncertainty. The transfers to employees—which don't even include overtime costs, which DOL did not even *attempt* to quantify or estimate—are based on solid empirical data, and they effectively demonstrate (if underestimate) the billions of dollars in increased labor costs that contractors will face as a result of the Rule. But by contrast, the supposed offsetting benefits that are necessary to tie the Rule to efficient and economical procurement are based on little more than speculation and "just following orders" buck-passing. That does not suffice under the Procurement Act (or the APA).

### D. The Rule Conflicts With Existing Statutes Concerning Federal Contractors And Minimum Wages

Even if Defendants could show a strong nexus between the Rule and efficient procurement generally, the Rule's invocation of the highly generalized Procurement Act directly conflicts with far-more specific Congressional pronouncements on contractor wages, rendering the Rule invalid.

If Congress speaks specifically to a problem, that concludes the inquiry—there is no need to investigate further about Congress's intent or agency authority: "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency,

must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842-43 (1984). This makes sense; when Congress directly speaks to an issue, there is no gap for the agency to fill under *Chevron*. In addition, "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *National R.R. Pass. Corp. v. Nat'l Ass'n of R.R. Pass.*, 414 U.S. 453, 458 (1974).

Congress has specifically determined, by multiple statutes, how much federal contractors should be paid. *See* 40 U.S.C. §3142; 41 U.S.C. §§6502(1); 6702(a). These statutes, the DBA, the PCA, SCA, speak comprehensively and specifically to the subject of minimum wages for federal contractors. In fact, when Congress passed the SCA in 1965, it did so because "the service contract is the only remaining category of Federal contracts to which no labor standards protection applies." S. Rep. No. 798, 89th Cong., 1st Sess., 3 (Oct. 1, 1965). All three of these statutes require payment of a *local* "prevailing wage," not a fixed hourly rate applicable *nationwide*. *See* 40 U.S.C. §§3142(b); 41 U.S.C. §§6502(1); 6703(1). In none of these statutes did Congress leave room for the President to meddle in these contexts freely via other, more-general authority. Each of these statutes have their own regulatory scheme, provide for the possibility of exceptions and carve outs, and are designed for their particular contexts.

It strains credulity to believe that Congress understood at the time it passed either the Procurement Act or the DBA/PCA/SCA trio of statutes that Defendants could simply fix a minimum wage nationwide for these contractors by fiat. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1226 (10th Cir. 2017) ("implausible" to believe DOI had implicit power to "create an alternative to the explicit and detailed remedial scheme" provided in statute). This is especially true since the SCA was passed in 1965, 16 years after the Procurement Act itself. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) ("[T]he implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.") (citation omitted).

DOL's response is to assert that the DBA, PCA and SCA simply provide a "floor" and the Procurement Act gives the necessary authority to go above this floor. 86 Fed. Reg. 67,129. But Congress did more than that: Congress stated unequivocally in its contractor laws that contractor wages were to be set *locally* and not nationally. The Rule flouts these unambiguous commands.

Moreover, the prevailing wage rule Congress prescribed in those statutes reflects an intent not to put undue upward pressure on local market wages. Because prevailing wages are, by definition, locality-specific and not higher than the prevailing local market wages, they should not create significant upward pressures. The Rule directly conflicts with Congress's purpose by imposing a nationwide, one-size-fits-all minimum that perpetrates the very forces that Congress intended to avoid. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996) ("The President's authority [under the Procurement Act] to pursue 'efficient and economic' procurement" does not extend to EOs that "conflict with another federal statute."). While Congress repeatedly sought to avoid mandating New York City- or San Francisco-appropriate wages in places like Boise and Lincoln, Nebraska, that crucial policy choice is unlawfully obliterated by the Rule.

## III.    The Rule Violates The APA

The States are also likely to prevail on their challenge to the Rule because it violates the APA as arbitrary-and-capricious decision-making.

### A. The Department Failed To Consider Alternatives Adequately And Failed To Supply Justifications For Its Decisions

A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). "When an agency changes its position, it must (1) display awareness that it is changing position, (2) show the new policy is permissible under the statute, (3) believe the new policy is better, and (4) provide good reasons for the new policy." *Center for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (cleaned up). Furthermore, agencies must

provide "a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* (cleaned up).

Courts should conduct a "searching and careful" analysis of the agency's decision-making process, and may not supply a reasoned basis for the agency's decision when one is not provided. *Id.* Although review of agency action is "deferential," the Court is "'not required to exhibit a naiveté from which ordinary citizens are free.'" *See Department of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted).

The EO and Rule effect major changes in position for the agency, including:

- A massive increase (nearly 50% overnight) in the applicable minimum wage from the inflation-indexed figure selected in 2014;

- A complete reversal of the 2018 Rule exempting outdoor recreation activities.

- Elimination of the prior tip credit available under all prior regulations.

No meaningful justifications are provided for these changed positions at all. In fact, with respect to these and other important issues, DOL rejected out-of-hand concerns raised by commentators, relying instead on the prescriptive nature of the EO to excuse their decision to refuse to consider any alternatives or even to provide good reasons. The Department's refusal to supply a rationale for these changes is both *explicit and intentional*:

- "Executive Order 14026 clearly does not authorize the Department to essentially nullify the policy, premise, and essential coverage protections of the order … by declining to extend the Executive order minimum wage to any worker covered by the DBA, FLSA, or SCA where such rate differs from the applicable minimum wages established under those laws." 86 Fed. Reg. at 67,129.

- "The Department notes, however, that *it does not have the discretion to deviate from the explicit terms of the Executive order*, including its gradual phase-out of the tip credit for covered workers[.]" *Id.* at 67,180 (emphasis added).

- "The Department *does not have the discretion to implement alternatives* that would violate the text of the Executive order, such as the adoption of a higher or

1    lower minimum wage rate, or continued exemption of recreational businesses."

2    *Id.* at 67,216 (emphasis added).

3    Nor does the EO provide the explanation that DOL's Rule lacks; the EO simply

4    asserts the new minimum wage, the withdrawal of the 2018 outdoors exemption, the

5    removal of the tip credit, and other changes on the basis of the bare justification that

6    "[r]aising the minimum wage enhances worker productivity and generates higher-quality

7    work by boosting workers' health, morale, and effort; reducing absenteeism and turnover;

8    and lowering supervisory and training costs." 86 Fed. Reg. at 22,835. That statement is a

9    naked *ipse* dixit, bereft of supporting reasoning. And even if this assertion were broadly

10   true, this explanation falls far short of what the APA requires. *Compare with* EO 13838;

11   83 Fed. Reg. at 48,540 (explaining why implementation of EO 13658 to outfitters and

12   guides operating on federal land would, among other things, "threaten[] to raise

13   significantly the cost…prevent[] visitors from enjoying the great beauty of America's

14   outdoors…[and] entail large negative effects"). Nor does the Department make even the

15   slightest effort to consider alternative increases in the contractor minimum wage—for

16   example to $13/hour. Moreover, if the Department truly believed that increased wages

17   would *increase* productivity and efficiency, why not raise the minimum to $20 or even

18   $25/hour? DOL does not even attempt to analyze those obvious alternatives.

19   Refusal to consider alternatives or explain decisions is *quintessential* arbitrary and

20   capricious agency action. The fact that DOL alleges it is bound by a highly prescriptive

21   and specific EO is irrelevant, as the D.C. Circuit has explained in similar circumstances:

22   "That the Secretary's regulations are based on the President's Executive Order hardly

23   seems to insulate them from judicial review under the APA, even if the validity of the

24   Order were thereby drawn into question." *Reich*, 74 F.3d at 1327. *See also Gomez v. Trump*,

25   485 F. Supp. 3d 145, 177 (D.D.C. 2020) ("APA review … is thus not precluded merely

26   because the official is carrying out an executive order."). DOL could have—and should

27   have—provided an explanation for its decisions and rejecting of alternatives. Blind

28   obedience is not a substitute for the reasoned decision-making that the APA demands.

Moreover, the Department's premise that the EO ties their hands is simply wrong—and constitutes yet another APA violation. Specifically, Section 4 of EO 14026 specifically instructs the Department to issue regulations implementing the Order only "to the extent permitted by law" and "consistent with applicable law," including "as appropriate, exclusions from the requirements of this order." 86 Fed. Reg. 22,836. Far from tying DOL's hands to violate the APA, the EO left the agency ample authority to comply with its APA obligations if it so wished. *It simply didn't.* DOL's misconception of its authority under the EO constitutes another APA violation independently requiring vacatur. *See, e.g.*, *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) ("An order may not stand if the agency has misconceived the law." (quotation marks omitted) (cleaned up)).

DOL and the EO's failure to comply with the APA and provide a reasoned explanation for their decisions alone is reason to enjoin those decisions as unlawful.

The Rule also fails to consider entirely the impacts on States and their reliance interests. Indeed, the Rule simply lumps States together with private government contractors—ignoring that States are sovereign entities, not businesses with customers to pass costs onto. The Rule will thus necessarily increase the wages for the States to pay, requiring either raising additional tax revenues or cuts to other programs. DOL's omissions violate the APA in two independent ways: *First*, the impacts to States is an "important aspect of the problem," which the Department was obliged to address, *State Farm*, 463 U.S. at 43; it violated the APA by failing to do so. *Second*, the Department ignored the States' reliance interests in the prior rule. "'When an agency changes course, as [DOL] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *National Urb. League v. Ross*, 977 F.3d 770, 778 (9th Cir. 2020) (quoting *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)) (cleaned up). Indeed, "'[i]t would be arbitrary and capricious to ignore such matters.'" *Id.* (quoting *Regents*, 140 S. Ct. at 1913). But that is precisely what the Department has done here: not only ignoring the States' reliance interests, but outright

failing to use the word "reliance" at all in the 110 pages that the Rule spans in the Federal Register.

These failures are highlighted by the Byrne and Christensen declarations, which explain how the EO's compression of wages at $15/hr has required increases in the wages of state workers who already made more than $15/hr and also increases in wages of workers making less than $15/hr who do not work on federal contracts. Byrne Decl. ¶¶8-13; Christensen Decl. ¶¶5-8. Similarly, Lori Wolff describes how the EO is contrary to the policies of the state employee compensation plan established by the Idaho Legislature. Wolff Decl. ¶¶4-11. All of these potential impacts to States and their reliance interests on the prior rule are wholly ignored, even though the Rule acknowledges these "spillover" effects: "The Department agrees that there will likely be wage increases for some workers earning above $15 per hour or working on non-covered contracts." 86 Fed. Reg. at 67,211. The Rule's failure to analyze these impacts, while simultaneously trampling upon the States' sovereign interests in determining the wages that they pay to *their own employees*, squarely violates the APA.

## B. The Department's Conclusion That The Rule Would *Increase* The Efficiency Of Governmental Contracting Is Arbitrary And Capricious

The Rule is also arbitrary and capricious because its conclusion that intentionally *increasing* the labor costs of government contractors will result in *more efficient* contracting by the federal government is arbitrary and capricious (as well as wildly counter-intuitive). That is so for largely the same reasons discussed above. *Supra* at 8 n.2, 15-19.

Importantly, DOL acknowledged that "contractors [could] pass along part or all of the increased cost to the government in the form of higher contract prices," which it estimated at $1.7 billion annually (exclusive of overtime costs). 86 Fed. Reg. at 67,206. DOL thus quite accurately anticipates that the Rule will *decrease* the efficiency of governmental contracting by increasing the federal government's costs of acquiring the same quantity of goods and services. And, as discussed above, DOL's conjuring of speculative countervailing benefits is simply unpersuasive. *Supra* at 8 n.2, 15-19.

That rationale is also transparently pretextual. Defendants are not promulgating this Rule because they believe it will *increase* efficiency of contracting—they almost certainly believe otherwise privately. But they mouth those words because their true reasoning—desired *social/equity-based* benefits—is not a valid basis for regulation under the Procurement Act. Defendants' offering of a transparently pretextual rationale does not suffice under the APA. *See New York*, 139 S. Ct. at 2573 (decision resting on a "pretextual basis" "warrant[s] a remand"). And even if accepted at face value, Defendants' rationale is unconvincing for all the reasons explained above. *Supra* at 8 n.2, 15-19.

## IV. The States Will Suffer Irreparable Harm If The Rule Is Not Enjoined

The States are likely to suffer irreparable harm in the absence of the requested preliminary injunction because they will have to undertake compliance efforts and raise wages; none of these costs can be recovered from the federal government. *See Arizona Recovery House Ass'n v. Arizona Dep't of Health Services*, 462 F. Supp. 3d 990, 997 (D. Ariz. 2020). "[A] regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring) (emphasis in original). Such irrecoverable injuries constitute irreparable harm. *See*, *e.g.*, *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021); *San Francisco v. U.S. CIS*, 981 F.3d 742, 762 (9th Cir. 2020).

The increases in wages, as well, are likely to be permanent once imposed. *See, e.g.*, Renee Haltom, *Sticky Wages*, Econ Focus (2013) (explaining "downward wage rigidity" meaning wages are especially unlikely to ever fall once raised), *available at* https://bit.ly/3jLe7Zi. Without an injunction, state agencies will be forced to choose between raising wages likely permanently, or forfeiting contracts. Neither of these decisions can be undone in the future.

The minimum wage mandate will also cause substantial harm to the States' economies because of businesses that will be forced to push up their labor costs, or give up lucrative government contracts or access to public lands. And as discussed above, the Rule is likely to lead to at least some disemployment effects, which will impact the States' public

fiscs, both through tax revenue and through unemployment payments.

Finally, the States sovereign injuries are by definition irreparable. All states "have an interest, as sovereigns, in exercising the power to create and enforce a legal code." *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (quotation marks omitted). And "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). By interfering with the States' relationships with their employees, and their ability to enforce their own, lower, minimum wages, the States suffer such sovereign injuries.

## V.     The Remaining Requirements For Injunctive Relief Are Satisfied Here

The third and fourth *Winter* factors, "the balance of the equities and public interest factors merge" because "the Government is a party." *Doe #1 v. Trump*, 984 F.3d 848, 861-62 (9th Cir. 2020) (cleaned up) (citation omitted). Enjoining the Rule will not cause cognizable harm to anyone; the Congressionally mandated minimum wages under the FLSA, DBA, PCA and SCA will remain in effect. Furthermore, for the same reasons, an injunction serves the public interest. The public is entitled to be able to contract with the government free from illegal restraints such as the Rule. Moreover, since the Rule is likely to increase government expenditures, enjoining the Rule will likely lead to meaningful *savings* to the federal government in the meantime. More fundamentally, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends," and an injunction is therefore in the public interest. *Alabama Realtors*, 141 S. Ct. at 2490.

An injunction is also in the public interest because (1) the Rule itself acknowledges that it will likely cause unemployment, *supra* at 7-8, and (2) the upward wage pressures created by the Rule are likely to contribute to inflation at a time when the U.S. is already experiencing inflation at unprecedented levels unseen in a *generation*. Preventing unemployment and exacerbation of rampant inflation is plainly in the public interest.

## CONCLUSION

The Rule exceeds Defendants' regulatory authority and will result in massive costs and expenditures if not enjoined. This Court should enjoin the Rule pending final judgment.

1    RESPECTFULLY SUBMITTED this 18th day of April, 2022.

2

3                                     **MARK BRNOVICH**
                                      **ATTORNEY GENERAL**

4                                     By s/ Drew C. Ensign
                                          Joseph A. Kanefield (No. 15838)
5                                         Brunn W. Roysden III (No. 28698)
                                          Drew C. Ensign (No. 25463)
6                                         Robert J. Makar (No. 33579)
                                          Office of the Arizona Attorney General
7                                         2005 N. Central Ave
                                          Phoenix, AZ 85004-1592
8                                         Phone: (602) 542-5025
                                          Joseph.Kanefield@azag.gov
9                                         Beau.Roysden@azag.gov
                                          Drew.Ensign@azag.gov
10                                        Robert.Makar@azag.gov

11                                    *Attorneys for Plaintiffs the State of Arizona and*
                                      *Mark Brnovich, Arizona Attorney General*
12

13                                    By s/ Brian Kane
                                          Brian Kane*
14                                        Chief Deputy Attorney General
                                          Office of the Idaho Attorney General
15                                        700 W. Jefferson Street, Ste. 210
                                          P.O. Box 83720
16                                        Boise, ID 83720
                                          Telephone: (208) 334-2400
17                                        Email: Brian.Kane@ag.idaho.gov

18                                    *Attorney for Plaintiff State of Idaho*

19

20                                    By s/ Thomas M. Fisher
                                          Thomas M. Fisher*
21                                        Solicitor General
                                          Office of the Indiana Attorney General
22                                        IGC-South, Fifth Floor
                                          302 West Washington Street
23                                        Indianapolis, IN 46204-2770
                                          Telephone: (317) 232-6255
24                                        Email: Tom.Fisher@atg.in.gov

25                                    *Attorney for Plaintiff State of Indiana*

26

27

28

                                          28

1

2                                    By s/ James A. Campbell
                                         James A. Campbell (No. 26737)
3                                        Solicitor General
                                         Office of the Nebraska Attorney General
4                                        2115 State Capitol
                                         Lincoln, NE 68509
5                                        Phone: (402) 471-2682
                                         Email: Jim.Campbell@nebraska.gov

6                                    *Attorney for Plaintiff State of Nebraska*

7                                    By s/ Thomas T. Hydrick
                                         Thomas T. Hydrick*
8                                        Assistant Deputy Solicitor General
                                         Office of the South Carolina Attorney
9                                        General
                                         Post Office Box 11549
10                                       Columbia, SC 29211
                                         Phone: (803) 734-4127
11                                       Email: thomashydrick@scag.gov

12                                   *Attorney for Plaintiff State of South Carolina*

       * admitted pro hac vice
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of April, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for parties that are registered CM/ECF users will be served by the CM/ECF system pursuant to the notice of electronic filing.

 s/ Drew C. Ensign
*Attorney for the State of Arizona*