ADITYA DYNAR,
AZ Bar No. 031583
*Counsel of Record*
Pacific Legal Foundation
3100 Clarendon Blvd
Arlington, VA 22201
(202)888-6881
ADynar@pacificlegal.org

MICHAEL POON*
CA Bar No. 320156
Pacific Legal Foundation
555 Capitol Mall, Ste 1290
Sacramento, CA 95814
(916) 419-7111
MPoon@pacificlegal.org

* *Pro Hac Vice*

*Attorneys for Amici Curiae Pacific Legal Foundation, Arkansas Valley Adventure, LLC, and Colorado River Outfitters Association*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ARIZONA, *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>MARTIN J. WALSH, *et al.*,<br><br>       Defendants. | CASE NO. 2:22-cv-00213-JJT<br><br>**BRIEF OF AMICI CURIAE PACIFIC LEGAL FOUNDATION, ARKANSAS VALLEY ADVENTURE, LLC, AND COLORADO RIVER OUTFITTERS ASSOCIATION IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. i
TABLE OF AUTHORITIES ...................................................................................... ii
LEGAL AND FACTUAL BACKGROUND............................................................. 1
AMICI'S INTEREST .................................................................................................. 3
ARGUMENT............................................................................................................... 4
    A. The Procurement Act Does Not Allow the President to Set
       Wage Rules........................................................................................................ 5
    B. The Rule Does Not Implement an Economical and Efficient
       System for Procurement ................................................................................... 8
    C. The Constitutional-Doubt Canon Requires a Narrow
       Construction of the Procurement Act.............................................................. 9
    D. The Rule Harms Businesses, Their Employees, and Their
       Customers ........................................................................................................ 10
CONCLUSION.......................................................................................................... 12
CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AFL-CIO v. Kahn*,
  618 F.2d 784 (D.C. Cir. 1979) ................................................................... 8, 9, 10

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
  141 S. Ct. 2485 (2021) ................................................................................ 12, 13

*Bradford v. U.S. Dep't of Labor*,
  No. 21-cv-3283, Docket No. 31, 2022 WL 204600 (D. Colo. Jan. 24, 2022) ....................................................................................................... 4

*Bradford v. U.S. Dep't of Labor*,
  No. 22-1023, Doc. No. 10110656538 (10th Cir. Feb. 17, 2022) ............... *passim*

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ............................................................................. 9

*Christian Legal Soc'y v. Martinez*,
  561 U.S. 661 (2010) .......................................................................................... 7

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*,
  485 U.S. 568 (1988) .......................................................................................... 9

*Gundy v. United States*,
  139 S. Ct. 2116 (2019) ...................................................................................... 4

*Kentucky v. Biden*,
  No. 21-cv-55, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) ........................... 10

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ...................................................................................... 4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................ 3

*Nat'l Restaurant Ass'n v. Dep't of Labor*,
  138 S. Ct. 2697 (2018) ...................................................................................... 4

*Noel v. N.Y.C. Taxi & Limousine Comm'n*,
    687 F.3d 63 (2d Cir. 2012) .................................................................................. 7

*Tiger Lily, LLC v. HUD*,
    5 F.4th 666 (6th Cir. 2021) ................................................................................. 9

**Statutes**

16 U.S.C. § 1853 ........................................................................................................ 8

33 U.S.C. § 1342 ........................................................................................................ 8

40 U.S.C. § 101 ............................................................................................... 1, 6, 8

40 U.S.C. § 101(1) ................................................................................................ 6, 7

40 U.S.C. § 121(a) ........................................................................................... 1, 6, 8

**Regulations**

49 C.F.R. § 365.101 ................................................................................................... 8

77 Fed. Reg. 60,029 ................................................................................................... 5

79 Fed. Reg. 20,749 ................................................................................................... 5

79 Fed. Reg. 60,634 ................................................................................................... 2

79 Fed. Reg. 9851 ...................................................................................................... 2

83 Fed. Reg. 25,341 ............................................................................................... 2, 3

83 Fed. Reg. 48,537 ................................................................................................... 2

86 Fed. Reg. 22,835 ................................................................................................... 3

86 Fed. Reg. 22,835 ................................................................................................... 9

86 Fed. Reg. 22,837 § 8(a)(i)(D) .............................................................................. 5

86 Fed. Reg. 67,126 ............................................................................................... 3, 5

86 Fed. Reg. 67,134 ................................................................................................... 4

86 Fed. Reg. 67,147 ................................................................................................... 6

86 Fed. Reg. 67,148 .................................................................................................... 6

86 Fed. Reg. 67,194 .................................................................................................. 10

86 Fed. Reg. 67,195 .................................................................................................. 10

86 Fed. Reg. 67,196 .................................................................................................. 10

86 Fed. Reg. 67,206 .................................................................................................... 3

86 Fed. Reg. 67,208 .................................................................................................. 11

86 Fed. Reg. 67,211 .................................................................................................. 11

In issuing Executive Order 14026 (President Biden's EO) and its implementing regulation, the Executive Branch lays claim to power over vast portions of the national economy—extending even to businesses like *amicus curiae* Arkansas Valley Adventure who simply hold permits to use federal lands.[1] As Plaintiffs argue, applying the executive order to permittees far exceeds the Executive's statutory powers over federal contractors and wrongfully usurps Congress's authority to decide major policy questions. Docket No. 21, at 11–13 ("Mot."). *Amici* have litigated the applicability of the wage rule and its application to permittees. *See Bradford v. U.S. Dep't of Labor*, No. 22-1023, Doc. No. 10110656538 (10th Cir. Feb. 17, 2022) (holding that *Amici* are likely to succeed on the merits of their claims and enjoining the wage rule as to seasonal recreational companies operating on federal lands). *Amici* submit this brief to explain the rule's significant overreach and to support Plaintiffs' request for injunctive relief. *Amici* also explain the economic stakes—the wage rule will harm both businesses *and* their employees because it is a blunt effort to force an economic policy that harms the diverse entities that it affects.

## LEGAL AND FACTUAL BACKGROUND

### The Procurement Act

The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to," 40 U.S.C. § 121(a), provide "the Federal Government with an economical and efficient system" to conduct four activities: "(1) Procuring and supplying property and nonpersonal services," "(2) Using available property," "(3) Disposing of surplus property," and "(4) Records management," *id.* § 101. The President usually exercises these powers by issuing executive orders, which, in turn, direct agencies to enact rules. Typically, these rules

---

[1] No party's counsel authored this brief in whole or in part, and no party or party's counsel made a monetary contribution to fund the preparation or submission of this brief. No person or entity other than amicus curiae or their counsel made a monetary contribution to the preparation or submission of this brief.

effect procurement policy by targeting businesses that sell the government goods or services.

### *The Executive Orders*

Executive Order ("EO") 14026 replaced two previous executive orders: President Obama's EO 13658 and President Trump's EO 13838. All three orders had directed the U.S. Department of Labor's Wage & Hour Division to issue implementing rules.

**President Obama's Executive Order:** EO 13658, issued by President Obama, imposed a minimum wage of $10.10/hour, plus annual increases, for all entities that are party to "contracts, contract-like instruments, and solicitations" with the federal government. 79 Fed. Reg. 9851 (Feb. 12, 2014); 79 Fed. Reg. 60,634 (Oct. 7, 2014) (final rule implementing the order). And covered entities were required in turn to require subcontractors (and *their* subcontractors, etc.) to pay the EO 13658 minimum wage.

The deliberate breadth of President Obama's wage rule had significant consequences for businesses that could hardly be thought of as "federal contractors." Indeed, companies like *Amici* Arkansas Valley Adventure and the members of the Colorado River Outfitters Association, who did no more than use federal lands to provide recreational opportunities to the public, appeared to fall under the rule's directives.

After intense lobbying efforts from the affected industry, and objections from Members of Congress, the agency delayed enforcement and implementation for many companies that held special use permits for federal lands.

**President Trump's Executive Order:** In 2018, President Trump issued EO 13838 to cut back the wage rule's broad scope. 83 Fed. Reg. 25,341 (May 25, 2018); 83 Fed. Reg. 48,537 (Sept. 26, 2018) (final rule implementing the order). The executive order recognized that seasonal recreational companies' business models and wage structures would cause the wage increase to be economically

infeasible, raise costs for the public, and suppress the hours that employers can offer to workers. Concluding therefore that the application of the Obama order to such businesses is not "economical and efficient," the Trump order exempted from the Obama order "contracts or contract-like instruments entered into with the Federal Government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on Federal lands." 83 Fed. Reg. at 25,341. Like its predecessor, the Trump order also resulted in an updated rule from DOL.

**President Biden's Executive Order:** Thereafter, President Biden issued EO 14026. 86 Fed. Reg. 22,835 (Apr. 27, 2021); 86 Fed. Reg. 67,126 (Nov. 24, 2021) (final rule implementing the order). The order and subsequent rule raised the minimum wage to $15/hour plus overtime and annual increases for firms that seek or possess federal contracts, as well as companies operating on federal land pursuant to "contract-like instruments," including permits. The order also specifically revoked the exemption for seasonal recreational businesses created by the Trump order. In the implementing regulation, DOL bluntly acknowledged that the rule was designed to apply to businesses that were not traditionally understood to be federal contractors, and specifically had eliminated any exemptions for "non-procurement" contractors. 86 Fed. Reg. at 67,206.[2]

**AMICI'S INTEREST**

Pacific Legal Foundation is a nonprofit, tax-exempt California corporation organized to litigate matters affecting the public interest in individual liberty, property rights, and the separation of powers. Founded over 45 years ago, PLF is the most experienced legal organization of its kind and routinely participates as *amicus*

---

[2] As Plaintiffs argue, the Biden order (EO 14026) and its implementing final rule completely failed to explain the Executive's decision to reverse the exemption for recreational businesses operating on federal lands, in violation of the Administrative Procedure Act. Mot. at 22–23; *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48, 50 (1983).

3

*curiae* in important cases concerning constitutional limits on the Executive Branch. *See, e.g., Gundy v. United States*, 139 S. Ct. 2116 (2019) (No. 17-6086), 2018 WL 2684377; *Lucia v. SEC*, 138 S. Ct. 2044 (2018) (No. 17-130), 2018 WL 1156621; *Nat'l Restaurant Ass'n v. Dep't of Labor*, 138 S. Ct. 2697 (2018) (No. 16-920), 2017 WL 727982.

Arkansas Valley Adventure, LLC ("AVA") is a small business that offers river-rafting and other recreational services to the public at an accessible price. AVA is not a federal contractor, but it holds special use permits that allow it to operate in certain federal lands in Colorado. Because the government considers the permit a "contract-like instrument" relating to federal land for the purpose of offerings services to the public, 86 Fed. Reg. at 67,134, DOL's wage rule applies against AVA.

Colorado River Outfitters Association ("CROA") is an industry association that represents up to 50 river outfitters, including AVA. Most CROA members possess federal permits that allow them and their clients to access federal lands, also subjecting them to the wage rule.

AVA and CROA, represented by PLF, have challenged the executive order's applicability to recreational businesses operating on federal lands pursuant to federal permits. *See Bradford v. U.S. Dep't of Labor*, No. 21-cv-3283, Docket No. 31, 2022 WL 204600 (D. Colo. Jan. 24, 2022) (denying plaintiffs' motion for preliminary injunction); *Bradford v. U.S. Dep't of Labor*, No. 22-1023, Doc. 010110646538 (10th Cir. Feb. 17, 2022) (granting plaintiffs' motion for an injunction pending appeal).

## ARGUMENT

The challenged wage rule is premised on an interpretation of the Procurement Act that empowers the President to directly and unilaterally manage the affairs of *every* business that holds a federal permit. If the rule is allowed to stand, the President will be empowered to control enormous portions of the economy—from

trucking to aviation, finance to fishing. But the Procurement Act is not so capacious. And the President cannot settle major policy questions without clear congressional direction. The Biden order and its implementing rule embody a policy choice that was reserved for Congress.[3] Moreover, as AVA's and CROA's experiences demonstrate, this policy choice has profoundly negative consequences for businesses and their employees across the country. As a result, the Court should conclude, in line with the Tenth Circuit, that Plaintiffs are likely to succeed on the merits, and the Court should issue the requested preliminary injunction. *Bradford*, No. 22-1023, Doc. No. 10110656538, at 2 (determining that *Amici* had demonstrated a "clear and unequivocal" right to relief).

### A. The Procurement Act Does Not Allow the President to Set Wage Rules

Executive orders issued under the Procurement Act have historically targeted federal contractors—businesses that sell the government goods or services. *See, e.g.*, *Non-Retaliation for Disclosure of Compensation Information*, 79 Fed. Reg. 20,749 (Apr. 8, 2014); *Strengthening Protections Against Trafficking in Persons in Federal Contracts*, 77 Fed. Reg. 60,029 (Sept. 25, 2012). That is the expected use of the Act.

But the Biden order, like the Obama order, directs DOL to impose wage controls not only on those who seek or possess a federal contract but also those who seek or possess a "contract-like instrument," specifically a "contract-like instrument entered into with the Federal Government in connection with Federal property or lands and relating to offering services for . . . the general public." 86 Fed. Reg. at 22,837 § 8(a)(i)(D). According to the implementing rule, "contract-like instruments" includes federal permits. 86 Fed. Reg. 67,126, 67,134 (Nov. 24, 2021) (final rule).

---

[3] The Executive's claimed power exceeds statutory authority in two ways. First, the Executive Branch's power is limited in the types of measures it can impose. Second, it can impose those measures only against specific types of entities. Because *Amici*'s situation particularly reveals the latter, *Amici* focus on the latter only and do not repeat Plaintiffs' arguments for the former.

Thus, the rule's provisions apply against businesses like AVA, CROA members, and other businesses who offer recreational services to the public on federal lands, pursuant to use permits issued by the Forest Service, the Bureau of Land Management, or other agencies. *Id.* at 67,147–48.

As Plaintiffs contend, extending EO 14026 to federal permittees demonstrates how the rule operates far beyond the bounds of the Procurement Act. Mot. at 11–13. The Act permits the President to issue orders, 40 U.S.C. § 121(a), that provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services . . . .

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

*Id.* § 101. For example, subsection (1) authorizes the President to regulate the government's purchase of supplies or services to maximize procurement economy and efficiency. But issuing permits to businesses like AVA does not fall within any of the categories—not even in the category of "[u]sing available property."

At first blush, providing businesses with permits to access federal lands may seem like "[u]sing available property" or "[d]isposing of surplus property." *Id.* § 101(2), (3). But the Act defines "property" to exclude federal lands. *See id.* § 102(9)(A) (excluding "land reserved or dedicated for national forest or national park purposes," "land withdrawn or reserved from the public domain," and property in the "public domain"). Consistent with that definition, the government does not rely on these "property" provisions to defend the rule. *Bradford*, No. 21-cv-3283, Docket No. 21, at 11 (D. Colo. Dec. 27, 2021).

Rather, the government believes the rule's application to non-procurement companies like AVA is authorized by 40 U.S.C. § 101(1). *Id.* That subsection, with § 121(a), authorizes the President to regulate how "the Federal Government"

6

"suppl[ies] . . . nonpersonal services." *Id.* § 101(1). But the government posits that by issuing use permits to recreational companies, the government supplies recreational services to the public. *See Bradford*, No. 21-cv-3283, Docket No. 21, at 11 (noting that the Procurement Act "empowers the Federal Government to administer a system for both procuring *and* supplying nonpersonal services" (cleaned up)). Under this reasoning, the rule allegedly serves to regulate the *government's* own provision of recreational services to the public.

But the government does not supply these recreational services; AVA, CROA members, and other private recreational businesses do. They provide services to the public on their own behalf. They advertise under their own names, are approached by consumers as a private company, contract with and are paid by consumers directly, and provide their services directly at their own risk of liability. The consumer has no relationship with the government with respect to these services and would be surprised to hear she's actually the government's client. The government simply allows, i.e., *permits* private businesses to provide services on federal land, and that does not transform the government into the entity providing the services. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 684–85 (2010) (a school that permits a religious group to use its facilities does not thereby provide religious services); *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 70 (2d Cir. 2012) ("An activity does not become a program or activity of a public entity merely because it is licensed by the public entity." (cleaned up)).

Yet the current rule turns a blind eye toward these facts and settled legal principles. To the government, if a business provides a service under a federal permit, *the government* is really the one providing the service. *Bradford*, No. 21-cv-3283, Docket No. 21, at 11. And this principle would also extend to businesses that sell goods, *i.e.*, "supply[] . . . property," pursuant to a federal permit. 40 U.S.C. § 101(1). Nothing in the Procurement Act permits such conceptual gymnastics by which businesses like AVA are brought within its scope.

Plaintiffs' motion and complaint demonstrate the many important federalism and separation-of-powers concerns at stake. To those, *Amici* add one more: If the rule were allowed to stand, the President's Procurement Act authority will extend to federal permittees, giving him unilateral, direct control over a vast number of businesses—from construction companies that require Clean Water Act permits, *see* 33 U.S.C. § 1342, to fishermen, *see* 16 U.S.C. § 1853, to moving companies and other transportation businesses, 49 C.F.R. § 365.101, and much more. The Court should stop the Executive Branch's sweeping—and unconstitutional—power grab.

### B. The Rule Does Not Implement an Economical and Efficient System for Procurement

That's not all. The Procurement Act only empowers the President to "provide the Federal Government with an *economical and efficient* system" to conduct the four enumerated activities. 40 U.S.C. § 101 (emphasis added). Although the President may issue orders "he considers necessary" to achieve economy and efficiency, *id.* § 121(a), the D.C. Circuit has nonetheless observed that the economy-and-efficiency requirement must meaningfully limit the President's prerogative; otherwise, the President would have a "blank check" to act, and the Act would be invalid as a forbidden delegation of legislative power. *AFL-CIO v. Kahn*, 618 F.2d 784, 793 n.51 (D.C. Cir. 1979) (en banc); *see* Mot. at 18. Thus, any Presidential order must have a sufficient "nexus" with "likely savings to the Government." *Kahn*, 618 F.2d at 793.

As Plaintiffs point out, Mot. at 15–17, the rule is neither economical nor efficient. Take the rule's application to AVA and CROA members. The government has no business transactions with federal permittees like AVA. These recreational companies serve only the public. They hold no government contracts and receive no government payments. Since the government does not pay the permittees anything, no regulation of any kind can produce "savings to the Government" with respect to

the permittees. *Kahn*, 618 F.2d at 793.[4] Although the President asserted that imposing a $15/hour minimum wage can "enhanc[e] worker productivity and generat[e] higher-quality work," "reduc[e] absenteeism and turnover," and "lowe[r] supervisory and training costs," 86 Fed. Reg. at 22,835, these benefit only the business. In the case of permittees like AVA, they cannot result in reduced government costs. To uphold the rule, therefore, the Court will have to reject a meaningful economy-and-efficiency requirement—and reduce the Procurement Act to the "blank check" of which the D.C. Circuit warned. *Kahn*, 618 F.2d at 795 n.51.

### C. The Constitutional-Doubt Canon Requires a Narrow Construction of the Procurement Act

The canon of constitutional doubt requires courts to construe statutes to avoid serious constitutional problems "unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.*, 485 U.S. 568, 575 (1988). This rule of construction prevails even when an agency ordinarily would be entitled to interpretive deference. *Id.* at 574–75. Thus, if an agency's broad reading of a statute implicates "concerns over separation of powers principles" under the "nondelegation doctrine," a court must read the statute narrowly to avoid such concerns. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 611, 617 (5th Cir. 2021).

An interpretation of the Procurement Act that permits the rule to stand would so weaken statutory limits as to "raise a nondelegation problem." *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021). "In applying the nondelegation doctrine, the 'degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred.'" *Id.* (quoting *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 475 (2001)).

---

[4] One might imagine that regulating permittees can spark a chain of causation that results, eventually, in government savings *somewhere*. But such a long, speculative chain cannot supply the necessary "nexus" between the regulation and the savings. *Kahn*, 618 F.2d at 793.

9

Here, allowing the President to unilaterally displace existing minimum wage rules for employers who merely have a special use permit, based on the pretense of his "procurement" authority, would be akin to saying the President can control any private company that receives any federal benefit. "Such unfettered power would likely require greater guidance than" the provisions set out in the Procurement Act. *Id.* If the Procurement Act can allow mandates far afield from traditional contracting activity, it raises "serious concerns" that the Act "runs afoul of the nondelegation doctrine." *Kentucky v. Biden*, No. 21-cv-55, 2021 WL 5587446, at *8 (E.D. Ky. Nov. 30, 2021). Likewise, holding that economy and efficiency are served by increasing costs for the public and firms subject to the rule, while producing no savings for the government, would render that requirement a dead letter.

Nullifying these key restrictions would provide the President with unlimited discretion. This is not a new concern. *Kahn* emphasized the need to enforce strict limits under the Procurement Act to avoid "the constitutional prohibition against excessive delegation of legislative power to the President." 618 F.2d at 793 n.51. To avoid these severe constitutional issues, the Court must narrowly construe the Procurement Act not to authorize uneconomical wage requirements for non-procurement firms.

### D. The Rule Harms Businesses, Their Employees, and Their Customers

Aside from simply being unlawful, which is more than enough reason to vacate the rule, it comes with profound consequences for the public.

DOL estimated the rule would affect more than 500,000 private firms, including approximately 40,000 firms that provide concessions or recreational services pursuant to special use permits on federal lands. 86 Fed. Reg. at 67,194–96. DOL also estimated the rule would result in "transfers of income from employers to employees in the form of higher wage rates" of "$1.7 billion per year over 10 years," with "average annualized direct employer costs" of "$2.4 million" for each firm. *Id.*

at 67,194. None of these figures include overtime costs, which the government did not even attempt to calculate—despite the significance of overtime to businesses like AVA who offer multi-day trips. *Id.* Unsurprisingly, the "final rule is economically significant[.]" *Id.*

And, as DOL recognized, these costs will be particularly troublesome for companies like AVA or other recreational outfitters. Such firms are "[n]on-procurement," as they do not sell goods or services to the government. *Id.* These firms "cannot as directly pass costs along to the Federal Government." *Id.* Indeed, the government assures us that the rule "may result in reduced profits" for such firms, or outright losses, ameliorated only to the extent consumers are willing to pay "higher prices." *Id.* DOL also recognized that the rule could cause "disemployment" amongst companies operating on federal lands. *Id.* at 67,211. The rule might also place permittees at a competitive disadvantage with competitors not operating on federal lands and thus not subject to the rule. *Id.* at 67,208. And because permittees will be forced to raise prices, and permit fees are pegged to prices, permit fees will also rise. *Id.*

Keep in mind—this is DOL's own assessment. AVA and the other members of CROA face these harms directly. AVA has been in business for more than 20 years, guiding its clients down Colorado's scenic rivers. Every season, AVA employs about 250 people, but like nearly everyone in the industry, AVA pays its guides "trip wages"—fixed rates based on the number of days a trip is expected to take. Many of AVA's guides come back year after year.

CROA's members follow this same business model. They provide much-needed access to rivers in Colorado and Utah, and pride themselves on making access to the outdoors affordable for their clients. They too overwhelmingly pay trip wages to their guides.

River outfitting is a seasonal business. A typical outfitter will conduct 80% of its yearly operations during a few short months in the summer. And river guides are

also seasonal employees, many of whom are attracted to the unique lifestyle available to them. Guiding is an opportunity to work outside in awe-inspiring landscapes, with the freedom that comes with a limited season. Some guides try to work as many shifts as possible during the season, so that they can save as much money as possible. Many then spend the remainder of the year traveling, skiing, or even guiding in South America.

The new rule uses the pretext of an outfitter's need to pay federal land agencies for a river use permit as a way to completely upend the traditional way the industry has operated for decades. It seeks to impose strict hourly reporting requirements for outfitters and force hourly wages and overtime rules for guides that work for multi-day rafting adventures. It eliminates the possibility of a trip wage and replaces it with the absurd requirement that an outfitter pay hourly overtime wages in a situation that makes no sense for the guides.

Put simply, most outfitters cannot pay guides overtime wages for days (and nights) on end. Instead, the only way to continue to provide affordable services to their customers is to limit the length of trips and impose strict limits on how many hours a guide can work in a given week. The rule harms everybody, including the guides—who have long depended on the chance to maximize their productivity in a short guiding season.

The rule threatens the life of the outdoor guiding industry because the President, acting on his own, decided that he knows best. But the rule will help neither the businesses nor the employees in this industry. Instead, it will gut it.

## CONCLUSION

The application of DOL's wage rule to non-procurement businesses like AVA and CROA's members demonstrates the "breathtaking amount of authority" that the Executive claims—the power to exercise essentially proprietary control over private businesses merely because they hold federal permits. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). But when the Executive

also seasonal employees, many of whom are attracted to the unique lifestyle available to them. Guiding is an opportunity to work outside in awe-inspiring landscapes, with the freedom that comes with a limited season. Some guides try to work as many shifts as possible during the season, so that they can save as much money as possible. Many then spend the remainder of the year traveling, skiing, or even guiding in South America.

The new rule uses the pretext of an outfitter's need to pay federal land agencies for a river use permit as a way to completely upend the traditional way the industry has operated for decades. It seeks to impose strict hourly reporting requirements for outfitters and force hourly wages and overtime rules for guides that work for multi-day rafting adventures. It eliminates the possibility of a trip wage and replaces it with the absurd requirement that an outfitter pay hourly overtime wages in a situation that makes no sense for the guides.

Put simply, most outfitters cannot pay guides overtime wages for days (and nights) on end. Instead, the only way to continue to provide affordable services to their customers is to limit the length of trips and impose strict limits on how many hours a guide can work in a given week. The rule harms everybody, including the guides—who have long depended on the chance to maximize their productivity in a short guiding season.

The rule threatens the life of the outdoor guiding industry because the President, acting on his own, decided that he knows best. But the rule will help neither the businesses nor the employees in this industry. Instead, it will gut it.

## CONCLUSION

The application of DOL's wage rule to non-procurement businesses like AVA and CROA's members demonstrates the "breathtaking amount of authority" that the Executive claims—the power to exercise essentially proprietary control over private businesses merely because they hold federal permits. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). But when the Executive

seeks to "exercise powers of vast economic and political significance," it must have "clea[r]" statutory authorization. *Id.* Yet the broad powers claimed by the President are possible only if the Procurement Act's limits are implausibly contorted. But the federal government *does not* provide whitewater rafting trips down the Colorado River simply because permittees provide those trips. Nor can the Procurement Act be read in a manner that ignores its text. Reading it to say that Presidential orders need not result in cost savings to the government directly contradicts the Act's words.

These clear violations of the Procurement Act show that Plaintiffs are correct: the Executive neglected legal limitations in rushing to unilaterally set wages for as much of the national economy as possible. *Amici* respectfully request the Court enjoin Defendants' unwarranted and unconstitutional expedition beyond the confines of the Procurement Act.

DATED: April 21, 2022.

Respectfully submitted,

By s/ *Aditya Dynar*
ADITYA DYNAR,
AZ Bar No. 031583
*Counsel of Record*
Pacific Legal Foundation
3100 Clarendon Blvd
Arlington, VA 22201
(202) 888-6881
ADynar@pacificlegal.org

MICHAEL POON*
CA Bar No. 320156
Pacific Legal Foundation
555 Capitol Mall, Ste 1290
Sacramento, CA 95814
(916) 419-7111
MPoon@pacificlegal.org

* *Pro Hac Vice*

*Counsel of Record for Amici Curiae*

*Pacific Legal Foundation, Arkansas Valley Adventure, LLC, and Colorado River Outfitters Association*

# CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

By s/ *Aditya Dynar*
ADITYA DYNAR
*Counsel of Record for Amici Curiae Pacific Legal Foundation, Arkansas Valley Adventure, LLC, and Colorado River Outfitters Association*