BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch

JUSTIN M. SANDBERG
Senior Trial Counsel
TAISA M. GOODNATURE
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 514-5838
E-mail: justin.sandberg@usdoj.gov

*Counsel for Defendants*

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Brnovich, *et al.*,<br><br>          Plaintiffs,<br><br>     v.<br><br>Joseph R. Biden, *et al.*,<br><br>          Defendants. | No. 2:22-cv-213-JJT<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION, AND DEFEDNANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 5

LEGAL STANDARDS .................................................................................................. 7

ARGUMENT ................................................................................................................. 8

I.   The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Excess-of-Statutory-
     Authority Claims With Respect to Subcontractors, Licensees & Permittees. .............. 8

II.  All of Plaintiffs' Claims Lack Merit. ........................................................................ 10

     A.   EO 14,026 and the Final Rule Are Authorized by the FPASA. .......................... 10

          1.   EO 14,026 and the Final Rule Have a Clear Nexus to Economy and
               Efficiency. ................................................................................................ 10

          2.   The FPASA Authorizes the President to Set Minimum Wage Requirements for
               Subcontractors, Licensees, and Permittees. .......................................... 21

          3.   There is No Conflict Between Executive Order 14,026 and Any Federal
               Minimum Wage Statutes. .......................................................................... 24

          4.   Constitutional Avoidance Principles Do Not Support Plaintiffs' Interpretation of
               the FPASA. ............................................................................................... 25

     B.   Executive Order 14,026 Cannot Be Challenged Under the APA, and Its
          Implementing Rule Is Not Arbitrary or Capricious. ......................................... 28

     C.   Executive Order 14,026 Does Not Violate the Spending Clause. ...................... 33

III. Plaintiffs Fail to Establish That They Are Entitled to a Preliminary Injunction........ 35

     A.   Plaintiffs Have Not Established Irreparable Harm. .......................................... 36

     B.   The Balance of the Equities and the Public Interest Favor Defendants. ............. 39

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

**Cases**

*A. L. A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935) ............................................................................................ 3

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ..................................................................................10, 38

*Ala. Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) ..................................................................................... 25

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
    458 U.S. 592 (1982) ......................................................................................... 38

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) .......................................................................... 8

*Alpharma, Inc. v. Leavitt,*
    460 F.3d 1 (D.C.Cir.2006) ............................................................................. 15

*Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn,*
    618 F.2d 784 (D.C. Cir. 1979) ................................................................*passim*

*American Federation of Government Employees, AFL-CIO v. Carmen,*
    669 F.2d 815 (D.C. Cir. 1981) ..................................................................20, 21

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.,*
    801 F. Supp. 2d 383 (D. Md. 2011),
    *aff'd,* 698 F.3d 171 (4th Cir. 2012) ................................................................ 31

*Ariz. Hosp. & Healthcare Ass'n v. Betlach,*
    865 F. Supp. 2d 984 (D. Ariz. 2012) ............................................................. 37

*Arizona v. Mayorkas,*
    No. CV-21-00617-PHX-DWL, 2022 WL 357348 (D. Ariz. Feb. 7, 2022) ......... 39

*Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.,*
    439 U.S. 234 (1978) ......................................................................................... 16

*Biden v. Missouri,*

    142 S. Ct. 647 (2022) ........................................................................................... 16

*Blocktree Properties, LLC v. Pub. Util. Dist. No. 2 of Grant Cty. Washington,*

    783 Fed. App'x 769 (9th Cir. 2019) ................................................................... 36

*Bostock v. Clayton Cnty.,*

    140 S. Ct. 1731 (2020) ......................................................................................... 13

*Bradford v. U.S. Dep't of Lab.,*

    No. 21-CV-03283-PAB-STV, 2022 WL 204600 (D. Colo. Jan. 24, 2022),

    *appeal docketed*, No. 22-1023 (10th Cir. Jan. 28, 2022) ........................................ 7, 24

*Bradley v. T-Mobile US, Inc.,*

    No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020) ................. 9

*Building & Constr. Trades Dep't v. Allbaugh,*

    295 F.3d 28 (D.C. Cir. 2002) ................................................................................ 27

*Caribbean Marine Services Co., Inc. v. Baldrige,*

    844 F.2d 668 (9th Cir. 1988) .................................................................. 36, 37, 38

*Celotex Corp. v. Catrett,*

    477 U.S. 317 (1986) ................................................................................................ 8

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*

    511 U.S. 164 (1994) .............................................................................................. 17

*Chamber of Com. v. Whiting,*

    563 U.S. 582 (2011) .............................................................................................. 18

*Chamber of Comm. of U.S. v. Napolitano,*

    648 F. Supp. 2d 726 (D. Md. 2009) ..........................................................13, 14, 16, 19

*Chamber of Commerce of U.S. v. Reich,*

    74 F.3d 1322 (D.C. Cir. 1996) ................................................................. 29, 32, 33

*City of Albuquerque v. U.S. Dep't of Interior,*

    379 F.3d 901 (10th Cir. 2004) ..........................................................................12, 28

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ................................................................................ 9

*Clark v. Rameker*,
   573 U.S. 122 (2014) .............................................................................. 23

*Compass Bank v. Lovell*,
   No. CV-16-00538-PHX-DJH, 2016 WL 8738244 (D. Ariz. Apr. 8, 2016) ......................... 39

*Contractors Ass'n of Eastern Pennsylvania  v. Secretary of of Labor.*,
   442 F.2d 159 (3d Cir. 1971) ........................................................ 1, 14, 20

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) .............................................................................. 25

*Dalton v. Specter*,
   511 U.S. 462 (1994) .............................................................................. 29

*Delgadillo v. Astrue*,
   601 F. Supp. 2d 1241 (D. Colo. 2007) .................................................. 31

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) .......................................................................... 33

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
   189 F. Supp. 3d 85 (D.D.C. 2016),
   *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) ............................................. 30, 32

*Do Sung Uhm v. Humana, Inc.*,
   620 F.3d 1134 (9th Cir. 2010) .............................................................. 17

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2013),
   *cert. denied*, 134 S. Ct. 2877 (2014) .................................................... 8

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ................................................................ 39

*Eisenberg v. Ins. Co. of N. Am.*,
   815 F.2d 1285 (9th Cir. 1987) ............................................................... 8

*Epic Sys. Corp. v. Lewis,*
    138 S. Ct. 1612 (2018) ................................................................................. 24

*Farkas v. Tex. Instrument, Inc.,*
    375 F.2d 629 (5th Cir. 1967) ..................................................................12, 14

*Farmer v. Philadelphia Elec. Co.,*
    329 F.2d 3 (3d Cir. 1964) ............................................................................. 14

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ................................................................................25, 26

*Feds for Med. Freedom v. Biden,*
    2022 WL 188329 & n.6 (S.D. Tex. Jan. 21, 2022) ..................................... 30

*Florida v. Nelson,*
    No. 8:21-CV-2524-SDM-TGW, 2021 WL 6108948 (M.D. Fla. Dec. 22, 2021) ................. 35

*Forest Grove Sch. Dist. v. T.A.,*
    557 U.S. 230 (2009) ..................................................................................... 17

*FPC v. Hope Natural Gas Co.,*
    320 U.S. 591 (1944) ..................................................................................... 28

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ................................................................... 3, 10, 29, 30

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,*
    561 U.S. 477 (2010) ................................................................................26, 31

*Garcia v. Google, Inc.,*
    786 F.3d 733 (9th Cir. 2015) .......................................................................... 8

*Gomez v. Biden,*
    No. 20-CV-01419, 2021 WL 1037866 (D.D.C. Feb. 19, 2021) ................... 32

*Gomez v. Trump,*
    485 F. Supp. 3d 145 (D.D.C. 2020),
    *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020) ................................ 32

*Gundy v. United States*,

    139 S. Ct. 2116 (2019) ........................................................................................ 27, 28

*Herrick v. Potandon Produce, LLC*,

    2016 WL 778355 (D. Idaho Feb. 26, 2016) ................................................................... 39

*Indus. Tectonics, Inc. v. Aero Alloy*,

    912 F.2d 1090 (9th Cir. 1990) .......................................................................................... 8

*Kentucky v. Biden*,

    No. 3:21-cv-00055-GFVT, 2021 WL 5587446 (E.D. Ky. Nov. 30, 2021) ......................... 35

*Kentucky v. Biden*,

    23 F.4th 585 (6th Cir. 2022) ..................................................................................... 19, 28

*Kisor v. Wilkie*,

    139 S. Ct. 2400 (2019) ..................................................................................................... 16

*Kollasoft Inc. v. Cuccinelli*,

    No. CV-19-05642-PHX-JZB, 2020 WL 263618 (D. Ariz. Jan. 17, 2020) ......................... 37

*Lewis v. Casey*,

    518 U.S. 343 (1996) ........................................................................................................... 9

*Liberty Mut. Ins. Co. v. Friedman*,

    639 F.2d 164 (4th Cir. 1981) ..................................................................................... 15, 22

*Lujan v. Defs. of Wildlife*,

    504 U.S. 555 (1992) ........................................................................................................... 9

*Maryland v. King*,

    567 U.S. 1301 (2012) ...................................................................................................... 39

*Massachusetts v. Mellon*,

    262 U.S. 447, 43 S.Ct. 597 (1923) ..................................................................................... 9

*Miller v. Youakim*,

    440 U.S. 125 (1979) ........................................................................................................ 16

*Missouri v. Biden*,

    2021 WL 5998204 (E.D. Mo. Dec. 20, 2021),

*appeal docketed*, No. 22-1104 (8th Cir. Jan. 18, 2022)............................................................ 4, 35

*Mistretta v. United States,*

    488 U.S. 361 (1989) ....................................................................................................... 28

*Morton v. Mancari,*

    417 U.S. 535 (1974) ....................................................................................................... 24

*NASA v. Nelson,*

    562 U.S. 134 (2011) ..................................................................................................26, 27

*National Broadcasting Co. v. United States,*

    319 U.S. 190 (1943) ....................................................................................................... 28

*Nat'l Endowment for the Arts v. Finley,*

    524 U.S. 569 (1998) ....................................................................................................... 35

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.,*

    142 S. Ct. 661 (2022) ..................................................................................................26, 27

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*

    434 U.S. 1345 (1977) ..................................................................................................... 39

*New York Cent. Sec. Corp. v. United States,*

    287 U.S. 12 (1932).......................................................................................................... 28

*Newspaper Ass'n of Am. v. Postal Regul. Comm'n,*

    734 F.3d 1208 (D.C. Cir. 2013) .................................................................................... 15

*Nken v. Holder,*

    556 U.S. 418 (2009) ......................................................................................................... 4

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.,*

    762 F.2d 1374 (9th Cir. 1985)....................................................................................36, 38

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*

    810 F.3d 631 (9th Cir. 2015) ........................................................................................ 23

*Panama Refining Co. v. Ryan,*

    293 U.S. 388 (1935) ......................................................................................................... 3

*Pennhurst State School & Hospital v. Halderman,*

451 U.S. 1 (1981) ..........................................................................................34, 35

*Privitera v. California Bd. Of Medical Quality Assurance,*

926 F.2d 890 (9th Cir. 1991) ................................................................... 36

*Raymond J Lucia Companies, Inc. v. U.S. Sec. & Exch. Comm'n,*

No. 18-CV-2692-DMS-JLB, 2019 WL 3997332 (S.D. Cal. Aug. 21, 2019) ........................... 4

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*

140 S. Ct. 2183, (2020) ............................................................................ 31

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers,*

531 U.S. 159 (2001) .................................................................................. 17

*South Dakota v. Dole,*

483 U.S. 203 (1987) .................................................................................. 34

*Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.,*

594 F.2d 730 (9th Cir. 1979) ................................................................... 8

*Tulare Cnty. v. Bush,*

185 F. Supp. 2d 18 (D.D.C. 2001),

*aff'd*, 306 F.3d 1138 (D.C. Cir. 2002) ................................................. 3, 30

*UAW-Lab. Emp. & Training Corp. v. Chao,*

325 F.3d 360 (D.C. Cir. 2003) ..........................................................*passim*

*Util. Air Regul. Grp. v. EPA,*

573 U.S. 302 (2014) .................................................................................. 25

*Whitman v. Am. Trucking Ass'ns,*

531 U.S. 457, (2001) ............................................................................. 4, 28

*Winter v. Nat. Res. Def. Council, Inc.,*

555 U.S. 7 (2008) ......................................................................... 4, 8, 23, 36

*Yakus v. United States,*

321 U.S. 414 (1944) .................................................................................. 28

**Statutes**

5 U.S.C. § 551 ........................................................................................................ 3

5 U.S.C. § 704 ...................................................................................................... 29

29 U.S.C. § 201 ...................................................................................................... 6

40 U.S.C. § 101 ............................................................................................... *passim*

40 U.S.C. § 101(1) .......................................................................................... 20, 23

40 U.S.C. § 121 .................................................................................................. 1, 2

40 U.S.C. § 121(a) .......................................................................................... *passim*

40 U.S.C. § 3141 .................................................................................................... 6

40 U.S.C. § 3142(a) ............................................................................................. 24

40 U.S.C. § 3142(b) ............................................................................................. 25

41 U.S.C. § 6502 .................................................................................................. 24

41 U.S.C. § 6502(1) ............................................................................................. 25

41 U.S.C. § 6701 .................................................................................................... 6

41 U.S.C. § 6703 ............................................................................................. 24, 25

Pub. L. No. 99-500, 100 Stat. 1783 (1986) ........................................................ 17

Pub. L. No. 99-591, 100 Stat. 3341 (1986) ........................................................ 17

Pub. L. No. 104-208, 110 Stat. 3009 (1996) ...................................................... 17

Pub. L. No. 107-217, 116 Stat. 1062 (2002) ................................................... 1, 17

**The Constitution**

U.S. Const. art. I, § 8, cl. 1 .......................................................................... 33, 34

U.S. Const. art. VI, cl. 2 ....................................................................................... 25

**Rules**

Fed. R. Civ. P. 12(b) .............................................................................................. 8

**Regulations**

29 C.F.R. pt. 10 ................................................................................................. 2, 6

ix

29 C.F.R. pts. 23 ............................................................................................................ 2

29 C.F.R. § 23.40(f) ..................................................................................................... 22

41 C.F.R. § 60-1.3 ........................................................................................................ 22

79 Fed. Reg. 60,634 (Oct. 7, 2014) ......................................................................... 5, 6

83 Fed. Reg. 48,537 (Sept. 26, 2018) .......................................................................... 6

86 Fed. Reg. 51,683 (Sept. 16, 2021) .......................................................................... 6

86 Fed. Reg. 67,126 (Nov. 24, 2021) ................................................................. *passim*

Exec. Order No. 10,925, 26 Fed. Reg. 1977 (Mar. 6, 1961) ................................ 11, 14

Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept.24, 1965) ................... 11, 14, 22, 23

Exec. Order No. 11,141, 29 Fed. Reg. 2477 (Feb. 12, 1964) ..................................... 11

Exec. Order No. 11,755, 39 Fed. Reg. 779 (Dec. 29, 1973) ..................................... 11

Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 1, 1978) .............................. 11, 14

Exec. Order No. 12,800, 57 Fed. Reg. 12,985 (Apr. 13, 1992) .................................. 11

Exec. Order No. 12,954, 60 Fed. Reg. 13,023 (Mar. 8, 1995) ................................... 11

Exec. Order No. 13,201, 66 Fed. Reg. 11,221 (Feb. 17, 2001) ............................. 11, 14

Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 6, 2008) .............................. 11, 14

Exec. Order No. 13,513, 74 Fed. Reg. 51,225(Oct. 1, 2009) .................................... 11

Exec. Order No. 13,658, 79 Fed. Reg. 9851 (Feb. 12, 2014) ................................ 5, 6, 7

Exec. Order No. 13,706, 80 Fed. Reg. 54,697 (Sept. 7, 2015) .................................. 11

Exec. Order No. 13,838, 83 Fed. Reg. 25,341 (May 25, 2018) ....................... 6, 30, 33

Exec. Order No. 14,026, 86 Fed. Reg. 22,835 (April 27, 2021) ....................... *passim*

**Other Authorities**

11A Charles A. Wright & Arthur R. Miller,

    Federal Practice & Procedures § 2948.1 (3d ed. 1998) ........................................... 36

11 Williston on Contracts § 3.52 (4th ed. 2021) ........................................................ 20

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) .............. 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Elena Kagan, *Presidential Administration*,

114 Harv. L. Rev. 2245 (2001)....................................................................................... 31

**INTRODUCTION**

In the Federal Property and Administrative Services Act of 1949 (FPASA), 40 U.S.C. § 101 *et seq.*, Congress gave the President broad authority to establish policies for the executive branch that "the President considers necessary" to foster an "economical and efficient system" for procuring and supplying goods and services and for using property. 40 U.S.C. §§ 101, 121. *See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (explaining that "[e]conomy and efficiency are not narrow terms") (cleaned up). Courts have long interpreted that authority to encompass orders like the one at issue here, and Congress has recodified the law without change against the background of those judicial interpretations, including as recently as 2002. Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002). Relying on this capacious grant of authority, courts have held that, as to government contractors, the President can (among other things): impose anti-discrimination requirements, *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor.*, 442 F.2d 159, 171 (3d Cir. 1971), demand compliance with certain wage and price standards (even if they would increase costs as to some contracts), *Kahn*, 618 F.2d at 788; and obligate contractors to post notices informing employees of their rights not to be required "to join a union or to pay mandatory dues for costs unrelated to representational activities." *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362, 366–67 (D.C. Cir. 2003).

In line with these prior presidential actions, President Biden issued Executive Order 14,026, 86 Fed. Reg. 22,835 (April 27, 2021) (EO 14,026). In certain circumstances, the EO permits executive branch agencies to contract only with entities that meet minimum-wage standards for their employees, much as a non-governmental entity decides the terms on which it will buy or sell products or services. Legally, EO 14,026 is unremarkable; President Obama issued a prior executive order that also set a minimum wage for government contractors, albeit one that is somewhat lower than the minimum wage set by EO 14,026. The legality of that prior executive order was never challenged and, in fact, the executive order largely remained in effect throughout the Trump administration.

1

1    Unmoved by the text of the statute, judicial precedent, executive practice, or congres-

2    sional acquiescence, Plaintiffs—the States of Arizona, Idaho, Indiana, Nebraska, and South

3    Carolina—try to limit Congress's broad grant of authority.  They principally maintain that,

4    under the FPASA, the President cannot decide that the executive branch will do business with

5    contractual partners who agree to certain wage terms.  Thus, they insist that EO and the final

6    rule issued by the U.S. Department of Labor (DOL) to implement it, *see* 86 Fed. Reg. 67,126

7    (Nov. 24, 2021) (codified at 29 C.F.R. pts. 10 & 23) (Final Rule), are invalid.  Plaintiffs have

8    also moved for a preliminary injunction.  Mot. for Prelim. Inj. (PI Mot.), ECF No. 25.

9    Plaintiffs' effort fails.  The key question here is whether there is a sufficiently close

10   "nexus" between the EO and economy-and-efficiency objectives of the FPASA.  *Kahn*, 618

11   F.2d at 792 (finding "a sufficiently close nexus between those [economy and efficiency] criteria

12   and the procurement compliance program established by [the] Executive Order").  There is.

13   As the EO states, "[r]aising the minimum wage enhances worker productivity and generates

14   higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and

15   turnover; and lowering supervisory and training costs."  86 Fed. Reg. at 22,835.  In short, the

16   rule is aimed directly at improving economy and efficiency in government contracting by im-

17   proving the efficiency of contractors' employees and thus of the federal government's con-

18   tracting operations.  And while Plaintiffs, relying on their own preferred economic theories,

19   may quibble over whether there will be efficiency gains, that is not a proper basis on which to

20   limit the President's ability to set contracting terms for the executive branch.  *See Chao*, 325

21   F.3d at 366-67 (upholding an executive order even though nexus with FPASA's goal "may

22   seem attenuated" and "one can with a straight face advance an argument claiming opposite

23   effects").  The FPASA does not enact Arizona's (or any other Plaintiff State's) theory of labor

24   productivity; Congress concluded that the President should be empowered to decide what he

25   or she "considers necessary" to improve economy and efficiency in government contracting.

26   40 U.S.C. §§ 101, 121.

27   Similarly, there is no merit to the contention that the FPASA empowers the President

28

to set policies regarding the contracting process, but not the terms of executive branch's contracts.  This argument is refuted by the text of the law, longstanding presidential practice, decades' worth of judicial precedent, congressional acquiescence—and common sense.  Nor do other wage statutes identified by Plaintiffs render the EO or Final Rule impermissible: Those laws, which merely set a wage floor, do not conflict with the EO and Final Rule.  And Plaintiffs find no more success with Count IV, their claim that the EO and Final Rule exceed the scope of the FPASA to the extent that they extend to subcontractors, licensees, and permittees, Compl. ¶¶ 138-41, ECF No. 1:  Not only do Plaintiffs lack standing to bring that claim, but their allegations rely on a crabbed construction of the statute, which fails to give effect to its plain text.   Accordingly, Plaintiffs' first, second, and fourth claims fail.

None of Plaintiffs' other claims fare any better.  They contend that the EO and the Final Rule also violate the prohibition in the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, on arbitrary and capricious agency action because they do not adequately explain a "host of decisions."  Compl., ¶ 130.  But the APA does not apply to the President, *Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992), or to agency rules to the extent they adopt choices made by the President in the exercise of authority delegated to him by Congress, *see Tulare Cnty. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002).  Plaintiffs contend, (PI Mot. at 23-24, that (i) APA review is available, and (ii) the EO authorized DOL to modify the EO's terms.  But Plaintiffs' support for the first proposition comprises dicta from one case and a second case that supports Defendants' argument that review is unavailable.  And Plaintiffs' contention that DOL could take a red pen to the EO contradicts the text of the EO, which instructs DOL to "implement *the requirements* of *this order*."  86 Fed. Reg. at 22,836 (emphasis added).

Plaintiffs' allegation that the FPASA violates the Constitution's non-delegation doctrine also falls flat.  Compl. ¶¶ 142-47.   The Supreme Court has invalidated only two laws under this doctrine, *see A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and Plaintiffs present no good reason for this

3

Court to do something that the Supreme Court has not done in over 85 years:  the twin statutory commands of economy and efficiency easily constitute an "intelligible principle" sufficient to satisfy the Constitution.  *See, e.g., Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472, (2001) (approving delegation to agency to enact whatever air quality standards are "requisite to protect the public health").  Finally, Plaintiffs argue that application of the FPASA to them would violate the Spending Clause of the Constitution, if it permits the policies set forth in the EO, because the FPASA does not provide notice of the conditions on funding.  Compl. ¶¶ 148-55.  Plaintiffs' argument is flawed:  It relies on cases regarding grant conditions, but contracts are not grants, *see, e.g., Missouri v. Biden*, 2021 WL 5998204, at *6 (E.D. Mo. Dec. 20, 2021), *appeal docketed*, No. 22-1104 (8th Cir. Jan. 18, 2022)  (rejecting similar argument because of the difference between contracts and grants), and given the contracts, EO, and Final Rule, Plaintiffs cannot plausibly claim that a contractual counterparty to the federal government would lack knowledge of the applicable wage standards.

Dismissing Plaintiffs' claims or entering judgment for Defendants would moot Plaintiffs' motion for a preliminary injunction.  *See, e.g., Raymond J Lucia Companies, Inc. v. U.S. Sec. & Exch. Comm'n*, No. 18-CV-2692-DMS-JLB, 2019 WL 3997332, at *3 (S.D. Cal. Aug. 21, 2019).  But, mootness aside, the fact that Plaintiffs' claims lack merit sinks Plaintiffs' motion for a preliminary injunction.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (requiring likelihood of success on the merits).  And Plaintiffs' motion also fails to establish other elements required for preliminary relief.  *See id.*  Most prominently, Plaintiffs have not demonstrated that they will suffer irreparable harm absent relief prior to a decision on the merits.  They rely on inadequate—and in some instances, speculative—claims of financial harm, quasi-sovereign injuries (as to which, in any case, they lack standing), and nonexistent sovereign injuries.  More is required for the extraordinary relief they seek.  That is especially true in light of Plaintiffs' long delay in seeking preliminary injunctive relief:  Plaintiffs filed their motion almost three months after the Final Rule went into effect, and almost five months after it was issued.  And, finally, the balance of the equities and the public interest—factors that merge when the federal government is a party, *Nken v. Holder*, 556 U.S. 418, 435 (2009)—

4

weigh against the issuance of an injunction:   The public is best served by allowing the President to exercise the authority given to him by Congress to establish policies that he or she considers necessary to further the economy and efficiency of federal government contracting.

Accordingly, for the reasons provided in this memorandum, the Court should (i) dismiss, or enter summary judgment in favor of Defendants on, each of Plaintiffs' claims and, relatedly, (ii) reject Plaintiffs' request for a preliminary injunction.

## BACKGROUND

Congress enacted the FPASA "to provide the Federal Government with an economical and efficient system" for, among other things, "[p]rocuring and supplying property and non-personal services, and performing related functions including contracting."  40 U.S.C. § 101. The statute authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the FPASA, provided that such policies and directives are "consistent" with the statute.  *Id.* § 121(a).

For nearly a decade, pursuant to executive orders issued by each of the three most recent Presidents, certain federal contractors and subcontractors have been required to comply with a minimum wage requirement as a condition of their contracts.  First, in 2014, President Obama issued Executive Order 13,658, which applies to the following four categories of contracts and contract-like instruments: (1) "procurement contract[s] for services or construction"; (2) "contract[s] or contract-like instrument[s] for services covered by the Service Contract Act"; (3) "contract[s] or contract-like instrument[s] for concessions"; and (4) "contract[s] or contract-like instrument[s] entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public."  Exec. Order No. 13,658, 79 Fed. Reg. 9851, 9853 (Feb. 12, 2014).[1]

---

[1] As explained in the rule implementing EO 13,658, the terms "contract" and "contract-like instrument" are defined collectively to include "all arrangements of a contractual nature," such as permits that "possess contract characteristics" and "use contract-like language," "regardless of whether the parties involved typically consider such arrangements to be 'contracts' and regardless of whether such arrangements are characterized as 'contracts' for purposes of the specific programs under which they are administered."  79 Fed. Reg. 60,634, 60,640 (Oct. 7, 2014) (internal quotation marks omitted).  The terms do not apply, however, "to an arrangement or an agreement that is truly not contractual."  *Id.*

5

As a further requirement, an agreement in one of these four categories falls within the scope of coverage only if the wages of workers under that agreement are governed by the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, the Service Contract Act, 41 U.S.C. § 6701 *et seq.*, or the Davis-Bacon Act, 40 U.S.C. § 3141 *et seq.*  EO 13,658 requires executive agencies, to the extent permitted by law, to include in covered contracts and contract-like instruments a clause requiring that workers in the performance of the contract or any subcontract thereunder be paid a minimum wage.  *Id.* at 9851.  That wage was initially set at $10.10 per hour and has since been subject to annual increases according to a formula.  *See id.*  As of January 1, 2022, the minimum wage for purposes of EO 13,658 is $11.25 per hour. 86 Fed. Reg. 51,683, 51,683 (Sept. 16, 2021).  Following public notice and comment, DOL implemented Executive Order 13,658 through a final rule, which took effect on December 8, 2014.  *See* 79 Fed. Reg. 60,634. Executive Order 13,658 and DOL's corresponding final rule were never challenged.

Next, in 2018, President Trump issued Executive Order 13,838, which exempted a narrow subcategory of contracts and contract-like instruments from the requirements of EO 13,658.  Specifically, EO 13,838 provided that EO 13,658 and its implementing rule would no longer apply to "contracts or contract-like instruments entered into with the Federal Government in connection with seasonal recreational services"—including "river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps"—"or seasonal recreational equipment rental for the general public on Federal lands."  Exec. Order No. 13,838, 83 Fed. Reg. 25,341, 25,341 (May 25, 2018).  EO 13,658 otherwise remained in effect, including as to contractors who provide "lodging and food services associated with seasonal recreational services."  *Id.*  DOL implemented EO 13,838 through a final rule, which took effect on September 26, 2018.  *See* 83 Fed. Reg. 48,537 (Sept. 26, 2018) (codified as amended at 29 C.F.R. pt. 10).

Finally, in 2021, President Biden issued EO 14,026, the relevant effects of which are to rescind EO 13,838 (thereby reimposing the requirements of EO 13,658 for seasonal recreational service contracts) and raise the relevant minimum wage to $15 per hour.  *See* 86 Fed. Reg. 22,835.  EO 14,026 requires agencies to include a $15 minimum-wage clause, beginning

January 30, 2022, in "new contracts; new contract-like instruments; new solicitations; exten-

sions or renewals of existing contracts or contract-like instruments; and exercises of options

on existing contracts or contract-like instruments" that fall within EO's scope of coverage,

which is identical to that of EO 13,658. *Id.* at 22,837. After public notice and comment,[2]

DOL issued the Final Rule on November 24, 2021, *see* 86 Fed. Reg. 67,126.[3] The Final Rule

has been in effect since January 30, 2022, *see id.* at 67,126, except that, on February 17, 2022,

the Tenth Circuit enjoined the Government from enforcing the EO, solely as to "contracts or

contract-like instruments entered into with the federal government in connection with sea-

sonal recreational services or seasonal recreational equipment rental for the general public on

federal lands," pending an appeal from a district court's denial of a preliminary injunction in a

challenge to the rule at issue here. Order at 2, *Bradford v. Dep't of Labor*, No. 22-1023 (10th Cir.

Feb. 17, 2022) (Tenth Circuit Injunction Order).

Plaintiffs filed this action on February 9, 2022. *See* Compl. They bring claims for non-

statutory and APA review of EO 14,026 and the Final Rule on the ground that they exceed

the President's authority under the FPASA, *see id.* ¶¶ 103-26, 138-41; a claim that EO 14,026

and the Final Rule are arbitrary and capricious, in violation of the APA, *see id.* ¶¶ 127-37; a

claim that the FPASA violates the non-delegation doctrine, *see id.* ¶¶ 142-47; and a claim that

EO 14,026 and the Final Rule are barred by the Spending Clause of the United States Consti-

tution, *see id.* ¶¶ 148-55. On April 18, 2022, Plaintiffs moved for a preliminary injunction. *See*

PI Mot. Defendants now oppose that motion, and separately move for dismissal or summary

judgment on all of Plaintiffs' claims.

## LEGAL STANDARDS

To obtain a preliminary injunction, the movants must show that "(1) [they are] likely

to succeed on the merits, (2) [they are] likely to suffer irreparable harm in the absence of

---

[2] Plaintiffs did not comment on the notice of proposed rulemaking.

[3] Plaintiffs allege that DOL issued the Final Rule on November 23, 2021. *See* Compl. ¶ 88. Although DOL announced the Final Rule on its website on November 22, 2021, the Rule was formally issued upon publication in the Federal Register on November 24, 2021.

preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter.*, 555 U.S. at 9.  The Ninth Circuit, employing a sliding scale analysis, has also stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the [movants] can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2013) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)), *cert. denied*, 134 S. Ct. 2877 (2014). "A preliminary injunction is an extraordinary remedy never awarded as of right." *All. for the Wild Rockies*, 632 F.3d at 1131 (quoting *Winter*, 555 U.S. at 24).

With respect to a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the burden of proof rests at all times with the party invoking the Court's jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).  In resolving the motion, the court is not limited to the pleadings, but rather "may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  Dismissal under Rule 12(b)(6) is appropriate if a complaint "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Under Rule 56(c), summary judgment is appropriate when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

## ARGUMENT

I.    **The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' Excess-of-Statutory-Authority Claims With Respect to Subcontractors, Licensees & Permittees.**

Plaintiffs lack standing to challenge the application of the EO and the Final Rule to subcontractors, licensees, and permittees.  Standing is assessed on a claim-by-claim basis, and

a plaintiff must allege an adequate causal connection between the harm alleged and the challenged action. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." (cleaned up)).

Plaintiffs suffer no direct financial harm from the EO and Final Rule's application to these groups, as they do no allege that any state entities are subcontractors, licensees, or permittees. *See* Compl.; PI Mot. Thus, any claim for standing as to such entities would hinge on Plaintiffs' allegations that, as a result of the EO and Final Rule, (1) they will lose tax revenue or have to pay increased unemployment benefits, (2) their economies will be harmed; and (3) they suffer a "sovereign injury," because their regulatory choices will be overridden.

None of these argument are persuasive. The first and second arguments are speculative, and speculative harm does not suffice under Article III. *See, e.g., Bradley v. T-Mobile US, Inc.*, No. 17-CV-07232-BLF, 2020 WL 1233924, at *7 (N.D. Cal. Mar. 13, 2020) ("Standing theories that depend on a speculative chain of possibilities—such as those that turn on the decisions of independent actors—lack the necessary causal connection.").[4] For example, whether states will lose tax revenue, pay increased unemployment benefits, or see private employers lose government contracts, depends on choices made by third parties who are not before the court (such as, for example, choices by contractors regarding whether to dismiss workers, and whether to forgo a contract with the federal government or simply negotiate different terms). And given that Plaintiffs can only guess about how these choices will be made, there is no basis for standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013). Similarly, Plaintiffs' sovereign injury argument comes up short: A sovereign injury can occur

---

[4] This second argument also seems to be a *parens patriae* argument—i.e., Plaintiffs seem to be trying to vindicate the interests of their citizens vis-à-vis the federal government—but it has long been established that States cannot raise arguments on behalf of their citizens against the federal government. *See Massachusetts v. Mellon*, 262 U.S. 447, 485–486, 43 S.Ct. 597, 600-01 (1923).

9

when the federal government overrides a state's regulatory choices, *see Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (noting that "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"), but the EO and Final Rule do not override any state choices. Rather, the critical choice belongs to the state in its role as a private market participant: It can choose to enter into a contract with the federal government on terms that are mutually agreeable, or, if no such terms exist, it can choose to forgo a contract. Requiring the state to make a choice—even a hard choice—does not infringe on a state's sovereign authority.

## II.     All of Plaintiffs' Claims Lack Merit.

On the merits, Plaintiffs' claims should be dismissed, or, alternatively, the Court should enter summary judgment in favor of Defendants as to each of Plaintiffs' claims. The EO and Final Rule are authorized by the FPASA; neither is arbitrary or capricious; and neither violates the Spending Clause.

### A.  EO 14,026 and the Final Rule Are Authorized by the FPASA.

For the reasons described below, each of Plaintiffs' arguments that the EO and Final Rule exceed the scope of Presidential authority under the FPASA fails as a matter of law.[5]

#### 1.  EO 14,026 and the Final Rule Have a Clear Nexus to Economy and Efficiency.

Since the FPASA was enacted in 1949, Presidents of both political parties have exercised their authority under the statute to issue executive orders pertaining to the compensation of federal contractors' employees. For example, Presidents have prohibited contractors from

---

[5] Plaintiffs challenge the scope of Presidential authority under the FPASA under both the APA (Compl. ¶¶ 120-26) and the doctrine of non-statutory review (Compl. ¶¶ 103-19). APA review of the Executive Order is unavailable because the President is not an agency. *Franklin*, 505 U.S. at 800–01. Thus, the APA claim should be rejected on that basis alone. Plaintiffs' scope-of-authority APA claim also challenges the Final Rule. *See* Compl. ¶¶ 120-26. But, to the extent the Final Rule simply adopts decisions made by the President—which is the extent to which the Final Rule is challenged in this case—it is not subject to review under the APA. *See* § II.B. Defendants do not dispute the availability of nonstatutory review as to whether the EO or the Final Rule exceed the scope of the President's authority under the FPASA and the Constitution.

discriminating on the basis of race, creed, color, or national origin and have required "affirm-ative action" as to "rates of pay or other forms of compensation," *see, e.g.*, Exec. Order No. 10,925, 26 Fed. Reg. 1977 (Mar. 6, 1961) (Pres. Kennedy); Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 24, 1965) (Pres. Johnson); prohibited contractors from discriminating on the basis of age, *see* Exec. Order No. 11,141, 29 Fed. Reg. 2477 (Feb. 12, 1964) (Pres. John-son)[6]; specified certain terms and conditions of employment, including wages, for state prison inmates employed by contractors, *see* Exec. Order No. 11,755, 39 Fed. Reg. 779 (Dec. 29, 1973) (Pres. Nixon); required contractors to comply with anti-inflationary wage and price standards, *see* Exec. Order No. 12,092, 43 Fed. Reg. 51,375 (Nov. 1, 1978) (Pres. Carter); and required contractors to provide their employees with paid sick leave, *see* Exec. Order No. 13,706, 80 Fed. Reg. 54,697 (Sept. 7, 2015) (Pres. Obama).

More broadly, Presidents have also exercised their authority under the FPASA to im-pose wide-ranging policies governing the hiring and supervision of contractors' employees, including requiring contractors to inform their employees that they have a right not to join a union or pay certain union dues, *see* Exec. Order No. 12,800, 57 Fed. Reg. 12,985 (Apr. 13, 1992) (Pres. George H.W. Bush); Exec. Order No. 13,201, 66 Fed. Reg. 11,221 (Feb. 17, 2001) (Pres. George W. Bush); prohibiting contractors from permanently replacing lawfully striking workers, *see* Exec. Order No. 12,954, 60 Fed. Reg. 13,023 (Mar. 8, 1995) (Pres. Clinton); re-quiring contractors to use an electronic system to verify their employees' eligibility to work in the United States, *see* Exec. Order No. 13,465, 73 Fed. Reg. 33,285 (June 6, 2008) (Pres. George W. Bush); and encouraging contractors to adopt and enforce policies prohibiting employees from text messaging while driving company- or government-owned vehicles or performing work on behalf of the government, *see* Exec. Order No. 13,513, 74 Fed. Reg. 51,225 (Oct. 1,

---

[6] Although the anti-discrimination executive orders do not cite the FPASA (or any other statute) as their source of authority, "only the FPASA could have provided statutory support" for them before the enactment of the Civil Rights Act of 1964 and the Age Discrim-ination in Employment Act of 1967, respectively. *Kahn*, 618 F.2d 784, 790-91 & n.29 (D.C. Cir. 1979)

2009) (Pres. Obama).[7]

Interpreting the scope of the President's authority to issue such orders, courts have recognized that the FPASA confers on the President broad authority to set conditions on government contracting that the President deems necessary for economical and efficient contracting. In *Kahn*, for example, the *en banc* D.C. Circuit recognized that "economy" and "efficiency"—the twin objectives that define the scope of the President's FPASA authority—"are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services." 618 F.2d at 789. That Congress conferred such broad authority on the President is unsurprising, the *Kahn* court reasoned; the statutory language "recognizes that the Government generally must have some flexibility to seek the greatest advantage in various situations" and to "mak[e] sophisticated judgments in pursuit of economy and efficiency." *Id.* at 788-89. Likewise, the Tenth Circuit has recognized that "Congress chose to utilize a relatively broad delegation of authority in the Federal Property and Administrative Services Act of 1949." *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914 (10th Cir. 2004). The Fifth Circuit, as well, has observed that "Congress has committed to the President broad authority" through the FPASA. *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967).

As a corollary to this broad delegation of authority, the standard of judicial review of executive orders issued pursuant to the FPASA is "lenient." *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 367 (D.C. Cir. 2003). Courts uphold such orders provided that "a sufficiently close nexus" exists between "the values of 'economy' and 'efficiency'" and the policy set forth in the order, *Kahn*, 618 F.2d at 792—even where that nexus "may seem attenuated" or "one can with a straight face advance an argument claiming opposite effects [with

---

[7] As shorthand, Defendants refer throughout this brief to EOs issued under FPASA as "requir[ing]" or "prohibit[ing]" certain actions of federal contractors. For avoidance of doubt, however, none of these EOs—including EO 14,026—requires anything of contractors absent their agreement. Rather, the EOs condition federal agencies' entering into contracts on the inclusion in those contracts of clauses requiring or prohibiting certain actions as a condition of the contracts. As discussed further below, private parties always remain free to opt out of contracting with the federal government if they are unwilling to comply with these conditions.

12

respect to economy and efficiency] or no effects at all," *Chao* 325 F.3d at 366-67.  Such defer-ence to the President's policy judgment is compelled by the statutory text, which provides that "[t]he President may prescribe policies and directives *that the President considers* necessary" to "provide the Federal Government with an economical and efficient system" for the procure-ment and supply of property and non-personal services, among other functions not relevant here.  40 U.S.C. §§ 101, 121(a) (emphasis added).  Where Congress uses such "broad lan-guage," the "presumed point" is to "produce general coverage—not to leave room for courts to recognize ad hoc exceptions." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012)).  And the deference that Congress commanded here makes abundant sense: decisions regarding the economy and efficiency of federal contracting frequently involve predictive judgments and trade-offs among competing policy goals, which "[t]he President and his Administration are in a better position than [the courts] to make." *Chamber of Comm. of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009).

Thus, for example, the D.C. Circuit recognized in *Kahn* that the challenged EO, which imposed anti-inflationary wage and price controls on contractors, could "divert[]" government contracts "from low bidders who are not in compliance with the wage and price standards to higher bidders," seemingly resulting in "an unwarranted drain on the public fisc."  618 F.2d at 792; *see also Chao*, 325 F.3d at 367 (noting that, in *Kahn*, "there was a rather obvious case that the order might in fact increase procurement costs (as it plainly did in the short run)").  Nev-ertheless, the court deferred to the President's judgment, reasoning that, "if the voluntary re-straint program [were] effective in slowing inflation in the economy as a whole," the govern-ment would "face lower costs in the future than it would have otherwise," and that those lower costs would "more than offset" any short-run "higher costs." *Kahn*, 618 F.2d at 793.  Likewise, courts have sustained executive orders establishing wide-ranging policies regarding federal contracting—including several described above, pertaining to contractors' employees' com-pensation, hiring, and supervision—as valid exercises of the President's authority under the

1   FPASA.[8]

2       EO 14,026 readily meets this standard.  As President Biden explained in the EO,

3   "[r]aising the minimum wage enhances worker productivity and generates higher-quality work

4   by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and low-

5   ering supervisory and training costs."  86 Fed. Reg. at 22,835.  This rationale is at least as

6   robust as the justifications on which courts have relied in upholding other EOs issued under

7   the FPASA.  For example, the D.C. Circuit upheld EO 13,201 based on President Bush's

8   statement that "[w]hen workers are better informed of their rights, including their rights under

9   the Federal labor laws, their productivity is enhanced."  *Chao*, 325 F.3d at 366 (quoting 66 Fed.

10  Reg. at 11,221).  Similarly, a district court in the District of Maryland sustained EO 13,465

11  over a challenge that it exceeded the President's FPASA authority, relying on President Bush's

12  statement that "[c]ontractors that adopt rigorous employment eligibility confirmation policies

13  are much less likely to face immigration enforcement actions, because they are less likely to

14  employ unauthorized workers, and they are therefore generally more efficient and dependable

15  procurement sources than contractors that do not employ the best available measures to verify

16  the work eligibility of their workforce."  *Napolitano*, 648 F. Supp. 2d at 738 (quoting 73 Fed.

17  Reg. at 33,285).

18      Moreover, the Final Rule cites ample empirical support for President Biden's determi-

19  nation that an increased minimum wage will result in the economy and efficiency gains that

20  the President cited in the EO.  *See* 86 Fed. Reg. at 67,212-215.  For example, DOL cited a

21  2003 study which "found that increased wages paid to workers at the San Francisco airport

22  increased productivity and shortened airport lines" and a 2011 study which found that, "in

23

24

25       [8] *See, e.g.*, *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 5 (3d Cir. 1964) (concluding that
26  the FPASA authorized EO 10,925); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir.
    1967) (same); *Contractors Ass'n of E. Pa.*, 442 F.2d at 163 (same, as to EO 11,246); *Kahn*, 618
27  F.2d at 794 (same, as to EO 12,092); *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360,
    366 (D.C. Cir. 2003) (same, as to EO 13,201); *Napolitano*, 648 F. Supp. 2d. at 729 (same, as to
28  EO 13,465).

both full and limited-service restaurants[,] productivity increased due to improved worker mo-

rale after a wage increase." *Id.* at 67,212-13.  DOL likewise cited various studies showing that

"[a]n increase in the minimum wage . . . decrease[s] both turnover rates and the rate of worker

separation," which "can lead to an increase in the profits of firms, as the hiring process can be

both expensive and time consuming"—with the cost of replacing an employee averaging 21

percent of the employee's annual salary, according to one empirical survey.  *Id.* at 67,213 (foot-

note and citations omitted).  Consistent with this analysis, managers of "traditionally low-wage

firms" who were surveyed as part of a 2011 economic impact analysis "explained that in nearly

all instances, increased wages led to both a decrease in turnover and an increase in profits."

*Id.*  Likewise, a 2005 study found that a locality's minimum wage increase resulted in a 31%

decrease in the turnover rate for all healthcare providers and 51% for new healthcare provid-

ers.  *Id.*  This data all supports the reasonableness of President Biden's determination that

increasing the minimum wage for federal contractors will promote economy and efficiency by

"enhanc[ing] worker productivity and generat[ing] higher-quality work by boosting workers'

health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and

training costs."  86 Fed. Reg. at 22,835.  Plaintiffs are thus mistaken insofar as they suggest

that the Government relies only on its "say-so," in contrast to "factual findings," to establish

the requisite nexus to economy and efficiency.  PI Mot. at 18 (citing *Liberty Mut. Ins. Co. v.

Friedman*, 639 F.2d 164, 166 (4th Cir. 1981)).

    Plaintiffs are free to disagree with the President's economic conclusions.  But they fall

far short of establishing that President Biden exceeded his statutory authority in drawing those

conclusions.  When, as here, a President makes "predictive judgments about the likely eco-

nomic effects of a rule," courts should be "loath to second-guess [the President's] analysis."

*Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) (quoting

*Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 9 (D.C.Cir.2006)).  Plaintiffs' preferred economic theories

do not justify such second-guessing here.  And to the extent Plaintiffs argue that if a minimum

wage increase would, in fact, benefit employers economically, the employers would increase

their wages voluntarily, *see* PI Mot. at 17, that reasoning misconstrues the statutory grant of

authority. Congress empowered the President to determine what policies are necessary for an economical and efficient system of government contracting. Moreover, Plaintiffs' objection applies equally to the EOs at issue in *Chao* and *Napolitano*. That is, one could argue that, if it were true that informing workers of their rights enhances their productivity or that the adoption of rigorous employment eligibility confirmation policies makes employers more efficient, then employers would adopt those policies voluntarily. But the courts nevertheless upheld the EOs at issue in those cases, recognizing the role that the FPASA assigns to the President to make judgments as to what is necessary for economical and efficient contracting.

Additionally, as discussed above, Presidents have exercised their FPASA authority for well over half a century to set policies governing the compensation of federal contractors' employees. And, more specifically, each of the past three Presidents has concluded that he had the authority to set a minimum wage for federal contractors.[9] As the D.C. Circuit explained in *Kahn*, when "the President's view of his own authority under a statute . . . has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect'" and "'should be followed unless there are compelling indications that it is wrong.'" 618 F.2d at 790 (first quoting *Bd. of Governors of the Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248 (1978); and then quoting *Miller v. Youakim*, 440 U.S. 125, 144 n.25 (1979))); *see also Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (relying in part on an agency's "longstanding practice" to determine the scope of its statutory authority); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring in the judgment) ("[T]he government's early, longstanding, and consistent interpretation of a statute . . . could count as powerful evidence of its original public meaning." (emphasis omitted)).

---

[9] Although President Trump exempted seasonal recreational services and equipment rental providers from the coverage of EO 13,658, he did so solely based on his policy judgment that the economy-and-efficiency rationale underlying that EO does not apply with the same force to seasonal recreational workers, in light of their "irregular work schedules, a high incidence of overtime pay, and an unusually high turnover rate." 83 Fed. Reg. at 25,341. Eliminating any possible doubt that President Trump understood the FPASA to authorize the President to set a minimum wage for federal contractors, he specified that providers of lodging and food services associated with seasonal recreational services—to whom, he concluded, the same policy considerations did not apply—would continue to be subject to EO 13,658. *Id.*

Moreover, Congress has repeatedly revised the Procurement Act against the background of this longstanding consensus among the courts of appeals, and it has never modified or restricted the President's power. *See, e.g.*, Pub. L. No. 99-500, 100 Stat. 1783, 1783-345 (1986); Pub. L. No. 99-591, 100 Stat. 3341, 3341-345 (1986); Pub. L. No. 104-208, 110 Stat. 3009, 3009-337 (1996). In fact, Congress recently recodified—without substantive change—both the FPASA's statement of purpose and the operative provision authorizing the President to set policies to achieve that purpose. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("This Act makes no substantive change in existing law."). "[I]t is well established that 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.'" *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1155 (9th Cir. 2010) (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) (some quotation marks omitted)).

In short, decades of history, as well as judicial precedent and congressional acquiescence, confirm that the FPASA authorizes the President to set policies relating to the compensation of federal contractors' employees. And the past three Presidents' practice further supports the conclusion that this authority includes the specific power to set a minimum wage for such employees.

Resisting this conclusion, Plaintiffs belabor the point that Congress has considered and rejected proposed legislation to raise the minimum wage pursuant to the FLSA to $15 per hour—seemingly suggesting that this Congressional inaction sheds light on the scope of the President's authority to issue the challenged EO. It does not. The Supreme Court has repeatedly held that "Congressional inaction cannot amend a duly enacted statute"—here, the FPASA. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994) (cleaned up); *see also Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 160 (2001) ("Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute . . . because a bill can be proposed or rejected for any number of reasons.").. Indeed, many of the EOs that Presidents have issued pursuant

17

1    to their FPASA authority adopted policies on government contracting that Congress has the

2    authority to impose more broadly through legislation.  For example, Congress enacted the

3    Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967 after Presi-

4    dents Kennedy and Johnson used the FPASA to prohibit government contractors from dis-

5    criminating on the basis of race or national origin or age, respectively, as noted above.  And,

6    as the Supreme Court observed, President George W. Bush required agencies to contract only

7    with employers that use E-Verify, even though Congress had explicitly forbidden the executive

8    branch from imposing such a requirement on private businesses.  *Chamber of Com. v. Whiting*,

9    563 U.S. 582, 599 (2011).

10        Additionally, Plaintiffs cite *Kahn* for the proposition that "only programs which have

11   the 'likely direct and immediate effect of *holding down* the Government's procurement costs'

12   have [the requisite statutory] nexus."  PI Mot. at 15 (citing 618 F.2d at 793).  But Plaintiffs

13   take the quoted language out of context.  Although the D.C. Circuit described the EO at issue

14   in *Kahn* in those terms, it did not adopt that description as a legal standard.  Much the same is

15   true of the *Kahn* court's statement that it "wish[ed] to emphasize the importance to [its] ruling

16   … of the nexus between the wage and price standards and likely savings to the Govern-

17   ment"—language that likewise articulated the objective the court had found to be advanced

18   by the order in that particular case, without implying that *all* orders under the Act must pro-

19   duce financial "savings to the Government" in order to be permissible.  618 F.2d at 792

20   (quoted in Compl. ¶ 38; PI Mot. at 18).

21        To the contrary, the D.C. Circuit explicitly stated that "'[e]conomy' and 'efficiency' are

22   not narrow terms; they encompass those factors like price, quality, suitability, and availability

23   of goods or services that are involved in all acquisition decisions."  *Kahn*, 618 F.2d at 789.  EO

24   14,026 promotes the quality of goods and services provided by federal contractors by "gen-

25   erat[ing] higher-quality work" and promotes their availability by "enhanc[ing] worker produc-

26   tivity," including by "reducing absenteeism."  86 Fed. Reg. at 22,835.  On these bases alone,

27   EO 14,026 passes muster under the *Kahn* standard.

28        Moreover, Plaintiffs are wrong to suggest that a minimum wage increase necessarily

18

will increase the government's contracting costs.  To the contrary, DOL predicted that the benefits of the minimum-wage increase would "offset" any increased labor costs.  *See, e.g.*, 86 Fed. Reg. at 67,152 ("[T]he Department anticipates that the economy and efficiency benefits of Executive Order 14026 will offset potential costs. . . .").  That prediction is supported by the empirical data cited in the Final Rule.  *See supra*, § II.A.1.

Plaintiffs also rely heavily on *Kentucky v. Biden*, 23 F.4th 585, 608 (6th Cir. 2022), in which a motions panel of the Sixth Circuit held that the plaintiffs in that case had shown a likelihood of success on the merits of their claim that the FPASA does not authorize President Biden to require federal contractors to comply with certain COVID-19 safety measures.  In that case, the court concluded—mistakenly, in the Government's view—that the EO challenged in *Kentucky* lacked "a 'close nexus' to the ordinary hiring, firing, and management of labor," in contrast to the measures upheld in *Kahn*, *Chao*, and *Napolitano*.  *Id.* at 607; *see also id.* at 608 (characterizing the EOs at issue in these precedents as "modest, work-anchored measure[s]" (internal quotation marks omitted)).  Even on the Sixth Circuit's own terms, the compensation of employees has a close nexus to the hiring, firing, and management of labor and is a closely "work-anchored" measure.  *Id.*  As noted, that nexus is confirmed by decades of EOs issued pursuant to the FPASA that set conditions related to compensation.  *Cf. Kentucky v. Biden*, 23 F.4th at 605 (characterizing the vaccine mandate aspect of the EO challenged in that case as "the imposition of an irreversible medical procedure without precedent in the history of the [FPASA's] application").  Additionally, to the extent that Plaintiffs echo the Sixth Circuit's reasoning that the FPASA confers only the authority for the President to take measures ensuring that the government's *entry* into contracts is efficient, and not that the underlying work on those contracts is performed efficiently, *see id.* at 604-06; *see also* Compl. ¶ 106, that interpretation of the statute runs headlong into the decades of past executive actions, judicial authority, and congressional acquiescence, as discussed.  Moreover, the Sixth Circuit's textual analysis does not withstand scrutiny on its own terms.  The court reasoned that the FPASA's reference to a "system" of contracting refers only to the system of entering into contracts.  *See Kentucky v. Biden*, 23 F.4th at 604.  But EO 14,026—like all of the EOs that

Defendants examined above—operates by requiring the inclusion of a particular clause in contracts that the government enters into.  Setting the terms of a contract is a necessary part of contract formation.  *See* 11 Williston on Contracts § 3.52 (4th ed. 2021) (noting that, for a contract to be enforceable, there must be agreement on essential terms).  The FPASA also enumerates "setting specifications" among the functions for which the President should act to ensure economy and efficiency. 40 U.S.C. § 101(1).  In any event, a system for the procurement and supply of goods and services—like any other system—is only as economical and efficient as its component parts, including both the government's and the contractors' roles.

Further, Plaintiffs argue that the "true" purpose of EO 14,026 is to create "*social/equity-based* benefits" and that the economy-and-efficiency rationale for the EO and the Final Rule are accordingly "pretextual."  PI Mot. at 26.  This argument is based on the mistaken premise that a government initiative can have only one "true" objective.  To be sure, one expected benefit of the contractor minimum-wage increase is to reduce poverty and income inequality.  *See* 86 Fed. Reg. at 67,214-15.  Defendants do not dispute that this ground alone would not support the President's exercise of FPASA authority.  But many of the EOs issued pursuant to the FPASA, like EO 14,026, have had additional benefits beyond promoting economy and efficiency in federal contracting.  For example, in *American Federation of Government Employees, AFL-CIO v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (R.B. Ginsburg, J.), the D.C. Circuit observed that the Executive Order sustained in *Kahn*—which had the principal purpose of lowering the government's procurement costs by requiring adherence to price and wage guidelines— had the "additional goal of slowing inflation in the economy as a whole."  *Id.* at 821 (citing Kahn, 618 F.2d at 792-793).  Much the same was true of the antidiscrimination requirements addressed in cases like *Contractors Association*. As the D.C. Circuit noted, these requirements had the "additional goal of promoting enhanced employment opportunities for minorities."  *Id.*  (citing *Contractors Ass'n*, 442 F.2d at 171). And it was equally true of the order at issue in *Chamber of Commerce*, in which President Bush required federal contractors to use the E-Verify system to confirm the lawful immigration status of their employees; that order had significant effects on the implementation of immigration laws in addition to its impact on the

economy and efficiency of federal procurement.  The President's determination of how best to achieve economy and efficiency in federal operations does not "become[] illegitimate," the D.C. Circuit explained, simply because, "in addition to" advancing those goals, it "serves other, not impermissible, ends as well."  *Carmen*, 669 F.2d at 821.

Finally, Plaintiffs offer a series of hypotheticals that they claim would arise from a decision in favor of Defendants in this lawsuit.  They contend that "nothing would prevent the government from making the same arguments to assert that the Procurement Act permits a mandatory paid leave system, employer drug testing, racial diversity quotas, or anything else which the President could argue would increase the efficiency of the businesses that contract with the government."  PI Mot. at 17.  The Court need not concern itself with such hypotheticals, as EO 14,026 breaks no new ground.  Rather, as explained, it fits comfortably among previous exercises of FPASA power over many decades, which courts have upheld and in which Congress has acquiesced.

For all of these reasons, this Court should conclude that EO 14,026 and the Final Rule fall well within the bounds of the President's authority to set government contracting policy pursuant to the FPASA.

## 2. The FPASA Authorizes the President to Set Minimum Wage Requirements for Subcontractors, Licensees, and Permittees.

As discussed above, Plaintiffs lack Article III standing to challenge the scope of EO 14,026 with respect to subcontractors, licensees, or permittees, because they fail to demonstrate that they are harmed by this aspect of the EO and Final Rule.  *See supra*, p.\_.  But in the event the Court reaches the merits of this argument, it is without merit.  The FPASA authorizes the President to prescribe policies that he or she deems necessary "to provide the Federal Government with an economical and efficient system" for, among other things, "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting."  40 U.S.C. §§ 101, 121(a).  Extending the requirements that the President imposes on contractors to their subcontractors is plainly necessary; otherwise, contractors could evade the President's policies entirely simply by engaging subcontractors who were not subject

to those policies to perform all work on their contracts.  Such an interpretation of the FPASA would render the statute entirely toothless.

Moreover, with respect to subcontractors, Plaintiffs rely entirely on *Liberty Mutual Insurance Co. v. Friedman*, 639 F.2d 164 (4th Cir. 1981), in which a divided panel of the Fourth Circuit held that EO 11,246—barring discrimination on the basis of race, color, religion, sex, or national origin and requiring affirmative action to ensure equal employment opportunity— could not be enforced against an insurance company that underwrote workers' compensation insurance "for many companies that contract[ed] with the government."  *Id.* at 166.  The majority reasoned that the application of EO 11,246 to the insurance company did not "satisfy[] the nexus test used in *Contractors Association*[, 442 F.2d 159] and *Kahn*[, 618 F.2d 784]."  *Id.* at 170.

As an initial matter, Plaintiffs read *Liberty Mutual* too broadly.  Plaintiffs suggest that the Fourth Circuit determined that the FPASA categorically fails to authorize the President to impose conditions on subcontractors.  But that is not what the court held.  It concluded merely that the FPASA did not authorize the President to impose conditions on the contract of the particular entity in that case.  *See id.* at 166, 172.  And *Liberty Mutual* was decisively unlike this case.  EO 11,246 applied across the board to employers of workers whose services were "necessary" to the performance of a covered contract.  *See id.* (citing 41 C.F.R. § 60-1.3).  That feature proved critical.  As the Fourth Circuit emphasized, the plaintiff in *Liberty Mutual* "[had] not signed any contracts or subcontracts that include the antidiscrimination or affirmative action clauses required to be included in covered contracts by Executive Order 11,246."  638 F.2d at 166.  It simply provided worker's compensation insurance to the contractor under "a single policy to cover employees working on both federal and nonfederal contracts without distinction between the two."  *Id.* at 171.  It was in that context that the Fourth Circuit found the nexus to economy and efficiency "simply too attenuated."  *Id.*

By contrast, EO 14,026 and the Final Rule apply only to the work of employees "in connection with" a covered contract or subcontract if an employee spends at least 20% of his or her hours in a given workweek performing such work.  *See* 29 C.F.R. § 23.40(f).  And, in

that circumstance, the employee is entitled to receive a $15 minimum wage only for the work hours spent in connection with the covered contract or subcontract. *See id.* § 23.220(a). The scope of coverage of EO 14,026 is thus much narrower than that of 11,246, and the reasoning of that case is therefore inapposite.

Subcontractors aside, Plaintiffs also appear to argue in their preliminary injunction motion (PI Mot. 11-12, 14) that EO 14,026 exceeds statutory authority insofar as it applies to federal licensees and permittees. But Plaintiffs did not make any such allegation or claim in their Complaint. "When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015).

In any event, to the extent that Plaintiffs argue that licensees and permittees fall outside the scope of the President's FPASA authority because they do not provide goods or services *to* the government, *see id.* at 14, that is irrelevant. The FPASA empowers the federal government to administer a system for both "[p]rocuring *and supplying* . . . nonpersonal services." 40 U.S.C. § 101(1) (emphasis added). When a contractor provides goods or services directly to the federal government, the government is "procuring" those goods or services. By contrast, the word "supplying" has a natural meaning in this provision: It extends the President's authority with respect to contractors from whom the federal government is not directly "[p]rocuring" goods or services, such as licensees and permittees with whom the government enters agreements for the purpose of "[s]upplying property and nonpersonal services" to the public, *id.* Plaintiffs offer no alternative interpretation that would comply with "the rule that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quotation marks omitted).[10] Thus, in the event the Court reaches this issue, it should join a district court in the District of Colorado in holding that the President's authority under the FPASA extends to conditions on the contracts that the federal government holds with licensees and permittees who provide

---

[10] The brief filed by *amici curiae* Pacific Legal Foundation, Arkansas Valley Adventure, LLC, and Colorado River Outfitters Association suffers from the same fatal defect. *See* ECF No. 28.

services on federal lands.  *See Bradford v. U.S. Dep't of Lab.*, No. 21-CV-03283-PAB-STV, 2022 WL 204600, at *9 (D. Colo. Jan. 24, 2022), *appeal docketed*, No. 22-1023 (10th Cir. Jan. 28, 2022).

### 3.  There is No Conflict Between Executive Order 14,026 and Any Federal Minimum Wage Statutes.

Plaintiffs next argue that Congress could not have assigned the President authority to set a minimum wage for federal contractors through the FPASA because "[t]he authority to set minimum wages in the national economy, particularly for the employees of federal contractors, is one that Congress has always exercised, and reserved to, itself."  Compl. ¶ 44. Stated slightly differently, they contend that "the Rule's invocation of the highly generalized Procurement Act directly conflicts with far-more specific Congressional pronouncements on contractor wages, rendering the Rule invalid."  PI Mot. at 19.  Plaintiffs point to three statutes, in particular, with which they claim Executive Order 14,026 conflicts (*id.* at 20-21): the Davis-Bacon Act, which requires the payment of prevailing wages to "mechanics or laborers" working on the construction of public buildings and public works, 40 U.S.C. § 3142(a), (b); the Walsh-Healey Public Contracts Act, which requires the payment of prevailing wages to employees of contractors engaged "by an agency of the United States for the manufacture or furnishing" of certain goods, 41 U.S.C. § 6502; and the McNamara-O'Hara Service Contract Act, which requires the payment of prevailing wages to service employees on federal government contracts that are principally for services, *id.* §§ 6702, 6703.

As the Supreme Court has held, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [the courts are] not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'"  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).  "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow."  *Id.*

Plaintiffs do not come close to meeting that demanding standard.  There is no conflict

1    between EO 14,026 and the federal statutes cited by Plaintiffs.  These statutes expressly set

2    "minimum" wages.  40 U.S.C. § 3142(b); 41 U.S.C. § 6502(1); 41 U.S.C. § 6703(1).  They do

3    not purport to limit the rate of pay above the minimum.  There is accordingly no conflict

4    between multiple wage floors that apply to the same employee; an employer simply must pay

5    at least the highest applicable minimum wage.

6         Were it otherwise, Plaintiffs' own state minimum wage laws would be called into ques-

7    tion.  Pursuant to the Supremacy Clause of the United States Constitution, a federal statute

8    controls over an inconsistent state statute.  *See* U.S. Const. art. VI, cl. 2; *see also, e.g.*, *Crosby v.*

9    *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) ("[S]tate law is naturally preempted to the

10   extent of any conflict with a federal statute.").  Thus, if Plaintiffs were correct that "Congress

11   has repeatedly and consistently reserved to itself the issue of regulating wages in the private

12   economy," Compl. ¶ 3, and federal wage statutes could not be harmonized with other, higher

13   minimum wage laws, then Arizona's $12.80 minimum wage and Nebraska's $9.00 minimum

14   wage—both higher than the current federal minimum wage under the FLSA of $7.25, *see*

15   Compl. ¶¶ 61, 75—might be preempted, and they plainly are not.   For the executive branch,

16   as for Plaintiffs, there is no conflict between enactments that each "set[] a 'floor' for the min-

17   imum wage." Compl. ¶ 73.

18              **4.  Constitutional Avoidance Principles Do Not Support Plaintiffs'**

19                   **Interpretation of the FPASA.**

20        Plaintiffs next argue that the Court should construe the President's authority under the

21   FPASA narrowly to avoid various constitutional concerns.  First, they invoke cases observing

22   that Congress generally "speak[s] clearly when authorizing an agency to exercise powers of

23   'vast economic and political significance.'" PI Mot. at 10 (quoting *Ala. Ass'n of Realtors v. HHS*,

24   141 S. Ct. 2485, 2489 (2021)); *see also Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)

25   ("When an agency claims to discover in a long-extant statute an unheralded power to regulate

26   'a significant portion of the American economy,' we typically greet its announcement with a

27   measure of skepticism." (citation omitted) (quoting *FDA v. Brown & Williamson Tobacco Corp.*,

28   529 U.S. 120, 159 (2000))).  For several reasons, however, those principles have no application

here.

First, the statutory text makes plain that Congress assigned the President the authority to determine which "policies and directives" are "necessary to carry out" the objectives of economy and efficiency.  40 U.S.C. § 121(a).  If an executive order bears a reasonable nexus to those broadly stated objectives, then the statute expressly authorizes it.  This case therefore does not implicate the principle that "cryptic" statutory provisions should not be read to "delegat[e]" the resolution of significant questions.  *Brown & Williamson*, 529 U.S. at 159-160.

Second, Presidents have exercised their authority under the FPASA to set conditions on the wages that contractors pay their employees since the statute's inception in the middle of the last century.  *See supra*, § II.A.1.  Far from invoking an unheralded power discovered in a long-extant statute, EO 14,026 simply builds on that foundation—a foundation that includes federal contractor minimum wage requirements that have been in effect during the past three Presidential Administrations.   In short, an executive order cannot be of "vast economic and political significance" when it merely effects a modest increase to the minimum-wage standard set forth in a 2014 EO that spanned Administrations of different parties and went unchallenged by any parties, either state or private.

Third, that the authority here is delegated to the President himself distinguishes this case from those where courts have questioned whether Congress meant to delegate authority over a "major question" to an agency.  Whereas courts have expressed the concern that agencies lack direct political accountability, *see, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 669 (2022) (Gorsuch, J., concurring), the President is unquestionably "accountable to the people," *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 513 (2010), for the consequences of his or her decisions.

Fourth, EO 14,026 and its implementing rule do not exercise regulatory authority at all, but rather the federal government's proprietary authority.  When the government acts "in its capacity 'as proprietor' and manager of its 'internal operation,'" it "has a much freer hand" than when it "exercise[s] its sovereign power 'to regulate.'"  *NASA v. Nelson*, 562 U.S. 134,

1   148 (2011).  The challenged minimum wage requirement does not apply to employers gener-

2   ally, or even to employees of covered employers who do not perform work on or in connec-

3   tion with federal contracts.  It simply reflects the President's management decision that the

4   federal government will do business with companies and other entities only on terms he or

5   she regards as promoting economy and efficiency.  Stated differently, the EO dictates only the

6   decisions of federal agencies.  Unlike when the President exercises regulatory authority, here,

7   private parties remain free to decline to contract with the government if they are unwilling to

8   increase their wages to comply.

9           Thus, any concern about agencies exceeding their statutory authority, *cf. Nat'l Fed'n of*

10  *Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 666 (2022), applies

11  here with diminished force in light of the President's inherent Article II power to exercise

12  "'general administrative control' … throughout the Executive Branch of government, of

13  which he is the head," *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir.

14  2002), including by managing the performance of employees and contractors alike, *see Nelson*,

15  562 U.S. at 150.  For all of these reasons, the "major questions" principles that Plaintiffs invoke

16  do not apply here.

17          Nor have Plaintiffs established that the Court should adopt a narrow reading of the

18  FPASA to avoid non-delegation concerns, because there are no legitimate non-delegation con-

19  cerns.  As an initial matter, as with major powers principles, non-delegation principles apply

20  with diminished force when the President exercises inherent Article II power to exercise gen-

21  eral administrative control of the Executive branch.  Rather, where the President "enjoys his

22  own inherent Article II powers," Congress can "assign the President broad authority" without

23  raising concerns. *Gundy v. United States*, 139 S. Ct. 2116, 2144 (2019) (Gorsuch, J., dissenting);

24  *id.* at 2140 (noting that under "traditional teachings," broadly worded delegations are permis-

25  sible where they "at least arguably, implicate[] the president's inherent Article II authority").

26          Moreover, the Supreme Court recently reaffirmed—as it has, "time and again"—"that

27  a statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an

28

27

intelligible principle to which the person or body authorized to [exercise the delegated author-ity] is directed to conform.'" *Gundy*, 139 S. Ct. at 2123 (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)).The FPASA plainly supplies an intelligible principle to guide the Presi-dent's discretion in administering the statute: it permits the President to "prescribe policies and directives that the President considers necessary" to "provide the Federal Government with an economical and efficient system" for procuring and supplying property and nonper-sonal services and performing related functions; using and disposing of property; and manag-ing records. 40 U.S.C. §§ 101, 121(a).  This delegation confines discretion no less than other "very broad delegations" that the Supreme Court has upheld over claims that they violated the non-delegation doctrine, including the authority to set "fair and equitable" prices, *Yakus v. United States,* 321 U.S. 414, 426 (1944); to determine "just and reasonable" rates, *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 600 (1944); to regulate broadcast licensing "as public interest, convenience, or necessity" require, *National Broadcasting Co. v. United States,* 319 U.S. 190, 225-226 (1943); to allow railroad acquisitions in the "public interest," *New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932); and to issue any air quality standards "requisite to protect the public health," *Whitman*, 531 U.S. at 472.

Indeed, every court of appeals that has decided the question has ruled that the FPASA's grant of contracting authority to the President supplies an intelligible principle and, accord-ingly, is not an unconstitutional delegation of legislative authority.  *See Kahn*, 618 F.2d at 785-86, 793 n.51 ("The FPASA requires the President to make procurement policy decisions based on considerations of economy and efficiency.  Although broad, this standard can be applied generally to the President's actions to determine whether those actions are within the legisla-tive delegation."); *accord City of Albuquerque*, 379 F.3d at 914-15); *Kentucky v. Biden*, 23 F.4th at 608.  Plaintiffs identify no compelling reason for this Court to depart from this weight of authority.

### B.  Executive Order 14,026 Cannot Be Challenged Under the APA, and Its Implementing Rule Is Not Arbitrary or Capricious.

Plaintiffs allege that the EO and the Final Rule are arbitrary and capricious in violation

28

of the APA.  Compl. ¶¶ 127-137.  Specifically, they maintain that the EO and Final Rule lack "meaningful explanations for a host of decisions," including the selection of a $15 minimum wage.  *Id.* ¶¶ 130, 134.  This claim is premised on a misunderstanding of the scope of the APA:  The President is not subject to the APA, and agency actions adopting choices made by the President in the exercise of authority delegated to him by Congress are similarly not subject to APA review (to the extent they simply adopt those presidential choices).  The Court should dismiss this claim or enter judgment in favor of Defendants.

The EO is not reviewable under the APA.  The APA allows courts to review "final agency action[s]," when there is no other adequate judicial remedy.  5 U.S.C. § 704.  And, helpfully, the APA defines the term "agency."  "'[A]gency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include" a host of governmental entities, including Congress and the Courts.  *Id.* § 704(b)(1).  But the statute does not include an exhaustive list of the exceptions to the definition of "agency."  The Supreme Court has decided that there is an additional entity—person, to be more specific—excepted from the reach of the APA:  the President.  "Out of respect for the separation of powers and the unique constitutional position of the President, we find that textual silence is not enough to subject the President to the provisions of the APA.  We would require an express statement by Congress before assuming it intended the President's performance of his statutory duties to be reviewed for abuse of discretion." *Franklin*, 505 U.S. at 800–01.  A few years later, in *Dalton v. Specter*, 511 U.S. 462 (1994), the Supreme Court reiterated that "[t]he actions of the President . . . are not reviewable under the APA because, as we concluded in *Franklin*, the President is not an agency."  *Id.* at 470 (cleaned up).  Thus, as the President is not an agency under the APA, Plaintiff's claims that the EO violates the APA fail.  Of course, Presidential actions are not immune from judicial oversight, as demonstrated by the discussion in Section II, above, and *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (permitting nonstatutory review to ensure compliance with applicable laws), but that oversight does not include second-guessing, under the APA's arbitrary and capricious clause, of discretionary choices made by the President.

Plaintiffs challenge the Final Rule, in addition to the EO, but the conclusion is the same—and the reasoning similar:  Plaintiffs' claim fails because the Final Rule is not subject to review under the APA to the extent it simply adopts discretionary choices made by the President, in the exercise of authority granted to him by Congress through the FPASA.  Plaintiffs' allegations focus on aspects of the Final Rule that implement the $15 minimum wage and the repeal of EO 13,838.  Compl. ¶¶ 131-135.   The selection of the hourly rate, and the decision to repeal EO 13,838, were choices made by the President, not DOL.  *See* 86 Fed. Reg. at 22,835-37.  And when making these choices, the President was exercising authority delegated by Congress to him—not DOL—to make decisions necessary to foster an "economical and efficient system" for federal contracting.  40 U.S.C. § 101, *see also id.* § 121(a) (authorizing the President to "prescribe policies and directives that the President considers necessary to carry out" the Act); 86 Fed. Reg. at 22,835 (stating that the EO was issued "to promote economy and efficiency in procurement").  On the other hand, DOL's role was to implement the President's choices regarding these matters—and that is what it did in the Final Rule.  "The purpose of this rulemaking is to implement Executive Order 14,026, and therefore comments questioning the legal authority and rationale underlying the President's issuance of the Executive order are not within the scope of this rulemaking action."  86 Fed. Reg. at 67129.

It follows from *Franklin* and *Dalton* that, to the extent Final Rule adopts discretionary choices made by the President in the exercise of authority delegated to him, APA review is unavailable.  And numerous courts have held just that.  *See, e.g., Tulare Cnty.*, 185 F. Supp. 2d at 28–29  (holding that "[t]hese Counts fail to allege jurisdiction, however, because the Forest Service is merely carrying out directives of the President, and the APA does not apply to presidential action"); *Feds for Med. Freedom v. Biden*, 2022 WL 188329, at *7 & n.6 (S.D. Tex. Jan. 21, 2022) (concluding that APA review is unavailable for a rule implementing vaccination requirement for federal government contractors because Plaintiffs challenged only the agency's implementation of an executive order); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 102 (D.D.C. 2016) (holding that action taken by State Department was, in fact, "unre-

1   viewable presidential action because it involved an exercise of discretionary authority commit-

2   ted to the President by law"), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017), *opinion amended and superseded*,

3   883 F.3d 895 (D.C. Cir. 2018), *as amended on denial of reh'g* (Mar. 6, 2018); *Ancient Coin Collectors*

4   *Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F. Supp. 2d 383, 403 (D. Md.

5   2011) (concluding that "the State Department and Assistant Secretary were acting on behalf

6   of the President, and therefore their actions are not reviewable under the APA"), *aff'd*, 698

7   F.3d 171 (4th Cir. 2012.  In short, the agencies in these circumstances were—like DOL here—

8   effectively stepping into the shoes of the President, whose actions are insulated from APA

9   review.

10          A contrary holding not only would contradict the well-reasoned authority cited above,

11   but would also put the agency in an untenable position.  Take for example Plaintiffs' allegation

12   that DOL did not consider alternatives to a $15-per-hour minimum wage.  Compl. ¶ 133.  The

13   President is the head of the executive branch, and he chose $15 per hour, using authority

14   granted to him by Congress in FPASA.  *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,

15   561 U.S. 477, 501–02 (2010) ("The President has been given the power to oversee executive

16   officers . . . .")  DOL could not say to the President, "$15 per hour, that's a good suggestion,

17   but we'll decide if it makes sense to us."  "Under our Constitution, the executive Power—all

18   of it—is vested in a President."  *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183,

19   2191, (2020); *see Delgadillo v. Astrue*, 601 F. Supp. 2d 1241, 1248 (D. Colo. 2007) ("[A]n execu-

20   tive order dictates an agency's policy unless or until Congress enacts a statutory policy . . . .").

21   In view of this, courts have correctly concluded that agency action is unreviewable under the

22   APA to the extent it adopts a President's choices under authority granted to the President by

23   Congress.

24          Concluding that the APA does not permit review of the Final Rule, to the extent that

25   it adopts choices made by the President, would not give the executive branch carte blanche to

26   avoid the APA's requirements:  Of course, the agency is bound by the requirements of the

27   APA to the extent it exercises its own statutory authority.  *See* Elena Kagan, Presidential Ad-

28

ministration, 114 Harv. L. Rev. 2245, 2351 (2001) ("When the challenge is to an action delegated to an agency head but directed by the President, a different situation obtains: then, the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern."); *see also Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 104 (reaching the same conclusion).

Unsurprisingly, Plaintiffs' brief contends, contrary to the discussion above, that the Final Rule is subject to APA review even insofar as it simply adopts discretionary choices made by the President. PI Mot. at 23-24. The contention is flawed, and the arguments in support of it are unpersuasive. Plaintiffs start by arguing that a D.C. Circuit case, *Reich*, 74 F.3d at 1327, and a D.C. District Court case, *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), *and amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419 (APM), 2021 WL 1037866 (D.D.C. Feb. 19, 2021), conclude that, in circumstances like those present here, APA review is available. But in *Reich*, the Plaintiff did not raise an APA claim, *see Reich*, 74 F.3d at 1327 (noting that "Appellants have not . . . amended their complaint to rely on the APA"), so any statements about reviewability are dicta, and numerous courts have chosen not to follow this dicta for the good reasons set out above. *Gomez* does no more to further Plaintiffs' cause. The *Gomez* court distinguished between non-reviewable "ministerial implementation[s] of presidential action" and reviewable agency actions that "expan[d]" Presidential action. 485 F. Supp. 3d at 178. As already explained, the Final Rule, to the extent challenged by Plaintiffs, constitutes the "ministerial implementation" of Presidential action. Thus, the conclusion that the elements challenged by Plaintiff are unreviewable is consistent with the *Gomez* decision.[11]

Next, Plaintiffs implausibly insist that the EO gave DOL the authority to reject any and every aspect of the EO. PI Mot. at 24 (stating that the EO "specifically instructs the

---

[11] In the introduction to their brief, Plaintiffs ask "why [did DOL] bother to take comments at all if it was always and completely bound to follow the EO without question or deviation"? PI Mot. at 3. The answer is simple: The EO left certain gaps for DOL to fill, as to which it exercised its own discretion. Plaintiffs do not challenge any of the discretionary choices made by DOL.

Department to issue regulations implementing the Order only 'to the extent permitted by law' and 'consistent with applicable law,' including 'as appropriate, exclusions from the requirements of this order') (quoting 86 Fed. Reg. at 22,835-836).  The crucial language of the EO regarding DOL's discretion is this:  "The Secretary shall, consistent with applicable law, issue regulations by November 24, 2021, to implement the requirements of *this order*." 86 Fed. Reg. at 22,836 (emphasis added).  Plaintiffs misunderstand this language.  Under their interpretation, the President was inviting DOL to rewrite the EO, i.e., to pick a different minimum wage or undo the rescission of EO 13,838.  But if DOL did that, it would not be "implement[ing] the requirements of this order."  86 Fed. Reg. at 22,836.  It would be implementing a fundamentally different order, one of its own making.   Rather than serving as an open-ended invitation to redline the EO, this language ensures that the agency will satisfy any necessary procedural requirements, and limit application of the EO to the contractors and situations otherwise allowed by law, *see e.g., Reich*, 74 F.3d 1339 (concluding that EO issued under FPASA was preempted by the National Labor Relations Act).[12]

## C.  Executive Order 14,026 Does Not Violate the Spending Clause.

Plaintiffs also allege that the EO and Final Rule are invalid under the Spending Clause.  Compl. ¶¶ 148-155.  According to Plaintiffs, the FPASA does not give the President the authority to issue the EO but, if it does, it (i.e., the FPASA) violates the Constitution's Spending Clause, U.S. Const. art. I, § 8, cl. 1, in this circumstance, because the FPASA does not "provid[e] clear notice to States that acceptance of federal contracting funds will require them to pay a minimum wage set by the federal government."  Compl. ¶154.  Thus, according to

---

[12] Plaintiffs argue that the President's conclusion that the minimum wage-requirements of the EO and the Final Rule will increase the efficiency of government contracting is both irrational and pretextual. PI Mot. at 15. These arguments fail.  First, the conclusion was made by the President and, as such, is unreviewable under the APA.  Second, for the reasons explained above, *see* Section II.A.1, there is nothing irrational about the conclusion.  Third, the conclusion is not pretextual: the mere fact that it aligns with the Administration's other policy priorities does not render it so. *See Dep't of Com.*, 139 S. Ct. at 2573-74 (explaining that a "court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons" and that "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities").

Plaintiffs, the EO and the related Final Rule are invalid.  The allegation is flawed:  it relies on case law from the inapplicable context of government grants and, in doing so, ignores the differences between grants and contracts.

The Spending Clause states, in relevant part, that "the Congress shall have Power . . . to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  In the context of federal *grants* to states, the Supreme Court has held that, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously."  *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).   Plaintiffs extrapolate the holdings of cases like *Dole* to the circumstances of this case and argue that, if the FPASA authorizes the EO, then it violates the Spending Clause, because it does not provide notice of the contractor minimum-wage provision.  Compl. ¶¶ 154-55.

But this case involves contracts, not grants, and Defendants are unaware of any authority for the proposition that the Spending Clause cases Plaintiffs rely on apply to contracts. Indeed, the cases relied on by Plaintiffs provide ample reason to conclude that they do not. Take, for example, *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981); *see* Compl. ¶ 151 (citing *Halderman*).  In that case, the Supreme Court explained its position on the congressional clear-statement rule, in the context of grants:

> Legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

*Halderman*, 451 U.S. at 17.  This case, of course, involves contracts—the measuring stick against which the Supreme Court evaluated grant conditions.  And in the context of contracts, Plaintiffs know the precise terms of their agreements, because there are actual contracts, laying

1    out the terms of the agreement.  Moreover, as Plaintiffs have been entering into contracts with

2    the federal government for years subject to the minimum-wage standards of EO 13,658, which

3    was issued by President Obama in 2014, it is unpersuasive for them to claim now that they

4    will not have adequate notice of any applicable wage standards absent their appearance in

5    statutory text. In short, Plaintiffs cannot credibly argue that they are "unaware of the condi-

6    tions or [are] unable to ascertain what is expected of them," *Halderman*, 451 U.S. at 17, insofar

7    as wages are concerned.

8         Plaintiffs' allegations resemble arguments made by states in three cases challenging the

9    executive order regarding the vaccination of employees of federal contractors.  The argument

10   was rejected by the courts that addressed it, and Plaintiffs' claim should be dismissed here.

11   Those states argued that, if the FPASA authorizes the federal government to predicate its entry

12   into contracts on the vaccination status of contractors' covered employees, then the FPASA

13   violates the Spending Clause because it does not provide adequate notice of this requirement.

14   Two courts rejected the argument, and they did so for similar reasons, *see Missouri v. Biden*, 2021

15   WL 5998204, at *6; *Kentucky v. Biden*, 2021 WL 5587446, at *7 (E.D. Ky. Nov. 30, 2021); the

16   argument was not squarely addressed by the Court in the third case, *see Florida v. Nelson*, 2021

17   WL 6108948, at *13 (M.D. Fla. Dec. 22, 2021).  First, both courts that rejected the argument

18   concluded that the states provided no support for the proposition that that the "*Pennhurst . . .*

19   standard[ ] applies to federal contracts."  *Missouri v. Biden*, 2021 WL 5998204, at *6; *see also*

20   *Kentucky v. Biden*, 2021 WL 5587446, at *7.  Second (and relatedly), both courts explained that,

21   as the Supreme Court held in *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998),

22   "when the Government is acting as patron rather than as sovereign, the consequences of im-

23   precision are not constitutionally severe," *Missouri v. Biden*, 2021 WL 5998204, at *6; *see also*

24   *Kentucky v. Biden*, 2021 WL 5587446, at *7.  Put otherwise, contracts are not the same as stat-

25   utes, and they should not be treated identically under the Constitution.

26   **III.   Plaintiffs Fail to Establish That They Are Entitled to a Preliminary Injunc-**

27   **tion.**

28        For all of the reasons stated above, Plaintiffs cannot prevail on the merits as a matter

of law—much less have they established a likelihood of success on the merits or even serious questions.  Moreover, Plaintiffs—who bear the burden of establishing that each *Winter* factor tips in their favor—also fail to establish that they will suffer irreparable harm absent emergency relief, or that the balance of equities and public interest favor Defendants.

### A.  Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs have not demonstrated that they are likely to be irreparably harmed absent a preliminary injunction.  Thus, their motion should be denied.

A plaintiff cannot secure preliminary injunctive relief without demonstrating that irreparable harm likely will flow from the Court's failure to issue an injunction prior to resolution of the case on the merits.  *Winter*, 555 U.S. at 20.  "Suffering irreparable harm prior to a determination of the merits is perhaps the single most important prerequisite for the issuance of preliminary injunctive relief."  11A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (3d ed. 1998)) (cleaned up).  The alleged harm must be both imminent and non-speculative.  *Privitera v. California Bd. Of Medical Quality Assurance*, 926 F.2d 890, 897 (9th Cir. 1991); *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  A delay in seeking a preliminary injunction undercuts the contention that there is an urgent need for relief prior to a determination on the merits.  *See, e.g.*, *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

Plaintiffs allege that they will suffer three forms of irreparable harm:  (1) financial injuries, in the form of compliance costs, increased wages, lost tax revenue, and increased unemployment benefit payments; (2) quasi-sovereign injuries, in the form of harm to Plaintiffs' economies; and (3) sovereign injuries, in the form of interference with the state's ability to regulate its workforce.  PI Mot. at 26-27.

None of these arguments is persuasive.  Financial harms ordinarily do not constitute irreparable harms.  *See Blocktree Properties, LLC v. Pub. Util. Dist. No. 2 of Grant Cty. Washington*, 783 Fed. App'x 769, 770-71 (9th Cir. 2019).  And while it is true that some courts have found

36

that a financial harm can constitute irreparable harm when "the plaintiff(s) are suing a government entity that has not waived sovereign immunity to seek monetary damages," *Kollasoft Inc. v. Cuccinelli*, No. CV-19-05642-PHX-JZB, 2020 WL 263618, at *9 (D. Ariz. Jan. 17, 2020), *appeal dismissed, cause remanded sub nom. KollaSoft, Inc. v. Koumans*, No. 20-15092, 2020 WL 8254340 (9th Cir. July 24, 2020), a court in this District has explained that more is required even when sovereign immunity is involved.  Specifically, the Court concluded that the financial harm must be "considerable" in relation to the resources of the parties.  *Ariz. Hosp. & Healthcare Ass'n v. Betlach*, 865 F. Supp. 2d 984, 1000 (D. Ariz. 2012).  Plaintiffs make no effort to demonstrate that any financial harm is considerable in relation to their resources, *see* PI Mot. at 26-27, which, in any case, would be an uphill climb given that, for example, Arizona has an executive budget well into the billions.[13]  *See* State of Arizona Executive Budget, Summary, Fiscal Year 2022 (available online at https://www.azospb.gov/Documents/2021/FY%202022%20Summary%20Book.pdf).

In addition, Plaintiffs' arguments that the Final Rule will result in decreased tax revenue and increased unemployment claims are speculative.  The assertion that tax revenue would decrease depends on speculation that any beneficial productivity effects, *see* 86 Fed. Reg. at 67,212, and increased personal income tax revenues from higher wages, will not offset any corporate tax wage deductions.  Similarly, Plaintiffs' arguments about increased unemployment claims rely on speculation that a higher minimum wage will reduce employment at the contractors—the Final Rule rationally concludes otherwise, *see* 86 Fed. Reg. at 67,211—and that if it does, that it will lead to an increase in unemployment benefits claims (and payments).  (Or, put otherwise, as noted in Section I, above, Plaintiffs' arguments rely on discretionary choices to be made by third parties not before the court.)  Such speculative arguments are insufficient to establish irreparable injury.  *See Caribbean Marine Services Co.*, 844 F.2d at 674.

Plaintiffs' alleged quasi-sovereign injuries also do not constitute irreparable harm.  On

---

[13] Moreover, any financial effect would be felt over time, as contracts were renewed, or new contracts were entered into:  there would not be an effect all at once at some point before final judgment.

1   this score Plaintiffs contend that the Final Rule will harm Plaintiffs' economies both because

2   "businesses . . . will be forced to push up their labor costs, or give up lucrative government

3   contracts or access to public lands." PI Mot. at 26-27. These alleged harms are speculative,

4   however, and so cannot constitute irreparable harm. *See Caribbean Marine Services Co.*, 844 F.2d

5   at 674. Plaintiffs can only speculate that higher wages will hurt their  economies, and there is

6   a strong reasons to believe the contrary is true. After all, the increased wages will go into the

7   pockets of their States' workers, giving them more money with which to buy, save, and invest.

8   Similarly, whether businesses will forgo government contracts, rather than just negotiating

9   different terms, is also speculative. (Again, Plaintiffs' arguments rely on decisions to be made

10  by third parties not before the Court.) But even if these speculative harms constituted irrep-

11  arable harm—they do not—Plaintiffs would lack standing to raise them. This argument seems

12  to be a repackaged *parens patriae* argument—i.e., Plaintiffs seem to be trying to vindicate the

13  interests of their citizens vis-à-vis the federal government—but it has long been established

14  that States cannot raise arguments on behalf of their citizens against the federal government.

15  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982).

16      Plaintiffs' arguments that they have or will suffer a sovereign injury similarly fail. A

17  sovereign injury can occur when the federal government overrides a state's choices, as embod-

18  ied in its own legal code. *See Abbott*, 138 S. Ct. at 2324 n.17 (noting that "the inability to

19  enforce its duly enacted plans clearly inflicts irreparable harm on the State"). But the Final

20  Rule does not override any choice made by a state regarding how much to pay its workers. A

21  state can choose whether or not to enter into a contract with the federal government. If it

22  chooses to enter into a contract, then it is choosing to abide by the terms requested by the

23  federal government—including terms about wages. And if a state does not like those terms,

24  then it can choose to forgo the contract, and leave its relationship with its workers as it is. No

25  harm is inflicted on the dignity of states as sovereigns by giving them this choice.

26      In addition, Plaintiffs' delay in seeking the injunction in this case "implies a lack of

27  urgency and irreparable harm," *Oakland Tribune, Inc.*, 762 F.2d at 1374, further undercutting

28  their arguments. Plaintiffs filed their motion for a preliminary injunction on April 18, 2022,

which was more than *two months* after filing their complaint (February 9, 2022), almost three *months* after the Final Rule went into effect (January 30, 2022), and almost *five months* after DOL issued the Final Rule (November 24, 2021).  *See* 86 Fed. Reg. 67,126. (Moreover, Plaintiffs have been on notice of the issue since the President issued the EO in April 2021.)  This pace does not bespeak an urgent need for relief.  Indeed, other Courts have viewed delays of similar lengths—or shorter—as undermining a plaintiff's argument for irreparable harm.  *See, e.g.*, *Herrick v. Potandon Produce, LLC*, 2016 WL 778355, at *4 (D. Idaho Feb. 26, 2016) (concluding that a three month delay before seeking to enjoin former employee from working at compet-itor "cuts against [the defendant's] argument for irreparable harm"); *Compass Bank v. Lovell*, No. CV-16-00538-PHX-DJH, 2016 WL 8738244, at *8 (D. Ariz. Apr. 8, 2016) (holding that a 2.5 month delay weighs against finding irreparable harm).  This Court should do the same.[14]

In sum, Plaintiffs have not established that they will be irreparably harmed absent the issuance of a preliminary injunction.

### B. The Balance of the Equities and the Public Interest Favor Defendants.

Plaintiffs also have failed to demonstrate that the balance of equities or public inter-est—factors that merge when the Government is a party,  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021)—tip in their favor.  As an initial matter, the public has an interest in the timely effectuation of their elected President's EO.  *Cf. Maryland v. King*, 567 U.S. 1301, 1303 667 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers))).  Further, the public has an interest in realizing the

---

[14] The Tenth Circuit has entered a nationwide preliminary injunction with respect to a narrow aspect of the rule.  Tenth Circuit Injunction Order at 2.  Plaintiffs do not have standing to challenge that aspect of the rule, as noted above, *see* § I, but even if they did, there would be no need for relief as to that aspect of the rule, in light of the Tenth Circuit's injunction.  *See, e.g., Arizona v. Mayorkas*, No. CV-21-00617-PHX-DWL, 2022 WL 357348, at *15 (D. Ariz. Feb. 7, 2022).

economy and efficiency benefits of the $15 minimum wage—including higher quality output from the employees of businesses with whom the government contracts on the public's behalf. Finally, the employees to whom EO 14,026 applies are entitled to their lawful wages. If this Court enjoined enforcement and that injunction is later dissolved, those workers would presumably have no recourse to recover the wages improperly withheld from them. For these reasons, Plaintiffs also have not met their burden of showing that the third and fourth injunction factors tip in their favor.

## **CONCLUSION**

For the foregoing reasons, the Court should (i) dismiss Plaintiffs' complaint or enter summary judgment in favor of Defendants, and (ii) deny Plaintiffs' motion for a preliminary injunction as moot. Alternatively, even if the Court reserves judgment on Defendants' motion to dismiss and motion for summary judgment, it should deny Plaintiffs' motion for a preliminary injunction, which fails to satisfy the *Winter* standard.

Dated: April 29, 2022                           Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

BRAD P. ROSENBERG
Assistant Branch Director
Federal Programs Branch

*/s/ Justin M. Sandberg*
JUSTIN M. SANDBERG
Senior Trial Counsel
Illinois Bar No. 6278377
TAISA M. GOODNATURE
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 514-5838
E-mail: justin.sandberg@usdoj.gov

*Counsel for Defendants*

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on April 29, 2022, I electronically transmitted the foregoing to the

3    Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic

4    Filing to the CM/ECF registrants for this matter.

5

6        */s/ Justin M. Sandberg*

7        JUSTIN M. SANDBERG

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28