2:22-cv-00213-JJT, July 12, 2022

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3              _____

4
   State of Arizona, et al.,          )
5                                      )
                     Plaintiffs,       )
6                                      )
                  vs.                  )  2:22-cv-00213-JJT
7                                      )
   Martin J. Walsh, et al.,            )
8                                      )  Phoenix, Arizona
                     Defendants.       )  July 12, 2022
9  _____)  1:33 p.m.

10

11         BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE

12        REPORTER'S TRANSCRIPT OF PROCEEDINGS

13               MOTION HEARING

14

15

16

17

18

19

20
   Official Court Reporter:
21 **Elaine Cropper, RDR, CRR, CCP**
   Sandra Day O'Connor U.S. Courthouse
22 401 West Washington Street
   Suite 312, SPC 35
23 Phoenix, Arizona  85003-2150
   (602) 322-7245
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

                United States District Court

2:22-cv-00213-JJT, July 12, 2022

1                              **APPEARANCES**

2

For the Plaintiff States:
3        **DREW C. ENSIGN, ESQ.**
         **JAMES K. ROGERS, ESQ.**
4        Office of the Attorney General
         2005 N. Central Ave.
5        Phoenix, AZ  85004-1592
         602.542.7695/(fax) 602.542.7670
6

7   For the Defendant Federal Government:
         **TAISA M. GOODNATURE, ESQ.**
8        **BRADLEY P. ROSENBERG, ESQ.**
         U.S. Department of Justice
9        Federal Programs Branch
         1100 L. St. NW
10       Washington, D.C.  20005
         202.514.3786/(fax) 202.616.8470
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

2:22-cv-00213-JJT, July 12, 2022

**P R O C E E D I N G S**                                    12:00:59

1

2          (Court was called to order by the courtroom deputy.)

3          (All counsel are present in the courtroom.)

4          (Proceedings begin at 1:33.)

5          THE COURT:  Good afternoon, everyone.  Please be    01:33:38

6    seated.

7          COURTROOM DEPUTY:  This is civil case 22-213, *State

8    of Arizona v. Martin Walsh*.

9          This is the time set for motion hearing.

10         Counsel, please announce.                           01:33:47

11         MR. ENSIGN:  Drew Ensign for the plaintiff states.

12         MS. GOODNATURE:  Taisa Goodnature for the federal

13   government.  And I'm joined with Brad Rosenberg, Assistant

14   Director of the Federal Programs Branch.

15         THE COURT:  All right.  Good afternoon to all of you  01:34:00

16   and welcome.

17         This is the time set for hearing both argument on the

18   preliminary injunction application as well as the motion to

19   dismiss.

20         Counsel, I have had the benefit of your briefing.  I  01:34:19

21   have been able to read all of your briefing and supporting

22   materials there were.  Appreciate all that went into those.

23   And I am now ready to hear your oral presentations.

24         You have an audience today because there are several

25   externs that are working in the various chambers within this  01:34:38

United States District Court

 1    building.  So for their benefit, I hope you're excellent.        01:34:41

 2          Because we have essentially two sets of motions, I'm

 3    going to handle this the way I would handle examination in a

 4    trial when both parties are calling the same witness where,

 5    essentially, I'm going to start with the movant on the          01:34:59

 6    application for injunctive relief and I'll hear roughly and

 7    technically your argument in chief.  I will then move over to

 8    the United States Government agency counsel and hear your

 9    response to that and your own support for your motion.  And we

10    will give each side two opportunities.  So I'm going to come    01:35:25

11    back to you for rebuttal and then you'll have, essentially, a

12    rebuttal in your own motion.

13          Whenever you're ready.  And I am fine, by the way, if

14    you want to go from the lectern or from counsel table.

15          MR. ENSIGN:  Good afternoon Your Honor.  Drew Ensign,     01:35:53

16    Arizona Deputy Solicitor General for the plaintiff states.

17          I would like to focus on five main points that we

18    underscore why a preliminary injunction is appropriate and why

19    the motion to dismiss or for summary judgment should be denied.

20          First, this case is controlled by the Major Questions     01:36:08

21    Doctrine, particularly as refined by the *West Virginia v. EPA*

22    decision.  Where it applies, that doctrine demands, quote,

23    clear Congressional authorization for the power the agency

24    claims, end quote, which is not even arguably present here.

25          The central question is thus, whether the question        01:36:27

United States District Court

1    presented here is a major one.  Here that question is whether    01:36:30

2    or not the authority to set wages for one-fifth of the U.S.

3    work force is a major question.  It plainly is.  It is

4    precisely the sort of, quote, regulatory power over a

5    significant portion of the American economy that *West Virginia*    01:36:48

6    holds makes the question a major one.  And it, similarly, is a

7    question of, quote, vast economic and political importance, end

8    quote, that *Alabama Realtors* make clear as a major question.

9         Now, defendants have argued that the rule does not

10    trigger the Major Questions Doctrine because it only affects    01:37:06

11    about 300,000 workers.

12         But *West Virginia* makes plain that the relevant

13    question is, quote, the breadth of the authority that the

14    agency has asserted, end quote.  And here that authority is to

15    regulate wages for one-fifth of the federal work force.    01:37:21

16         THE COURT:  When you use the term or the calculation,

17    quantity, ratio, one-fifth, what's the derivation?  I noticed

18    that in the briefing.

19         MR. ENSIGN:  It's this Court's own observation in the

20    *Brynovich v. Biden* decision.  We quoted specifically this    01:37:40

21    Court's finding that that's one-fifth of the federal work

22    force.

23         THE COURT:  That what is one-fifth of the federal

24    work force?

25         MR. ENSIGN:  That the scope of authority -- that the    01:37:48

2:22-cv-00213-JJT, July 12, 2022

| | | |
|---|---|---|
| 1 | number of employees that are reached under the definition of | 01:37:52 |
| 2 | contractor that this court uses and that the federal vaccine | |
| 3 | contractor used. | |
| 4 | THE COURT:  Doesn't this regulation only reach a | |
| 5 | subset of those persons, that is, those that are not making $15 | 01:38:04 |
| 6 | an hour? | |
| 7 | MR. ENSIGN:  I don't believe so, Your Honor, and for | |
| 8 | several reasons.  And I think, for example, if you look to the | |
| 9 | *Brown & Williamson* case, the question was not what -- how | |
| 10 | FDA had exercised its power and how much tobacco regulation | 01:38:18 |
| 11 | there would be.  The question was whether or not the authority | |
| 12 | to regulate tobacco at all was a major question, and it plainly | |
| 13 | was. | |
| 14 | Similarly, the asserted power here is the power to | |
| 15 | set wage mandates for one-fifth of the economy.  Now, just | 01:38:33 |
| 16 | because they haven't exercised to it the maximum extent that | |
| 17 | they can is not dispositive.  In fact, it's not even relevant. | |
| 18 | The relevant question is -- | |
| 19 | Sorry, Your Honor.  You looked like you had a | |
| 20 | question. | 01:38:48 |
| 21 | THE COURT:  No.  I'm trying hard not to interrupt.  I | |
| 22 | know it's impolite so I won't.  I'll wait until you're finished | |
| 23 | with the area. | |
| 24 | MR. ENSIGN:  Your Honor, you should feel absolutely | |
| 25 | free to. | 01:38:58 |

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1      So it's the scope of the authority asserted here.          01:38:58

2 And the authority -- there's nothing in their arguments here

3 that would prevent them from setting, say, $100 an hour minimum

4 wage that would affect, you know, roughly 90 percent or more of

5 the theoretical authority.                                     01:39:14

6      So the way the Supreme Court has looked at it

7 similarly in *West Virginia v. EPA*, they didn't look at how many

8 coal plants is this going to affect.  They said the authority

9 to regulate carbon dioxide is of such a sweeping nature that

10 it's a major question without considering how EPA proposed to   01:39:29

11 exercise that authority.  So it's the scope of the potential

12 authority that makes a question a major one.

13      You might wonder at what level of specificity that

14 is; but certainly I think the relevant question here, and it's

15 a dispositive one, is, do they have the ability to set global   01:39:47

16 wage mandates for employees within the scope of their

17 Procurement Act authority?  And I think that question is

18 plainly a major one and it's a major one, you know, further for

19 the reasons that this Court recognized in *Brnovich v. Biden* and

20 the Sixth Circuit recognized in *Kentucky v. Biden*.            01:40:04

21      You know, I think Justice Gorsuch's concurrence in

22 West *Virginia v. EPA* is particularly instructive here.  There

23 he gives three distinct factors, each of which is individually

24 likely to trigger the Major Questions Doctrine.  And somewhat

25 usually, I think all three are present here.                    01:40:22

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1       I'll start with the one that is most applicable.                01:40:29
2   When an agency seeks to regulate a significant portion of the
3   American economy.  That is plainly the case here.  This
4   regulation seeks to regulate a significant portion of the U.S.
5   economy.  It may actually make a difference for a smaller          01:40:43
6   subset but the sweep of the authority is, it affects one-fifth
7   of the federal -- sorry, not the federal work force, the entire
8   U.S. work force.

9       Second, another factor is when an agency claims the
10  power to resolve a matter of great political significance.         01:40:59
11  That is plainly the case with minimum wage regulations.  That's
12  one of the most politically salient -- political footballs that
13  exists.  Hardly any campaign election cycle goes by without
14  innumerable candidates campaigning specifically on the minimum
15  wage, including President Biden himself as recently as the last    01:41:22
16  election.  And so I think the idea that minimum wage regulation
17  doesn't have significant political importance is simply
18  untenable.

19      And the third factor that the concurrence identified
20  is when an agency seeks to intrude into an area that is the        01:41:35
21  particular domain of state law.  Now, as an initial matter,
22  what states paid their own employees is plainly the traditional
23  domain of state law.  And this rule tells states exactly what
24  they must pay their own workers.

25      THE COURT:  If they choose to contract?                        01:41:55

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1        MR. ENSIGN:  That is correct in a sense, Your Honor,      01:41:59

2   although as a practical matter, that is a choice that no state

3   has ever refused.  This is a power that -- this is an offer the

4   states can't refuse.  No state is not a federal contractor.

5   There's no state that doesn't have universities that aren't      01:42:15

6   federal contractors.  It certainly is the case that -- and the

7   rule itself acknowledges that this is going to reach regulation

8   of state employees.

9        You know, certainly there's the theoretical ability

10  to refuse federal aid.  We acknowledge that exists in the      01:42:33

11  abstract.  But certainly dictating to states what they must pay

12  their own workers is a traditional domain of state law.  You

13  know, more than just that, I think, minimum wage regulation is

14  a perennial topic of robust debates in state legislatures where

15  Congress only occasionally dabbles in this field, typically      01:42:53

16  only once a decade or so, often less.

17       By contrast, the state legislatures are constantly

18  acting at the laboratories of democracy and regulating in this

19  field.  Indeed 29 states currently have minimum wages above the

20  federal floor which underscores how much the states are the      01:43:10

21  active regulator in this field.

22       So for all of these reasons, we think the Major

23  Question Doctrine applies.  And there's essentially no argument

24  here that if it does apply, that the requisite clear

25  Congressional authorization is provided by the Federal      01:43:27

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    Procurement Act.                                                    01:43:29

2            Second, the rule does not satisfy the close nexus

3    requirement that the Procurement Act demands.  The DC circuit

4    in *Kahn* only upheld regulation of wages through price controls

5    because there it had a, quote, likely direct and immediate       01:43:47

6    effect of holding down the Government's procurement costs.  But

7    here the rule itself acknowledges that contractors could pass a

8    law in part or all of the increased costs to the Government in

9    the form of higher contract prices and, quote, thus necessarily

10   increasing the Government's contracting expenses.                01:44:06

11           And to the extent that there might be any offsetting

12   efficiencies, which is another disputed issue that might be

13   created, they will at most be indirect and delayed rather than

14   the direct and immediate sort of effect that the DC circuit

15   found sufficient in *Kahn*.                                      01:44:25

16           Ultimately here, the defendants' interpretation has

17   no limiting principle at all.  Indeed when pressed for specific

18   examples by the states, all the defendants would dismissively

19   offer is that this Court need not concern itself with such

20   hypotheticals, end quote.                                        01:44:44

21           THE COURT:  Before you go on, Mr. Ensign.  I can't

22   resist this time because I don't want to lose the thought.  Is

23   it your position that with *Kahn* as a precedent, the benefits

24   must be immediate?

25           MR. ENSIGN:  Your Honor, I think that is likely the      01:45:04

United States District Court

1    case.  That's clearly what the DC-- it's what the DC circuit        01:45:06

2    found sufficient and what it clearly implied, the absence of

3    which would have doomed the rule.  I think the fair reading of

4    *Kahn* is that the Government was very close to the line of its

5    authority there; but, nonetheless, that because it set price       01:45:22

6    ceilings and was intentionally designed to hold down the cost

7    of contracting, it, nonetheless, sufficed.  *Kahn* itself

8    expressly says that it doesn't grant a blank check to the

9    President.

10           Now, there may be things where, you know, maybe            01:45:38

11   that's not the right way to measure it or maybe something -- if

12   you look, for example, I think at nondiscrimination statutes,

13   for example, I think that has an obvious -- it has an obvious

14   efficiency rationale because by definition, picking people on

15   bases, other than their own merits, is going to be necessarily     01:45:59

16   inefficient.  I think that would -- courts have found that that

17   satisfies the test as well.

18           My intuition would be that that would be a fairly

19   direct effect.  But -- but I think it, you know, may very well

20   be tenable even if it were not a direct effect.  But I think       01:46:16

21   certainly the DC circuit, when addressing regulation of wages

22   under the Procurement Act, thought that, you know, that

23   regulation was only okay, because it had the direct and

24   immediate impact and that stretching further than that would

25   very likely have caused the Government to exceed its authority     01:46:36

2:22-cv-00213-JJT, July 12, 2022

1   under the Procurement Act.                                        01:46:38

2           THE COURT:  Thank you.

3           MR. ENSIGN:  Third, this rule violates the APA if the

4   APA applies.  Defendants admit that they did not consider

5   alternatives to a $15 an hour mandate whatsoever.  That plainly   01:46:54

6   violates the APA.  And so the question is just whether or not

7   the APA applies.  It does.  There is simply no just following

8   orders exception that defendants conjure.

9           As the DC circuit explained, the existence of a,

10  quote, President's Executive Order hardly seems to insulate       01:47:16

11  defendants' actions from judicial review under the APA.  That's

12  *Chamber of Commerce v. Reich*, and that's exactly what

13  defendants are claiming here.

14          The Ninth Circuit has actually put an even finer

15  point on it, and particularly their decisions in the *East Bay*   01:47:33

16  cases confirmed that.  That case acknowledged that, quote,

17  Presidential action is not ordinarily agency action and is

18  typically unreviewable under the APA.  But the proclamation and

19  rule together create an operative rule of addition . . . that

20  is reviewable by this Court, end quote, and that's 993 F.3d at    01:47:53

21  669.

22          Here the rule in the Executive Order, too, creates a

23  rule of decision, which is to create the $15 an hour mandate.

24  The Executive Order by itself accomplishes exactly nothing and

25  doesn't cause anyone to pay anyone an additional cent.  It's      01:48:12

2:22-cv-00213-JJT, July 12, 2022

1   only when it interacts with the rule that it becomes legally      01:48:15
2   operative.  And so *East Bay* makes clear that is reviewable.

3        The Ninth Circuit similarly explained and read the
4   *Chamber of Commerce* case exactly as the state does here.  The
5   Ninth Circuit crated *Chamber of Commerce* for the explicit     01:48:31
6   proposition that, quote, agency regulations that implement an
7   Executive Order are reviewable under the APA, end quote.  That
8   is 932 F.3d at 770, citing *Chamber of Commerce*.  That is
9   precisely what we have here.  We have an agency regulation that
10  implements an Executive Order which the Ninth Circuit holds is   01:48:51
11  squarely reviewable under the APA.

12       Now, defendants have pointed to the *Franklin* case as
13  precluding APA review; but as we've explained, that only
14  applies when the President is the final actor in the sequence
15  and legal consequences flow direct from his action.  That is    01:49:08
16  simply not the case here.  The Executive Order by itself has no
17  operative effect on any federal contractors.  It's only the
18  rule of defendants that give it any legal effect.  And in that
19  case, *Franklin* is not applicable and *East Bay* and *Chamber of*
20  *Commerce* both make clear that the rule is reviewable under the  01:49:28
21  APA.

22       Moreover, the Executive Order, by its terms, does not
23  preclude APA compliance.  It expressly says that DOL should act
24  only, quote, to the extent permitted by law, consistent with
25  applicable law, end quote, and includes authorization          01:49:50

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   specifically to create, quote, as appropriate, exclusions from    01:49:54

2   the requirements of this order, end quote.

3          On its face then, the Executive Order does not

4   preclude APA compliance and actually affirmatively asked DOL to

5   consider alternatives as, quote, exclusions from the    01:50:10

6   requirements of the order.  And so not only does the Executive

7   Order not preclude compliance with the APA, it directs DOL to

8   comply with applicable law and to consider exclusions, which

9   the rule admittedly refuses to do.

10         Fourth, even if the central choices such as the $15    01:50:31

11  an hour mandate itself, are not subject to the APA, DOL admits

12  that at least some parts of the rule are subject to the APA.

13  And that is at 32, note 11 of their first brief.  That

14  concession is fatal here because DOL has not even attempted to

15  offer a defense of its failure to consider the reliance    01:50:51

16  interest of the states or indeed anyone else.  Indeed the word

17  "reliance" cannot be found anywhere in all 110 pages of the

18  rule.  And defendants squarely refuse to answer the states'

19  argument on this point and their briefs won't use the word

20  "reliance" either.  The failure to consider those reliance    01:51:10

21  interests violates *Regents* if any part of the rule is subject

22  to the APA.  And defendants admit that at least some parts of

23  the rule are indeed subject to APA requirements.

24         Finally, the rule violates the trio of the

25  Davis-Bacon Act, the Public Contracts Act, and the Service    01:51:31

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   Contracts Act.  All of those statutes require that the federal        01:51:34

2   government pay local prevailing wages for particular contracts.

3   While defendants suggest that that only sets wage floors, those

4   statutes do more than that.  They direct the method by which

5   the appropriate wages are to be considered, or to be determined   01:51:50

6   rather, which is to say they demand that they be set locally

7   rather than on a nationwide, one-size-fits-all basis.

8          The rule flouts these statutes and improperly uses a

9   general provision to trump far more specific ones that are here

10  replicated in triplicate.                                          01:52:12

11         With that, I welcome any questions from the Court.

12         THE COURT:  I probably am going to hold all of my

13  remaining questions until the conclusion of all of the

14  argument.

15         MR. ENSIGN:  Thank you, Your Honor.                          01:52:35

16         THE COURT:  Actually, while you're up there, let me

17  ask you this, Mr. Ensign.  Although I'm not sure -- no, I can

18  leave that.  That's fine.  That's fine.  Thank you.

19         All right.  Ms. Goodnature, as I said, you're fine

20  from counsel table or the lectern, whatever you prefer.            01:52:57

21         MS. GOODNATURE:  Thank you, Your Honor.

22         Good afternoon, Your Honor.  And may it please the

23  Court, Executive Order 14,026 fits comfortably within the range

24  of executive actions that Presidents have taken pursuant to the

25  Federal Property and Administrative Services Act and that          01:53:12

United States District Court

1    courts have upheld since the statute's inception decades ago.          01:53:15

2          Not only have Presidents Obama, Trump, and Biden

3    agreed that the statute confers the specific authority to set a

4    minimum wage requirement for federal contractors, but

5    Presidents dating back to President Kennedy in 1961 have           01:53:32

6    concluded that the statute authorizes the President to set

7    certain requirements touching on the compensation and wages of

8    federal contractors' employees.

9          THE COURT:  Can I ask you a question about the

10   history you've just laid out?  Because I remember, as I read      01:53:50

11   the opening pages of your first brief on this issue, that you

12   had called out the fact that in 2014, President Obama had

13   issued an EO on this subject, very similar to the one we have

14   now but lower dollars to begin with and escalation factor and

15   so forth.  And then -- which was not challenged, I believe is      01:54:11

16   what you had said.  And then in 2018 President Trump issued an

17   EO that modified that to excise the outfitters and a few other

18   provisions.  That, too, was not changed.

19         Was the import of your statement there that because

20   neither of those Executive Orders were challenged, that parties   01:54:34

21   in the position of the states now have waived the ability or

22   was it simply the persuasive value of the fact that these were

23   recognized?

24         MS. GOODNATURE:  The purpose of that statement was to

25   emphasize the persuasive value and, furthermore, the              01:54:55

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   proposition that where the Executive Branch has understood its          01:54:57

2   authority in a particular manner over a series of years and in

3   this case, over a series of administrations.  That is at least

4   evidence, the Supreme Court has held, that that interpretation

5   is correct.  We do not purport that that evidence is              01:55:12

6   conclusive, but certainly the fact that those three Presidents

7   all agreed as to the scope of their authority and that those

8   Executive Orders went unchallenged in court is entitled to some

9   consideration as to whether or not they were supported which,

10  in turn, implicates the support for the Executive Order that       01:55:30

11  President Biden issued.

12           THE COURT:  Thank you.  Please go ahead.

13           MS. GOODNATURE:  I would like to turn to the Major

14  Questions Doctrine which my friends on the other side have

15  emphasized; and in particular, the Supreme Court's very recent    01:55:45

16  decision in *West Virginia v. EPA*.  And that decision has laid

17  out, in somewhat greater detail than previous cases, the

18  precise contours of what has come to be known as the Major

19  Questions Doctrine.  And indeed it underscores that the

20  doctrine is not applicable to this case.                          01:56:04

21           And that is for the four reasons that we emphasized

22  in our moving brief at pages 25 through 27 as well as two

23  additional reasons that I would like to address today.

24           The four reasons that we addressed in our brief are

25  that the statutory provision at issue here is not a vague,        01:56:20

United States District Court

2:22-cv-00213-JJT, July 12, 2022

| | | |
|---|---|---|
| 1 | ancillary provision.  Certainly it uses broad terms.  And as | 01:56:26 |
| 2 | the Supreme Court recognized in *Bostock v. Clayton County*, the | |
| 3 | import of a broadly worded delegation of authority is generally | |
| 4 | to confer broad authority.  But there is a difference between | |
| 5 | broad authority and a vague or ancillary provision which seems | 01:56:42 |
| 6 | to play a different role in the statutory scheme and that is | |
| 7 | what was at issue in *West Virginia v. EPA*. | |

Moreover, the federal government's action here is not fundamentally novel or unprecedented, nor has the President acted outside his area of expertise in exercising his proprietary authority on behalf of the federal government as a contracting entity.  And that further distinguishes the Executive Order at issue here and the implementing rule from the actions at issue in other Major Questions cases.

In particular, when it comes to acting outside the agency's area of expertise or taking an action that is fundamentally novel or unprecedented, this case, in light of the precedent that I mentioned earlier and that we have cited in our brief, stands in contrast to several of the key Major Questions cases such as *Brown & Williamson* where the FDA, in an unprecedented fashion, sought to regulate tobacco; *Utility Air Regulatory Group v. EPA* in which the EPA, in an unprecedented manner, sought to regulate small greenhouse gas sources such as hotels and office buildings; and, finally, in *Alabama Association of Realtors v. HHS* in which the CDC sought to

2:22-cv-00213-JJT, July 12, 2022

1    regulate the real state relationship between a landlord and          01:58:12

2    tenant by extending an eviction moratorium.  None of those

3    factors are present here.

4            The third factor counseling against the application

5    of the Major Questions Doctrine -- or rather the third            01:58:26

6    independent reason why that doctrine does not apply is that the

7    President here is not exercising regulatory -- regulatory

8    authority but, rather, proprietary authority.  And as Your

9    Honor noted in colloquy with my friends, the states here are

10   free to opt out of contracting with the federal government.        01:58:44

11   Certainly we recognize that.

12           There's a long history of the states contracting with

13   the federal government; but as to this point in particular, I

14   would direct the Court's attention to the contrast between

15   two -- what could have been major -- so-called Major Questions     01:58:58

16   cases that the Supreme Court decided earlier this year in

17   considering the vaccine mandates that were imposed in the pair

18   of cases decided I believe on the same day:  *NFIB v. OSHA* and

19   *Biden v. Missouri*.  And this pair of cases underscores this

20   distinction that we are drawing wherein where the Executive        01:59:23

21   Branch exercises proprietary authority.  The Major Questions

22   Doctrine is simply not applicable.

23           So in *NFIB v. OSHA*, the authority exercised there was

24   regulatory.  OSHA imposed a vaccine mandate on all employers of

25   at least 100 employees, regardless of whether they were in any     01:59:44

United States District Court

1    sort of contractual or contractual-esque relationship with the    01:59:49

2    federal government.  And the Supreme Court struck down that

3    mandate under the Major Questions Doctrine.

4         By contrast, in *Biden v. Missouri*, the Supreme Court

5    upheld the imposition of that vaccine mandate on health care    02:00:01

6    workers as a condition on Medicare and Medicaid funding.  And

7    that's really analogous to what we have here where the minimum

8    wage requirement for federal contractors' employees is a

9    condition on federal contracting which those contractors are

10   simply not required to accept, unlike the OSHA mandate, which    02:00:24

11   applied -- which there was no way for an employer of 100 or

12   more employees to escape its reach.

13        And *Biden v. Missouri*, like *NFIB v. OSHA*, was briefed

14   in many ways as a Major Questions case.  And it's telling that

15   the Supreme Court did not apply the doctrine there.    02:00:45

16        Fourth, we have here a direct delegation of authority

17   to the President and not to an unelected agency head, which

18   various Supreme Court justices, including Justice Gorsuch, have

19   concluded implicate some of the concerns underlying the Major

20   Questions Doctrine that call for a particularly clear    02:01:04

21   statement.

22        As I mentioned, there are two additional factors that

23   distinguish this case from *West Virginia v. EPA*.  The first is

24   that, notably, in *West Virginia v. EPA*, the Executive Branch

25   itself had disagreed as to whether or not the statute at issue    02:01:21

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    conferred authority to support the Clean Power Plan that is at    02:01:25

2    issue.   The Biden -- excuse me.   The Obama Administration had

3    developed that plan and the Trump Administration had rescinded

4    it expressly on the ground that the Trump Administration

5    concluded that the Executive Branch lacked authority.    02:01:41

6          And as we've discussed, that stands in contrast to

7    the agreement across presidential administrations with respect

8    to the scope of the Federal Property and Administrative

9    Services Act.

10          And the last reason is that the magnitude of the    02:01:55

11    action at issue in *West Virginia v. EPA* was far greater than

12    the magnitude of the rule at issue here.

13          So just to touch back to the actual effects of the

14    rule here, this is in the federal rule at pages 67,194 to '195.

15    as part of its analysis for purposes of OMB review, DOL    02:02:21

16    determined that there are 507,200 potentially affected firms.

17    And that goes to the broadest possible scope of who could be

18    affected under this rule without respect to whether those

19    employers already pay $15 an hour.

20          So, in other words, as my friend was discussing, the    02:02:46

21    sweep of the Government's interpretation of the statute here,

22    DOL found that this rule implicated, at most, 507,200 firms

23    regardless of whether they already paid a minimum wage of $15.

24    Of course many of them do and, therefore, there's no practical

25    effect here.   But even considering the maximum possible effect,    02:03:09

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1     that was the figure.                                        02:03:13

2           Moreover, DOL found that there were 1.8 million

3     potentially affected workers.  And, again, "potentially

4     affected" refers to those workers who fall within the sweep of

5     the rule, not just those who will see their wages rise as a    02:03:26

6     result of the rule.  That is a much smaller number.  327,300

7     employees is the number that DOL determined will actually see

8     their wages rise as a result of the action at issue here.

9           As we noted in our reply brief, the U.S. work force

10    currently employs about 164 million workers.  So even         02:03:50

11    considering the total sweep of workers affected, regardless of

12    whether they actually have a -- regardless of whether the rule

13    has a practical effect on those workers, it's roughly one

14    percent of the total U.S. work force.

15          And if Your Honor will bear with me for a few more of    02:04:09

16    these figures, I think it's also instructive to compare those

17    numbers to the impacts of the rule in *West Virginia v. EPA* and

18    in the NFIB and *Missouri* vaccine cases.

19          So with respect to the number of employees, the *NFIB*

20    case -- and Your Honor will recall that's the case in which the  02:04:30

21    Supreme Court struck down the OSHA mandate applying to all

22    large employers in the United States.  That mandate was

23    expected to affect about 84 million workers.  And by contrast,

24    in *Biden v. Missouri*, the condition on Medicare/Medicaid

25    funding that required health care workers to be vaccinated,     02:04:51

United States District Court

 1   that rule impacted about 10.4 million workers.                    02:04:54

 2          And, again, the Supreme Court did not apply the Major

 3   Questions Doctrine in that case and, in fact, concluded that

 4   the vaccine requirement was supported under the statute at

 5   issue there.  Again, that was 10.4 million and the Court did     02:05:09

 6   not apply the doctrine.

 7          Here at the absolute most, we have 1.8 million

 8   potentially affected workers and only around 300,000 who will

 9   actually see an effect.

10          THE COURT:  So let me take you back to the same           02:05:24

11   question that I asked Mr. Ensign at the outset and his answer

12   was, I am not to consider only that subset of folks that would

13   be directly affected --

14          MS. GOODNATURE:  Correct.

15          THE COURT:  -- if you can define that, that it is to      02:05:38

16   look at the more global number.  Is he correct?

17          MS. GOODNATURE:  He is correct in citing a statement

18   of the Supreme Court directing the Court to consider the total

19   sweep.

20          I will note there's some ambiguity, as I read *West*      02:05:49

21   *Virginia v. EPA* because the Court did rely in determining the

22   majorness of the rule, if Your Honor will, in noting that the

23   actual effect of the Clean Power Plan was -- excuse me, Your

24   Honor -- it was expected to reduce GDP by at least one trillion

25   dollars by 2040.  So not only is that on eye-popping number,     02:06:13

1    that is significantly larger than the dollar amounts at issue          02:06:17

2    here.  And I won't walk through all of those but they are in

3    the final rule at the pages I cited for Your Honor previously.

4           But the Court did explicitly cite the actual affect

5    of the Clean Power Plan.  And my friend noted that in a          02:06:31

6    hypothetical, we are -- if the President raised the minimum

7    wage to $100, the effect would be much later.  But similarly,

8    the Clean Power Plan not just in terms of the interpretation of

9    the statute but the actual mechanism as to the way the

10   executive actions worked there, which would be the equivalent          02:06:49

11   of the specific minimum wage that the President set here, was

12   relevant to the Court's consideration of the majorness of the

13   rule.

14          So I would draw the Court's attention to that aspect

15   of *West Virginia v. EPA* but we are certainly happy to have the          02:07:04

16   Court focus primarily on the theoretical sweep of the rule, if

17   you will.

18          THE COURT:  Ms. Goodnature, I'm going to need just a

19   second to need to reread a little bit of what you just said.

20   It was fairly densely packed so hold on just a second.          02:07:25

21          MS. GOODNATURE:  I apologize, Your Honor.

22          THE COURT:  All right.  Thank you.

23          MS. GOODNATURE:  I am happy to mirror or follow the

24   progression of my friend's argument.

25          With that, I'll turn to the nexus and the rule          02:07:56

2:22-cv-00213-JJT, July 12, 2022

1    statute here.   In terms of the focus on *Kahn*, the DC circuit in    02:07:59

2    the subsequent case of *Chao* recognized that in the short run,

3    those wage and price controls plainly had the effect of

4    increasing the federal government's expenditures.   In other

5    words, the actual effect of the wage and price control order at    02:08:16

6    issue in *Kahn* increased the direct cost to the federal

7    government, at least in the short run.

8           Nevertheless, in *Kahn* itself, the *en banc* DC circuit

9    concluded that because the overall purpose of that rule was to

10   decrease inflation, which would help the economy as a whole in    02:08:36

11   addition to the, sort of, smaller economic sphere of federal

12   contracting, those wage and price controls were supported.

13          And indeed the Court noted in *Kahn* explicitly that

14   there would be circumstances in which the Government was forced

15   to choose to contract with a higher bidder rather than a lower    02:08:58

16   bidder if that lower bidder did not agree to comply with those

17   controls.   So I don't think it's a fair reading of *Kahn* to

18   suggest that only actions with the direct immediate effect of

19   reducing Government expenditures in the context of federal

20   contracting are supported or authorized under the Federal    02:09:21

21   Property and Administrative Services Act.

22          Indeed, we went through some of the nexus in our

23   brief between the -- excuse me, Your Honor -- the nexus that

24   President Biden noted in the Executive Order and noted in our

25   brief, that the level of detail that President Biden cited in    02:09:47

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   terms of increasing workers' productivity is at least as robust    02:09:51

2   as the explanations that the Courts upheld in *Chao* and

3   *Napolitano*.  So in those cases -- and I apologize, Your Honor.

4   Excuse me.

5       So I would simply direct the Court's attention to    02:10:16

6   compare the explanation that President Biden offered in the

7   Executive Order here with the explanations that were given to

8   support Executive Order 12,800 and Executive Order 13,465.  And

9   these were both other Executive Orders that touched on the

10  relationship between the employer and the employee in the    02:10:37

11  federal contracting context, and that explanation here is at

12  least as robust.

13      I understand plaintiff states to concede that the APA

14  does not apply to the President and, therefore, does not govern

15  this Court's review of the Executive Order itself.  If I am    02:10:54

16  correct in understanding that, I am happy to turn briefly to

17  whether the APA applies to the final rule issued by DOL, which

18  I understand to be the primary point of disagreement here.  But

19  please, of course, correct me if I should spend some time on

20  APA review -- the unavailability.    02:11:15

21      THE COURT:  I had written down, when Mr. Ensign was

22  making this point, that I wanted to get your view.

23      MS. GOODNATURE:  Yes.  So our view is that of course

24  the APA does not apply to the President.  That is

25  well-established under Supreme Court authority.  At the same    02:11:30

2:22-cv-00213-JJT, July 12, 2022

1   time, it's inherent in judicial review that this Court is                    02:11:32

2   empowered to ensure that the President was acting within the

3   confines of his statutory authority.  That is a quite lenient

4   standard of review here.  Indeed, again, notably the APA does

5   not apply, so this is not even an arbitrary and capricious          02:11:50

6   review but, rather, the Court must be able to satisfy itself

7   that -- and I'm quoting here from the statute, 40 U.S.C.,

8   Section 121 --

9           THE COURT:  Ms. Goodnature, I am going to

10  short-circuit you just a little.  I would rather you focus on       02:12:06

11  the second half of this, which is that it applies to the agency

12  and the rule to enact.

13          MS. GOODNATURE:  Absolutely.  So I'll move on to that

14  point.  Thank you, Your Honor.

15          So the agency -- of course there's no following            02:12:15

16  orders exception to the APA here; but the critical point to

17  consider is whether the agency is exercising its own authority

18  and its own discretion or whether it's carrying out an

19  Executive Order that the President issued pursuant to his own

20  authority.                                                          02:12:34

21          So this would be a very different case if the Federal

22  Property and Administrative Services Act delegated authority to

23  the Secretary of Labor, and then the APA would apply to all of

24  the considerations that the plaintiff states notes, including

25  the selection of the $15 minimum wage, and whether to impose        02:12:50

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   various exceptions.                                                    02:12:54

2           Here, unlike the cases that the plaintiff states cite

3   in their briefs, the authority is held by the President

4   himself.  And the President made each of the determinations

5   that the plaintiff states challenge here.                             02:13:07

6           Certainly DOL filled in certain sort of gaps in the

7   Executive Order in developing the final rule and for that

8   purpose, went through notice and comment rule-making, took

9   comments, and the like.  But in terms of the key properties'

10  view of this order, those -- of the rule, rather, those were          02:13:28

11  all mandated by the Executive Order.  And then Professor

12  Kagan's article, which is cited in both of the briefs, gets

13  into this, that when the agency is just stepping into the

14  President's shoes, which is what DOL was doing here, the APA

15  doesn't apply to the agency's actions in simply carrying out a        02:13:46

16  presidential mandate.

17          I also dispute my friend's representation that the

18  Executive Order itself somehow doesn't have independent legal

19  effect.  Certainly Executive Orders have legal effect, barring

20  a statute to the contrary or the like.  And here President            02:14:05

21  Biden set the effectiveness date of January 30, 2022.  Indeed

22  he did direct the DOL to issue those regulations and intended,

23  as did occur, for them to be complete before the effectiveness

24  date.

25          But it's simply not the case that the President was           02:14:25

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    reliant in some way on the Department of Labor to give effect          02:14:28

2    to his own order under the Federal Property and Administrative

3    Services Act.

4             THE COURT:  So before we leave that, as I listened to

5    Mr. Ensign's presentation -- and I know he may come back and          02:14:47

6    talk about this again in response to what you're saying now --

7    he gave quarter to the notion that there are some things that

8    if, essentially, dictated by the President, must be essential

9    terms of whatever rule scheme comes out, that there's a very

10   good argument that that is not really subject to APA review.          02:15:07

11            So, for example, if the President said $15, it's $15,

12   but that there were many other things that -- and I think you

13   even indicated there were gap-fillers that were provided

14   through the review and comment process by the department.  But

15   it is plaintiff's position that all of the input or commentary         02:15:34

16   on that was ignored as if all of this was a *fait accompli* from

17   the beginning.  So I'm having trouble sort of parsing the line

18   between the two positions and how to figure out exactly what

19   lays where.

20            MS. GOODNATURE:  Absolutely.                                   02:15:51

21            And I would invite Your Honor to probe further the

22   question of whether the plaintiff states do challenge any of

23   these gap-filler provisions.  Indeed in the briefing the

24   plaintiffs haven't identified any decision that DOL made that

25   was not dictated by the Executive Order itself.                        02:16:06

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1     As Your Honor noted, $15, that was President Biden's     02:16:10

2     decision.  DOL didn't have discretion to stray from that.  I

3     think it's a fair reading of the complaint and the briefs to

4     interpret the plaintiff states as challenging the scope of

5     coverage in the Executive Order but, again, that was set forth     02:16:24

6     in the Executive Order itself.

7     So it's not before this Court today to decide whether

8     or not the agency adequately undertook input on any of those

9     other provisions.  Indeed the $15 minimum wage is the essential

10    part of the rule here and that comes directly from the     02:16:45

11    Executive Order from which DOL had no discretion to sway.

12    Additionally, I think it might be helpful to consider

13    the case of *Tulare County v. Bush* which is a decision of the

14    District of -- the District of Columbia, affirmed by the

15    DC circuit, and of *Gomez v. Trump*.  These are cited in our     02:17:05

16    brief as well.  And I think that if you look at the facts of

17    those cases, it helps to draw this line, which I agree is

18    somewhat fine, between the aspect of agency action and

19    implementing executive direction pursuant to the President's

20    own authority versus the agency's own decision.     02:17:26

21    So in *Tulare County*, at issue was the designation of

22    a monument pursuant to the Antiquities Act which delegates

23    authority directly to the President.  And the District and the

24    DC circuit in that case held that as long as on the face of the

25    Executive Order itself the aspects of the designation -- excuse     02:17:46

1    me, Your Honor.  I would like to back up for a brief moment.          02:17:52

2            All of the issues in that case that plaintiffs

3    challenged with respect to that designation flowed from the

4    Executive Order, just like we have here.  And the courts there

5    confined their consideration to the face of the Executive Order          02:18:06

6    itself and determined that regardless of whether the Court

7    might agree with the determination or even uphold it under the

8    APA's arbitrary and capricious standard, all that was required

9    in that instance, because the President was exercising his own

10   authority, was that the Court could discern that this fell          02:18:22

11   within the scope of authority that the President has under the

12   Antiquities Act under the Federal Property and Administrative

13   Services Act.

14           And expanding a bit on this distinction, in *Gomez v.*

15   *Trump*, at issue was the State Department's implementation of          02:18:38

16   President Trump's presidential proclamations that addressed

17   entry into the country during the COVID-19 pandemic.  So there

18   was a suspension of visa issuance and adjudication that

19   President Trump mandated by Executive Order and then delegated

20   to the State Department -- and, again, that was an exercise of          02:18:59

21   presidential authority -- and then delegated to the State

22   Department to fill in some of the details.

23           Now in that case the Court held that because the

24   State Department had simply reasoned that this was required by

25   the President, therefore, they put it into effect and filled in          02:19:15

1    those gaps, that the aspects of the State Department action    02:19:20

2    that were challenged there, the Court reasoned, were not, in

3    fact, compelled by President Trump's proclamations and went

4    beyond those boundaries.

5            And in that instance, the district of DC held that    02:19:36

6    the State Department was required to engage in more traditional

7    agency policy determinations and factual findings to support

8    those determinations.  So in other words, I think the central

9    question here is whether or not the challenged provision of the

10   Executive Order or the rule flows directly from President    02:20:00

11   Biden's determination in the Executive Order.

12           Here every challenged aspect of the Executive Order

13   and the rule is compelled by the President's exercise of his

14   own authority under the statute and, therefore, the DOL's

15   ministerial implementation of those provisions of the order is    02:20:17

16   not subject to any form of APA review by this Court.

17           I would like to turn briefly to the argument with

18   respect to the sort of interplay between various minimum wage

19   statutes and my friend's contention that this is an area that

20   is really reserved to the states in which the federal    02:20:55

21   government only occasionally dabbles I believe Mr. Ensign said.

22           There's attention here in plaintiffs' argument in

23   that to the extent that plaintiffs maintain that the

24   Davis-Bacon Act, the Walsh-Healy Public Contracts Act, and the

25   McNamara-O'Hara Service Contractors Act, which all govern    02:21:17

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    aspects of the wages paid to federal contractors employees, to    02:21:23

2    the extent that plaintiffs argue that those federal statutes

3    preempt the action at issue here and are intended to

4    effectively occupy the field of regulation of the wages that

5    federal contractors must pay to their employees, that argument    02:21:41

6    cannot be squared with the plaintiffs' argument that this is

7    really an area for the states because, of course, if that trio

8    of statutes occupied the field and was -- and should be best

9    interpreted as indicating that Congress has reserved to itself

10   the authority to regulate in the space and to set minimum wages    02:22:01

11   for federal contractors, then plaintiffs would not be able to

12   set higher minimum wages, because that would be a comprehensive

13   statute governing this area.  And plaintiffs have not advanced

14   any argument in response to that issue.

15           So that's the first point with respect to plaintiffs'    02:22:25

16   argument regarding those three statutes.

17           In terms of the relationship between states and their

18   own employees, the first point is that, again, this is not a

19   regulatory action so there's nothing that requires the states

20   to comply with this $15 minimum wage absent their own agreement    02:22:42

21   to a contractual provision set forth in an actual contract that

22   they are free to sign or not to sign.  But another point is

23   that plaintiffs cite the dissent in their brief in *Garcia v.*

24   *San Antonio Metropolitan Transit Authority*, the dissent of

25   Justice Powell.  That is at 469 U.S. 528.    02:23:04

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1        And indeed, I would direct the Court's attention to        02:23:10

2    the majority opinion in that case which expressly rejected the

3    proposition that the federal government can not regulate wages

4    in areas of traditional governmental functions, overruling

5    *National League of Cities v. Usury.*        02:23:24

6        So plaintiffs' argument fails for that reason, that

7    the federal government is not able to basically have any say or

8    regulation, even as a regulatory matter, in the wages that

9    states pay to their own employees.  Again, as noted, this is an

10   even easier case because it simply is a matter of contract that        02:23:43

11   the states are free to walk away from.

12       Just a moment, please.

13       So, again, just to take that argument up a step,

14   level of generality, it's very common sensical here that

15   multiple minimum wages can operate at the same time.  And        02:24:06

16   that's really the flaw with plaintiffs' argument regarding the

17   conflict, both with other federal statutes and with state

18   minimum wages, that many employers are governed by various

19   minimum wages that apply; for example, state and federal.  Some

20   localities I believe have their own minimum wages and they are        02:24:24

21   simply required to pay the highest minimum wage that applies

22   whether as a matter of regulation or of contract.

23       And I would just like to turn back for a moment to

24   plaintiffs' interpretation of the statute and, in particular,

25   to its interplay with the Major Questions Doctrine.        02:24:42

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   Plaintiffs' interpretation seems to suggest that because the                02:24:45
2   Executive Order and rule at issue here touch on all employees
3   of federal contractors, which is certainly a significant number
4   of employees, although lower than the numbers in the cases that
5   we discussed earlier, that the statement that they are looking             02:25:03
6   for must, as we read it, essentially say:  Pursuant to the
7   Federal Property and Administrative Services Act, the President
8   has the authority to impose a minimum wage requirement on
9   federal contractors.

10          And that simply can't be the case.  Indeed                          02:25:21
11  plaintiffs' interpretation would nullify the statute in its
12  entirety in that every action that the President -- well, at
13  the very least, the widest scope of the President's authority,
14  pursuant to this central provision of the statute.  Again, this
15  is not a vague or ancillary provision like the Section 611 at              02:25:39
16  issue in *West Virginia v. EPA*, but this is the provision that
17  confers authority on the President and specifically provides
18  the President may prescribe policies and directives that the
19  President considers necessary to carry out this subtitle.  The
20  policies must be consistent with this subtitle.  That is at 40             02:25:59
21  U.S.C., Section 121.

22          And the purpose of the subtitle is to provide the
23  federal government with an economical and efficient system for
24  the following activities and then lists some activities.
25  That's at 40 U.S.C., Section 101.                                           02:26:16

United States District Court

1    Your Honor will note that the statute doesn't provide    02:26:18
2 a list of specific actions that the President can take which
3 plaintiffs in another case might argue is intended to be
4 exhaustive, and the Court should not read more broadly than
5 those specific provisions.  But, rather, it confers broad    02:26:33
6 authority on the President, which must be given effect in this
7 Court's scope of review and standard of review to make
8 determinations.

9    These are complex policy determinations as to what is
10 necessary for those purposes.  And plaintiffs have not offered    02:26:52
11 any limiting principle of their Major Questions interpretation
12 and, indeed, it's not clear what they argue the Federal
13 Property and Administrative Services Act, which confers
14 authority to regulate contracting, and there is a relatively
15 large number of federal contractors, what plaintiffs understand    02:27:10
16 that the statute does confer.

17    And, again, in all of the cases that we've cited
18 upholding Presidential action pursuant to the Federal Property
19 and Administrative Services Act, the lens that courts have
20 applied is whether the Court can discern a nexus between the    02:27:27
21 objectives of economy and efficiency and the provisions of the
22 challenged executive actions.  And that is plainly satisfied
23 here, both on the face of the Executive Order itself and in
24 DOL's detailed factual findings in the final rule, noting the
25 relative costs and benefits of the rule itself.    02:27:47

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1        Thank you, Your Honor.                                    02:27:54

2        THE COURT:  All right.  Thank you, Ms. Goodnature.  I

3   don't have any questions for you now but I may have at the

4   conclusion of everybody's presentation.

5        MS. GOODNATURE:  Thank you.                               02:28:03

6        THE COURT:  Mr. Ensign?

7        MR. ENSIGN:  Thank you, Your Honor.

8        To start with, I think there is a useful point of

9   history here, which is that for the first 65 years of the

10  Procurement Act, the federal government never exercised       02:28:26

11  authority in this manner to set blanket minimum wages.  That

12  has simply never occurred until the last eight years.  And so

13  this idea that there is well-established precedent that the

14  President can do this is simply belied by the fact that for

15  about 85 percent of the history of the Procurement Act such   02:28:48

16  authority went entirely undiscovered and unemployed.

17       You know, moreover, as to the 2014 mandate, Arizona

18  could not have even challenged that.  At that point, the

19  Arizona minimum wage was higher than $10.10, so it wasn't even

20  conceivable for us to challenge it at that point.  That's     02:29:07

21  undoubtedly why many didn't challenge it, is that it had very

22  little effect.  But by contrast, this $15 one has significant

23  bite, and it's not the precedent that the federal government

24  believes it to be.

25       Turning to the Major Questions Doctrine, and I really    02:29:27

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   think this is really the crux of the case, several points.  I     02:29:30
2   believe my friend describes *West Virginia* as a refinement of
3   the doctrine.  It's substantially more than that.  You know,
4   notably, it's only in the last two weeks that the federal
5   government has ever conceded that such a doctrine exists at       02:29:42
6   all.  You'll note that they used Major Questions and scare
7   quotes in three separate occasions in the briefing here.

8         If you look at the Government's briefs in both the
9   *OSHA* and *CMS* mandate cases, you will also you find them
10  similarly in scare quotes without acknowledgment that such a     02:30:00
11  doctrine exists.  So *West Virginia v. EPA*, we view it as
12  refinement because we always thought it existed and they
13  violated it.  But *West Virginia* is the final coffin in the nail
14  (sic) of the idea that there was no such doctrine, which has
15  now compelled the federal government to a very belated           02:30:20
16  acknowledgment that it does, in fact, exist.

17        You know, I do want to address a point that was in
18  their brief, which is, they suggest the Major Questions
19  Doctrine doesn't apply because the rule is exercising the
20  President's inherent authority under Article II.  I think        02:30:36
21  that's highly problematic for two reasons, the first of which
22  is the rule does no such thing.  While the rule acknowledges
23  that the Executive Order was under -- issued under both the
24  President's constitutional authority and the Procurement Act,
25  it then goes -- it then goes on to explain what the Procurement  02:30:53

1    Act does and never returns to Article II once.  It does not    02:30:56

2    rely or even mention the President's so-called inherent powers.

3         And so even if you thought that could be a basis for

4    defending the rule, that is an impermissible post

5    hoc rationalization that violates foundational principles of    02:31:14

6    administrative law can't not sustain this rule.

7         But secondly, the consequences of such inherent

8    authority existing are very substantial and never addressed by

9    the Government.  If the President actually has inherent

10   authority to set wages for one-fifth of the economy, he could,    02:31:32

11   for example, set them at $50 an hour.  And even if Congress

12   passed a law over his veto mandating a $15 an hour minimum

13   wage, if he actually has such inherent authority, then his

14   determination would control over Congress's.  That's the usual

15   holding of *Youngstown Steel*, is when the President is using his    02:31:55

16   inherent authority, that is, you know, where the President's

17   authority is at its utter ebb.  But where it applies, it

18   applies not withstanding what Congress may have enacted by

19   statutory law.

20        So if we are really dealing with an inherent    02:32:11

21   authority case, the consequences of that would be very, very

22   substantial.

23        As to whether or not there's a specific authorization

24   here, you'll note, for example, the word "wage" simply is

25   nowhere to be found in the Procurement Act, which further    02:32:27

United States District Court

1  confirms that this is ancillary to the field of wage        02:32:30

2  regulation.   If you have somewhere where Congress passes the

3  minimum wage bill, for example, you're going to see "wage" as a

4  word littered all over that statute.   It's central to the

5  regulation.                                                   02:32:44

6         But wage regulation is completely ancillary to the

7  Procurement Act which deals with the efficient procurement.

8  And so we do think it's an ancillary provision when you compare

9  what they are doing with what the core of the authority is.

10        I think the scope of their authority is really kind    02:33:03

11 of breath-taking here.   And you'll note they still have not

12 answered any of the hypotheticals.   They have not addressed

13 whether or not they can use this authority, for example, to

14 mandate the fifth of the work force stop drinking soda or, you

15 know, eat a vegetarian diet or if they could use it to,        02:33:16

16 essentially, like, override state laws regarding marijuana

17 regulation by imposing drug test requirements, or whether or

18 not they could use it to impose any number of regulations.

19        They have not supplied any limiting principle at all.

20 And it's very apparent, particularly at this late stage in the  02:33:34

21 regulation, that they view the Procurement Act as plenary

22 authority to regulate one-fifth of the work force in any manner

23 they wish.   And that sweeping scope of authority which, again,

24 still has no limiting principle, is absolutely a Major

25 Question.                                                       02:33:54

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1       Perhaps the Government will enlighten this Court on            02:33:55

2   reply as to what conceivable limitations exist.  But it's

3   notable that all throughout the briefing they still will not

4   address this Court's examples in the *Brynovich v. Biden case*.

5   And we think that's very telling.                                 02:34:11

6       You know, turning back to whether or not the prior

7   regulation establishes much of a precedent, the Obama 10.10

8   mandate is in 2014.  We'll note that Clean Power Plant Mandate

9   that the Court struck down in *West Virginia v. EPA* was a 2015

10  regulation.  So it had only one year less pedigree than the      02:34:32

11  wage mandate that they claim is well-established here.  And

12  that certainly didn't trouble the Court seemingly at all.

13      So the fact that the Clean Power Plan was seven years

14  old and the fact that contractor minimum wages are eight years

15  old is, we submitted, a distinction without a difference.        02:34:54

16      You know, I believe my friend also pointed to the

17  fact that the Government is exercising proprietary authority

18  here as a reason why the Major Questions Doctrine didn't apply.

19  This Court specifically held otherwise in *Brnovich v. Biden*.

20  This Court held that the Procurement Act, even though it was     02:35:12

21  acting in a proprietary capacity, was a Major Question.

22      So, too, did the Sixth Circuit in *Kentucky v. Biden*.

23  And indeed I believe the federal government's record as to

24  state challenges to this is 0 and 6.  So certainly the idea

25  that the Major Questions Doctrine doesn't apply to proprietary   02:35:31

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1  actions of the Government is simply not borne out by the
2  extensive and recent case law.

3       I believe my friend noted the *CMS* case but that's
4  something fundamentally different.  That's the Government
5  running its own program.  And so where the Government has
6  express Congressional authorization to at least run the
7  program, that is fundamentally unsurprising that they would use
8  that authority.

9       However, this is something substantially different.
10 It's much more like the vaccine mandate where just as the
11 Procurement Act doesn't use the word "vaccine" once and it's
12 very surprising that they would employ it to do so, it also
13 doesn't use the word "wages" once.  And it's similarly a Major
14 Question when it attempts to do so.

15      I believe my friend also pointed to the fact that the
16 Clean Power Plan was more of a political football between
17 administrations as opposed to this one.  I don't think that
18 that is a substantial difference.  As an initial matter, you
19 know, the Presidents cannot control what authority Congress has
20 given them by their actions, and so I don't think that the
21 history of what the Presidents have done can change whether or
22 not Congress gave them authority to do so in 1949.

23      But even if they could, it still is something of a
24 football.  In essence, the Trump Administration essentially
25 gutted the 10.10 mandate by exempting the only place that it

02:35:34
02:35:50
02:36:04
02:36:20
02:36:37
02:36:58

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   was having any real, you know, sting.  And then this                    02:37:03

2   administration has reimposed it.  So it's very much like the

3   political football that was at issue in the *West Virginia v.*

4   *EPA* case.

5          You know, as to the Major Questions, too, we're only            02:37:17

6   looking at an aspect of it because that's who will be directly

7   affected and paid more as a result.  You know, essentially, who

8   will go up to $15 an hour.  But the rule itself acknowledges

9   that there will be spill-over effects.  And the rule further

10  refuses to analyze those effects.  And in doing so, it                 02:37:38

11  drastically understates the scope of the effect here.

12         And so it's far more than 300,000 workers.  And the

13  rule doesn't even attempt to estimate how many workers it will

14  be.  And certainly Idaho has submitted extensive declarations

15  explaining why it's likely to have substantial effects.  That          02:37:54

16  is another reason that this is arbitrary and capricious if the

17  APA applies.

18         Turning to, you know, that issue of whether the APA

19  applies, again, you know, *East Bay* on this is very clear.  I

20  believe my friend described the rule as a ministerial                  02:38:19

21  implementation of the Executive Order, and *East Bay* expressly

22  says:  Agency regulations that implement an Executive Order are

23  reviewable under the APA.

24         I believe they have confirmed this is an

25  implementation of an Executive Order.  The Ninth Circuit's rule        02:38:37

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    under *East Bay*, therefore, applies.                      02:38:40

2            You know, I think the fact that the -- by way of

3    analogy, if you look at the *Regions* case, for example, or at

4    least many, many other cases, the displacement of judicial

5    review by statute is extremely disfavored.  And federal courts   02:38:53

6    will only accept Congress overcoming that presumption of

7    judicial review with exceptionally clear language.

8            I think it's quite reasonable for federal courts to

9    demand, similarly, that if the President intends for the

10   agencies to violate the APA, that he should at least have to   02:39:16

11   explicitly have to do so.  That would not only promote clarity

12   as to whether or not the APA applies, and it's utterly muddy

13   here as to where it applies and when; but it would also require

14   the President to take, you know, accountability for that

15   choice.                                                       02:39:31

16           I also didn't hear any response to the language in

17   the Executive Order that DOL was authorized to create, quote,

18   as appropriate exclusions from the requirements of this order,

19   end quote.

20           So I think two are quite obvious.  One, it could have   02:39:47

21   considered exempting the states from what they pay their own

22   workers.  That would have been a lot more respectful of the

23   principles of federalism and the usual presumptions that apply

24   in the field.  That's one such exemption they could have

25   created that the President expressly authorized them to        02:40:04

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    consider.  And by authorizing them to do so, it presumably is          02:40:07

2    subject to the APA.

3              Similarly, they could have considered exemptions for

4    particularly low-wage areas where it would be most disruptive.

5    This is not going to be very disruptive, for example, in              02:40:18

6    California, which has a $15 hour minimum wage; but it may be

7    particularly disruptive in other areas of the country.  And

8    that's an alternative that the Executive Order both authorizes

9    and explicitly was not considered.

10             And that is one of the APA's, you know, greatest sins        02:40:33

11   is the failure to consider alternatives.  And here the

12   Executive Order even authorized them to do so.  The idea that

13   agencies can refuse to consider alternatives in something bound

14   by the APA is truly radical and dystopian.

15             A couple of other quick points.  My friend mentioned         02:40:59

16   inflation briefly.  This is notably something that was not

17   addressed in their brief, but we think it certainly goes to the

18   public interest here.  We are experiencing extraordinary and

19   unprecedented inflation right now and it is very clear that the

20   effect of the rule would be inflationary.  I mean, the parties         02:41:16

21   can certainly dispute the magnitude but -- of that inflationary

22   effect but the direction is utterly clear.  Wage mandates are

23   absolutely going to have inflationary effects.  Wages and

24   prices are essentially the two fundamental components of

25   inflation and the rule, you know, expands one of them.                 02:41:35

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1        Your Honor, turning to the trio of statutes, there's        02:41:45

2    a fundamental difference between preemption and the ordinary

3    cannon that specific language controls over the general.

4        You don't have to have conflict preemption in order

5    to resolve tension between two statutes in a manner where the        02:41:59

6    specific controls the general.  There's no dispute whatsoever

7    that that trio of statutes is far more specific about wages to

8    be paid as opposed to the Procurement Act, which doesn't speak

9    of pages expressly at all or use the word even once.  So it

10   doesn't have to be the case that it would be conflict        02:42:19

11   preemption for the state to pay more than what those trio of

12   statutes require in order for the ordinary cannon of statutory

13   construction that specific controls over the general to apply.

14       So it doesn't have to be impossible for the two to be

15   complied with in order for that cannon to say where you have        02:42:36

16   highly specific detailed statutes that prescribe exactly how

17   you're supposed to determine the right wages to pay, that that

18   would control over a statute that doesn't even mention the

19   wages once.  And it's not merely that sets floors.  It sets the

20   method by which the appropriate wages are to be determined        02:42:54

21   which is to be local.

22       And so as to that, by imposing a nationwide

23   one-size-fits-all mandate, it violates the method that Congress

24   has directed for contracts as they -- that are governed by

25   those trio of statutes.        02:43:11

United States District Court

1          You know, finally, let me give you -- I believe my          02:43:16

2  friend has suggested that the statute is a complete nullity

3  under our interpretation.  We don't think that's the case at

4  all.

5          Let me give you a couple of examples of things they          02:43:27

6  could do.  You know, while we don't think that they have the

7  authority to set wages for one-fifth of the work force, they

8  certainly have authority to pick a higher bidder over a lower

9  one if they think it will do a better job.  Another example is,

10  they can certainly pool their resources as to purchasing.          02:43:45

11          If they think they are getting not the best deal on

12  copy paper, for example, they can pool the Government's

13  purchasing power and purchase it altogether.  That would

14  certainly promote efficient contracting.  If the Government

15  gets tired of paying $500 for a hammer, they can certainly set          02:43:58

16  regulations over what the appropriate prices of hammers should

17  be and what they won't exceed.

18          They could do any number of things on a much more

19  micro basis where it would certainly be efficiency promoting.

20  But this -- the claim power here is the global plenary power to          02:44:15

21  remake one-fifth of the U.S. work force in whatever manner they

22  assert.  And that simply is well beyond the authority that the

23  Procurement Act gives, particularly under the Major Questions

24  Doctrine, which simply dispels any doubts that they have no

25  such plenary power.          02:44:36

United States District Court

2:22-cv-00213-JJT, July 12, 2022

 1          And I certainly welcome any questions that the Court    02:44:41
 2   may have.

 3          THE COURT:  All right.  Thank you, Mr. Ensign.

 4          MS. GOODNATURE:  Your Honor, there has been

 5   significant argument back and forth today, but there are five    02:45:04

 6   key points that I would like to emphasize in rebuttal that show

 7   why the Court should rule for the federal government today,

 8   largely in response to my friend's comments just now.

 9          The first is with respect to the decision in *Brnovich*

10   *v. Biden* of another court in this district, the court    02:45:21

11   emphasized in its ruling that the infirmity, in its view, with

12   the contractor vaccine mandate at issue there was that it went

13   to public health as distinct from economy and efficiency.  Of

14   course the Government does not agree and that case is on appeal

15   to the Ninth Circuit.    02:45:43

16          But the Court need not get into that issue here

17   because the minimum wage requirement at issue directly

18   regulates the economics of the underlying transactions.  It has

19   nothing to do with public health, and that distinguishes my

20   friend's hypotheticals regarding theoretical rules pertaining    02:45:57

21   to whether employees can drink soda or must eat a vegetarian

22   diet.  Here we have a fundamentally economic Executive Order

23   and rule.

24          Again, the Government's position is that the Major

25   Questions Doctrine doesn't apply where the Government is    02:46:13

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1  exercising proprietary authority.  But should the Court be          02:46:17

2  unpersuaded of that point, as the Court's colleague was in

3  *Brnovich v. Biden*, we've gone through the six other reasons why

4  the major questions -- excuse me, five other reasons why the

5  Major Questions Doctrine does not apply here and why *West*          02:46:31

6  *Virginia v. EPA* is readily distinguishable.

7          Second, my friend noted that in the *Medicare/Medicaid*

8  vaccine mandate case the Government was administering its own

9  program.  And here the Government is administering its own

10 contracts.  Again, it bears repeating that the only directly        02:46:50

11 regulated parties here are the agencies, which are forbidden to

12 contract with employers who don't pay the minimum wage.  And

13 the potential contractors themselves are free to walk away from

14 the contract if they are unwilling to comply with it.

15         Next my friend speculated as to some different rules         02:47:10

16 that the Administration could have adopted, including an

17 exemption for the states.  Now, this falls under the umbrella

18 of APA review which, again, we maintain doesn't apply here.

19 But moreover, even if the APA did apply, plaintiff states did

20 not comment in the rule-making here.  And it's a principle of       02:47:33

21 administrative law that in order to bring a challenge under the

22 APA to a rule as arbitrary and capricious, the issue must have

23 been raised in the commenting process itself.  And litigants

24 can't, after the fact, come up with other possibilities that

25 the agency should have considered but didn't without putting        02:47:53

United States District Court

2:22-cv-00213-JJT, July 12, 2022

 1  those considerations before the agencies, which the states did  02:47:57

 2  not do here.

 3          Next, with respect to inherent Article II authority,

 4  the Government's position -- we have not -- we have defended

 5  the Executive Order and the rule here solely on the basis of  02:48:11

 6  the Federal Property and Administrative Services Act, not as an

 7  independent exercise of inherent Article II authority.  But

 8  it's also worth noting that that statute rests on the

 9  foundation that the President is the head of the executive

10  agency and as such, exercises certain inherent authority to  02:48:27

11  determine with whom the Government will do business.  And that

12  background informs interpretation of the Federal Property and

13  Administrative Services Act, and that rationale is relevant in

14  other courts' decisions.

15          In terms of the other hypotheticals that have been  02:48:44

16  raised, I believe in the brief, the -- my friend noted the

17  possibility of racial quotas in hiring.  Those would, of

18  course, be illegal for independent reasons under the Supreme

19  Court's affirmative action precedent.  So of course it's true

20  that the Government can't do something under its authority  02:49:02

21  pursuant to the Federal Property and Administrative Services

22  Act that is otherwise illegal.

23          And with respect to the other questions in terms of

24  the other hypotheticals, rather, of drug testing and the like,

25  those would all be questions as to whether or not there's a  02:49:22

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    nexus between economy and efficiency.  And those questions    02:49:25

2    aren't before the Court.  But the limiting principle is clear.

3    Contrary to my friend's argument, the limiting principle is

4    whether the Court can discern a nexus between the statutory

5    objectives of economy and efficiency.    02:49:38

6         Finally, in setting forth various actions that

7    plaintiff states apparently accept would be permitted under the

8    Federal Property and Administrative Services Act, my friend

9    noted various theoretical objectives but kept coming back to

10   the fundamental point that in the plaintiff states' view the    02:49:59

11   President lacks authority to set a minimum wage requirement

12   because "wage" appears nowhere in the statute.  Neither, for

13   that matter, does "copy paper" or "hammers" or any of the other

14   hypothetical actions that he hypothesizes the Government could

15   take.  The question is the nexus to economy and efficiency.    02:50:19

16        And, similarly, I would also note that in all of the

17   Executive Orders that have been upheld by courts across the

18   country in the last several decades, none of the specific

19   requirements at issue there were called out explicitly in the

20   statute.  The statute doesn't mention discrimination.  It    02:50:40

21   doesn't mention the right not to join a union and the like.

22        So in short, the Court should rule for the Government

23   on the pending motions because the text of the statute makes

24   clear and courts have interpreted the statute to require a

25   requisite -- a sufficient nexus between the action and economy    02:50:58

United States District Court

2:22-cv-00213-JJT, July 12, 2022

| | | |
|---|---|---|
| 1 | and efficiency.  That is present here, both on the face of the | 02:51:01 |

1   and efficiency.  That is present here, both on the face of the
2   Executive Order and in light of DOL's detailed findings.
3              Thank you, Your Honor.
4              THE COURT:  All right.  Thank you.
5              I have at least two questions for both of you.
6              Please go ahead and have a seat, Ms. Goodnature.
7              The way I'm going to do this is, I'm going to ask the
8   question first of you, Mr. Ensign.
9              And then I will ask for your reaction, Ms.
10  Goodnature.
11             Mr. Ensign, I would like you to amplify on a
12  statement or a component of an argument you made in your
13  briefing to the Court.  It kind of got touched on in the
14  argument but I want to go more directly to it.  You had stated
15  that if anything, a vaccine mandate has a stronger nexus to
16  procurement efficiency than the increased minimum wage since a
17  vaccine mandate might have done what it was advertised to do.
18             I would like to -- I would like you to exhaust that
19  for me.  I'm not sure that I've picked up everything you were
20  intending from the statement.
21             MR. ENSIGN:  Certainly, Your Honor.  I think the key
22  point there is that the causal chain was far more direct.  It
23  was -- the vaccine requirement, if it worked, would reduce
24  absenteeism because people wouldn't be sick as much and,
25  therefore, wouldn't be missing work.  And everyone acknowledges

02:51:12
02:51:37
02:51:59
02:52:19
02:52:38

1  that missed work due to sickness, and certainly death, would    02:52:41

2  decrease the efficiency of contractors.  And so that had a far

3  more obvious nexus.  The direct effect, like the one step down

4  or the one step further in the causal chain, was to improve

5  efficiency.    02:53:02

6          Here the first step in the causal chain is to

7  increase the cost that the Government has to pay to procure the

8  same goods and services.  And the rule itself acknowledges

9  this.  The rule is going to increase the costs that federal

10 contractors have to pay their workers by at least $1.7 billion    02:53:21

11 on top of spill-over effects that were not analyzed.  And the

12 Government expressly acknowledges that some or all of those

13 costs are going to be passed on to the Government.  That is the

14 direct and immediate effect.

15         The far more attenuated and down the causal chain and    02:53:37

16 down the temporal, you know, timeline is their claim that

17 resulting efficiency gains at some undetermined time will

18 outweigh the increased costs that they directly acknowledge

19 their rule will cause.

20         And so I think that is the distinction there where    02:53:56

21 if -- and the vaccine mandate case, the asserted first, you

22 know, first link in the chain down the causal chain would be to

23 increase efficiency of contractors and thereby reduce the

24 acquisition costs that the Government pays for goods and

25 services.    02:54:17

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    By contrast, the first step -- the first chain in the    02:54:18

2  causal link here is an intentional increase in their

3  acquisition costs, which the rule acknowledges on its face, and

4  then it has a wish-casted efficiency gains that will be down

5  the causal chain in time that they claim will offset it.  And    02:54:35

6  so that, we see, as the fundamental distinction and why the

7  nexus is even more attenuated in this case than in the federal

8  contractor vaccine mandate.

9    THE COURT:  I am not going to ask you whether you

10  agree by the reasoning behind the Executive Order at issue,    02:54:53

11  because it's clear from everything you've written to me that

12  you don't, but that's beside the point for my question.

13    My question is, except for purposes of argument here

14  that the President's theory and justifications will ultimately

15  out and work, is it still your position in that case that    02:55:23

16  because it's not an immediate effect, an immediate effect that

17  this is impermissible?

18    MR. ENSIGN:  Yes, Your Honor, and I think for two

19  reasons there.  And I think the first -- and looking to the

20  DC circuits case in *Kahn* in particular, direct and immediate is    02:55:41

21  really what they thought would pass muster, and this is far

22  more attenuated than that.

23    And so even if you accept the economic premises upon

24  which the rule and the EO are based, we think it still flunks

25  the test as set forth in *Kahn*.    02:55:57

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    But secondly, I think even if you accept the economic          02:56:00

2    theory at issue there, there is still nothing that suffices

3    here.  And let me explain why.

4    The Executive Order itself only has a single

5    conclusory sentence that says:  This will increase efficiency.   02:56:11

6    It has no actual analysis itself to support it.  In order to

7    support it, the federal defendants rely on the rule itself.

8    But the rule itself is hopelessly tainted.  I mean, it is the

9    product of an admittedly incurably closed mind.  It is not the

10   product of any economic analysis that had any chance of          02:56:32

11   arriving at a result other than $15 an hour and no exceptions.

12   And so this is not the product of some technical

13   expertise that the Court can defer to.  This is a transparently

14   reverse-engineered exercise that has nothing to do with

15   economic analysis and has everything to do with single-minded    02:56:54

16   obedience to a command.  And so I think if you had a rule that

17   adequately examined alternatives under the APA and did the

18   economic analysis under the APA subject to consideration of

19   alternatives, this would be a fundamentally different case.

20   But that's not what we have here.  We have the               02:57:13

21   President himself didn't supply the economic analysis and the

22   economic analysis of the rule itself is something that cannot

23   be deferred to because it -- you know, it's transparently

24   pretextual.

25   THE COURT:  And Ms. Goodnature, I would like your          02:57:33

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1  response to the answer that I just received.                    02:57:35

2           MS. GOODNATURE:   Thank you, Your Honor.   Three brief

3  points in response.   The first is that the State of Arizona in

4  particular argued the exact opposite with respect to the nexus

5  between vaccine mandate at issue in *Brnovich v. Biden* in terms    02:57:47

6  of the nexus to economy and efficiency.   Of course we recognize

7  there's no collateral symptom or anything like that.   But the

8  Court should take with a significant grain of salt counsel's

9  attempt to distinguish the close nexus, purportedly, or direct

10 nexus between the vaccine mandate and the objectives of economy   02:58:10

11 and efficiency.

12          But more fundamentally, the statute cannot be read to

13 require -- to permit rather only actions that reduce Government

14 expenditures in the short term.   This is clear from *Kahn* when

15 read in conjunction with *Chao*, which considered the actual      02:58:28

16 effects of the rule at issue in that case.   And it's also clear

17 from the various other cases that courts have decided upholding

18 actions under the Federal Property and Administrative Services

19 Act.

20          *Chao*, in particular, considered an Executive Order      02:58:43

21 requiring employers to notify their employees of the right not

22 to join a union.   The direct effect of advising employees of

23 such a right is not to reduce the expenditures of the federal

24 government.   The same is true in *Napolitano*.   That was the case

25 in which the Government required to verify eligibility to work    02:59:02

United States District Court

1  in the United States using the E-Verify system.  Notably, in        02:59:07
2  the short term, that would have required employers to take
3  extra steps in their hiring process and potentially to decline
4  to hire certain employees.

5      Nevertheless, President Bush determined that the                 02:59:22
6  long-term effects would be to promote economy and efficiency.
7  So, again, that standard simply doesn't stand up, either on the
8  text of the statute or in light of the various precedent.

9      Third and finally, I would like to clarify briefly
10  our position on DOL's factual findings.  So, again, the           02:59:40
11  statement in the Executive Order itself, which is that raising
12  the minimum wage enhances worker productivity and generates
13  higher-quality work by boosting workers' health, morale, and
14  effort; reducing absenteeism and turnover; and lowering
15  supervisory and training costs, is as robust as the              03:00:00
16  explanations that were considered sufficient to uphold those
17  Executive Orders in *Chao* and *Napolitano*.

18      And, moreover, in the case that we discussed earlier,
19  *Tulare County v. Bush*, the district court and the DC circuit
20  both agreed that the relevant consideration was the relatively    03:00:27
21  brief and succinct explanation on the face of the Executive
22  Order there for the designation of a monument.

23      So the Government's position is that the explanation
24  given in the Executive Order itself is sufficient for the Court
25  to discern that nexus and to determine that the President acted  03:00:44

United States District Court

1    within the scope of authority in determining that this order          03:00:47

2    was necessary to promote economy and efficiency.  Nevertheless,

3    because this is not APA review as to the President, I think we

4    all agree on that, the Court is free to consider anything else

5    that sheds lights on that nexus.  I believe my friend noted a        03:01:04

6    precedent referring to post hoc rationalizations that applies

7    in the APA context where the Court is limited to considering

8    the administrative record.  That doesn't apply here.

9            At a minimum, we all agree to the President's

10   Executive Order.  The Court can consider the DOL's factual           03:01:23

11   findings in the rule-making to further confirm that the

12   Executive Order here satisfies the requisite nexus and,

13   therefore, was authorized under the statute.

14           THE COURT:  All right.  Thank you.

15           One more question for you, Mr. Ensign.                       03:01:46

16           And then I will give you an opportunity to respond.

17           Let's assume, again for purposes of argument, that

18   the Court concludes that plaintiffs have satisfied all of the

19   *Winter* factors for some form of injunctive relief.  Mr. Ensign,

20   what gives the District Court here in Arizona the authority to       03:02:18

21   impose injunctive relief in Indiana, South Carolina, Idaho,

22   Nebraska?

23           MR. ENSIGN:  It would be the APA itself or the

24   non-statutory cause of action as to the Procurement Act.  So 5

25   U.S.C. 706 provides that this Court shall set aside agency           03:02:40

United States District Court

1   action that is, you know, violative of the APA.                        03:02:44

2          THE COURT:  Right.  But I was confirmed for, and

3   commissioned for, a position in the District of Arizona.  And

4   the statute that you've identified for me does not speak to

5   other districts.  And so that's my question, is what -- what    03:03:01

6   specific authority to do I look to to say that a district court

7   in one district can impose injunctive relief nationwide, is

8   what you're asking for; right?

9          MR. ENSIGN:  Your Honor, we would certainly be

10  satisfied with, as a preliminary basis, an injunction limited   03:03:22

11  to the plaintiff states and certainly their geographic

12  boundaries is something at the core.  But to answer your

13  question more directly, I think -- I think ultimately what

14  would guide this Court is equitable considerations rather than

15  a lack of authority.                                            03:03:41

16         So let me start with *vacatur*, because I think that's

17  particularly useful, and then work back to injunctions.  So

18  Section 706 provides that the Court shall set aside agency

19  action if it violates the APA.

20         And the default rule in both the DC and Ninth           03:03:55

21  Circuits is that *vacatur* full stop is the appropriate remedy

22  for an APA violation and then remand without *vacatur*, or a more

23  limited *vacatur*, can be obtained if the Government establishes

24  some fairly rigorous tests.  In the DC Circuit it's the

25  *AlliedSignal* test and in the Ninth Circuit -- they have a     03:04:16

United States District Court

 1   couple of different cases but the basic consideration is          03:04:19

 2   disruptive consequences.

 3              So the default remedy under the APA at final

 4   adjudication is a full *vacatur* of the challenged rule.

 5              As to the Procurement Act, that is not specifically    03:04:33

 6   directed but the *Chamber of Commerce* recognizes, and *Kahn*

 7   itself recognizes, a nonstatutory cause of action.  It's fairly

 8   clear that they are applying APA-like principles there and it's

 9   also clear that courts have repeatedly issued -- well, for

10   example, the Southern District of Georgia entered a nationwide    03:04:54

11   injunction in a contractor vaccine challenge.

12              The federal government appealed that to the 11th

13   Circuit and sought a stay pending appeal on the basis of, among

14   other things, that the scope of the injunction was excessive

15   and they lost.  They clearly didn't think all that much of that  03:05:11

16   argument because they declined to seek review from the Supreme

17   Court or a stay from the Supreme Court.

18              And so starting with *vacatur*, this Court has

19   authority under Section 706 to enter a *vacatur*.

20              As to --                                               03:05:27

21              THE COURT:  Go ahead.

22              MR. ENSIGN:  As to injunctions, it gets a little more

23   interesting but the *vacatur* background principle informs the

24   injunctive relief.  The basic -- if you read the APA's text

25   literally, you will say that the default remedy is to vacate     03:05:43

2:22-cv-00213-JJT, July 12, 2022

1    the rule entirely if it's found to be illegal.  That's not how          03:05:47

2    the Supreme Court has read it.  The Supreme Court has

3    recognized that if Congress wishes to displace the equitable

4    authority of federal courts, that it needs to do so in

5    explicitly clear language in a way that "shall" doesn't               03:06:00

6    provide.  So this Court retains its traditional equitable

7    authority to essentially decline to vacate or to enjoin a rule,

8    but it certainly possesses the authority to enjoin it as well.

9            The federal government, very recent vintage, has

10   pushed back on the idea that nationwide injunctions violate it,       03:06:20

11   violate the APA.  I think that's a real stretch for a text that

12   says that you shall set aside agency action that is illegal

13   without restriction.

14           So, you know, certainly courts have already made the

15   first leap to say the courts maintain their traditional              03:06:37

16   equitable jurisdiction.  And that is not something that we

17   quarrel with, but it's something quite extraordinarily to say

18   that a statute that says that you shall set aside action that

19   violates the APA actually means you shall not set it aside

20   except as to the scope of plaintiffs before you.                     03:06:55

21           And so this Court maintains its traditional equitable

22   jurisdiction that includes the authority to enter a nationwide

23   injunction.  You may think for various reasons that in

24   exercising your equitable discretion, that's not a good idea.

25   And that is certainly well within this Court's equitable             03:07:11

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1    discretion.  But this Court possesses the full range of its          03:07:14

2    ordinary equitable powers, including the power to issue an

3    injunction.  And that's presently what's pending before you.

4              THE COURT:  All right.  Mr. Ensign, thank you.

5              Ms. Goodnature?                                            03:07:28

6              MS. GOODNATURE:  Again, I think, once again, I have

7    three points in brief response to that.  And the first is that

8    under basic principles of equitable -- of remedies rather,

9    courts generally confine any remedies that they impose to the

10   parties before the Court wherever they may operate.  And that      03:07:44

11   if the Court did find that plaintiffs were likely to succeed on

12   the merits and had satisfied the other *Winter* factors, that

13   would be the appropriate relief here.  That is relief limited

14   to the parties themselves.

15             Moreover, with respect to these questions of *vacatur*    03:08:03

16   that have been discussed, that's not relevant here because

17   setting aside the proposition for a moment that the APA plainly

18   doesn't apply as to, at a minimum, the Executive Order, we all

19   agree the *vacatur* only applies at the summary judgment stage in

20   an APA case.  And plaintiffs have not moved for summary             03:08:22

21   judgment here.

22             So in terms of final relief that the Court might

23   issue, the question of *vacatur* really isn't teed up by the

24   motions that are pending before the Court today.

25             And lastly, turning back from *vacatur* to injunctions,   03:08:38

United States District Court

2:22-cv-00213-JJT, July 12, 2022

1   with respect to the question of nationwide injunctions, of          03:08:42

2   course this is a controversial issue, I would command the

3   Court's attention to a very recent decision of Judge Sutton in

4   the case, coincidentally, *State of Arizona v. Biden* discussing

5   all of the reasons why nationwide injunctions are deeply          03:08:58

6   problematic in our democracy.  And, again, I would let that

7   decision speak for itself, but I would command it to the

8   Court's attention as a very recent and persuasive explanation

9   of the problems with nationwide injunctions and the reasons why

10  no such injunction should issue here.                              03:09:17

11          THE COURT:  All right.  Thank you, Ms. Goodnature.

12          If you'll give me just a moment, please.

13          All right.  Counsel, thank you very much for your

14  presentations, for your responsiveness, and for your toleration

15  of my interruptions today, both of you.                           03:10:13

16          I'll take the matter under advisement and we'll

17  render a decision as soon as possible.

18          Good day to everybody.

19          (Whereupon, these proceedings recessed at 3:10 p.m.)

20                         *  *  *  *  *                               03:10:26

21

22

23

24

25

United States District Court

1        C E R T I F I C A T E                                    03:10:26

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of       03:10:26

6   Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled     03:10:26

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15       DATED at Phoenix, Arizona, this 18th day of July,          03:10:26

16  2022.

17

18

19

20                      s/Elaine M. Cropper                         03:10:26

21                      _____

22                      Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  03:10:26

United States District Court