**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

State of Arizona, *et al.*,

                Plaintiffs,

v.

Martin J. Walsh, *et al.*,

                Defendants.

No. CV-22-00213-PHX-JJT

**ORDER**

At issue are the Motion for Preliminary Injunction (Doc. 25, "PI Mot.") filed by the Plaintiff States of Arizona, Idaho, Indiana, Nebraska and South Carolina (collectively, "the States"), and the Response in the form of a Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment (Docs. 39, 40, "MTD/MSJ") filed by Defendants United States Secretary of Labor Martin J. Walsh, United States Department of Labor ("DOL"), the DOL Wage & Hour Division, President Joseph R. Biden, and Acting Administrator of the DOL Wage & Hour Division Jessica Looman. Plaintiffs filed a consolidated Reply in support of their Motion for a Preliminary Injunction and Response to Defendants' Motion to Dismiss Or, In the Alternative, for Summary Judgement (Doc. 48, "Resp."), and Defendants filed a Reply in support of their Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment (Doc. 53, "Reply"). Also at issue is Plaintiffs' Rule 56(d) Motion to Deny Summary Judgment or for Jurisdictional Discovery (Doc. 49), to which Defendants filed a Response (Doc. 52), and Plaintiffs filed a Reply in support (Doc. 54).

On July 12, 2022, the Court heard the parties' arguments on Plaintiffs' Motion for Preliminary Injunction and Defendants' Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment. (*See* Doc. 58, Transcript of Proceedings on July 12, 2022 ("Tr.").) For the reasons set forth below, the Court denies Plaintiffs' Motion for Preliminary Injunction, grants Defendants' Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment, and denies Plaintiffs' Motion for Jurisdictional Discovery.

## I.   BACKGROUND

On April 27, 2021, President Biden issued Executive Order ("EO") 14026, Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 22,835 (April 27, 2021). Broadly, EO 14026 raised the minimum wage for federal contractors to $15 per hour by requiring agencies to include a $15 minimum-wage clause, beginning January 30, 2022, in "new contracts; new contract-like instruments; new solicitations; extensions or renewals of existing contracts or contract-like instruments; and exercises of options on existing contracts or contract-like instruments." *Id*. at 22,837. EO 14026 directed the DOL to issue regulations to implement its requirements. *Id*. at 22,836. After a public notice and comment period, the DOL issued the Final Rule implementing the EO on November 24, 2021, and the rule took effect on January 30, 2022. 86 Fed. Reg. 67,126 (Nov. 23, 2021). On February 17, 2022, the Tenth Circuit enjoined the government from enforcing the EO as to "contracts or contract-like instruments entered into with the federal government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands," pending an appeal from a district court's denial of a preliminary injunction in a challenge to the EO and Final Rule. *Bradford v. U.S. Dep't of Labor*, No. 22-1023, Doc. 10110656538 (10th Cir. Feb. 17, 2022).

Defendants contend that EO 14026 is "unremarkable," noting that President Obama issued a 2014 executive order establishing a minimum wage for federal contractors, the legality of which was never challenged. (MTD/MSJ at 1, 5–6.) *See* Exec. Order No. 13658, 79 Fed. Reg. 9851, 9853 (Feb. 12, 2014). In 2018, President Trump issued EO 13838, which provided an exemption for "seasonal recreational services" workers, including those

providing "river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps" and those facilitating "seasonal recreational equipment rental for the general public on Federal lands." Exec. Order No. 13838, 83 Fed. Reg. 25,341, 25,341 (May 25, 2018). President Trump's Order otherwise left intact President Obama's order, including its continued effectiveness as to contractors who provide "lodging and food services associated with seasonal recreational services." 83 Fed. Reg. at 25,341. The DOL implemented both presidents' executive orders through final rules, which took effect on December 8, 2014, and September 26, 2018, respectively. *See* 79 Fed. Reg. 60,634; 83 Fed. Reg. 48,537. In issuing their executive orders, Presidents Obama, Trump, and Biden all invoked their powers under the Federal Property and Administrative Services Act of 1949 ("FPASA" or "the Act"), 40 U.S.C. § 101 *et seq*.

On February 9, 2022, Plaintiffs brought suit against Defendants to challenge EO 14026 and the Final Rule. Plaintiffs raise six claims for relief, alleging that (1) under the FPASA the President lacked the authority to issue EO 14026 and the DOL lacked authority to issue the Final Rule; (2) the EO and Final Rule were issued not in accordance with law and in excess of the authority granted by the FPASA, in violation of the Administrative Procedure Act ("APA"); (3) the EO and Final Rule are arbitrary and capricious in violation of the APA; (4) the EO and Final Rule exceed the authority granted by the FPASA to the extent they apply beyond federal contracts to acquire goods and services; (5) the FPASA violates the non-delegation doctrine; and (6) the EO and Final Rule are barred by the Spending Clause of the United States Constitution. (*See generally* Doc. 1, Compl.)

On April 18, 2022, Plaintiffs moved for a Preliminary Injunction enjoining the enforcement of the Final Rule implementing EO 14026. (*See generally* PI Mot.) On May 11, 2022, Defendants responded in opposition to Plaintiffs' Motion for a Preliminary Injunction, and moved the Court to dismiss Plaintiffs' claims or, alternatively, to enter summary judgment in favor of Defendants, on the grounds that (1) the Court lacks subject matter jurisdiction over Plaintiffs' claims pertaining to subcontractors, licensees, and permittees; and (2) Plaintiffs' claims lack merit. (*See generally* MTD/MSJ.)

## II.     LEGAL STANDARDS

### A.     Article III Standing

Article III courts are limited to deciding "Cases" and "Controversies." U.S. Const. art. III, § 2. Article III requires that one have "the core component of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To have Article III standing, a plaintiff must show (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant(s); and (3) it is likely, not merely speculative, the injury will be redressed by decision in the plaintiff's favor. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). A complaint that fails to allege facts sufficient to establish standing requires dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See, e.g.*, *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).

### B.     Preliminary Injunction

To qualify for preliminary injunctive relief, a movant must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of hardships tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, the Court may grant temporary injunctive relief where it finds both "serious questions going to the merits" and a "balance of hardships that tips sharply towards the plaintiff," and the second and fourth *Winter* factors are also satisfied. *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### C.     Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or the existence of subject matter jurisdiction in fact." *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). "Where the jurisdictional issue is separable from the merits of the case, the [court]

may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill*, 594 F.2d at 733; *see also Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("With a 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction."). The burden of proof is on the party asserting jurisdiction to show that the court has subject matter jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

### D. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A dismissal under Rule 12(b)(6) for failure to state a claim can be based on either (1) the lack of a cognizable legal theory; or (2) the absence of sufficient factual allegations to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). When analyzing a complaint for failure to state a claim, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

## III. ANALYSIS

### A. Justiciability

Before addressing the merits of Plaintiffs' Motion for Preliminary Injunction, Defendants argue that Plaintiffs lack standing to challenge the application of EO 14026 and the Final Rule as to subcontractors, licensees, and permittees. (MTD/MSJ at 8–10.)

To establish an injury in fact, the first element of standing, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and

particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016) (citation and quotation marks omitted). A "concrete" and "particularized" injury must be "real," not "abstract," *id.*, and "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. To be "actual or imminent," a threatened injury must be "certainly impending"— "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

Defendants claim that Plaintiffs will suffer "no direct financial harm" from the EO and Final Rule's application to subcontractors, licensees, and permittees, so any claim for standing hinges on Plaintiffs' allegations that (1) they will lose tax revenue or have to pay increased unemployment benefits; (2) their economies will be harmed; and (3) they suffer a "sovereign injury," because their regulatory choices will be overridden. (MTD/MSJ at 9.) As to the arguments hinging on lost tax revenue, increased unemployment benefits, and harm to the states' economies, Defendants argue that any such harm is too speculative. (*Id.*) Whether such consequences flow from the EO or Final Rule depends on "choices made by third parties who are not before the court," and Plaintiffs can "only guess" about whether federal contractors will choose to dismiss workers, forgo contracts, or negotiate terms because of the increased minimum wage requirements. (*Id.*) *See Bradley v. T-Mobile US, Inc.*, No. 17-CV-07232-BLF, 2020 WL 1233924, at *7 (N.D. Cal. Mar. 13, 2020) ("Standing theories that depend on a 'speculative chain of possibilities'—such as those that turn on 'the decisions of independent actors'—lack the necessary causal connection." (quoting *Clapper*, 568 U.S. at 414)). Defendants also assert that because the EO and Final Rule do not override any state choices, there can be no sovereign injury. (MTD/MSJ at 10.) *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). According to Defendants, Plaintiffs in their roles as private market participants can choose whether to contract with the federal government, or to forgo such contracts—the fact that they must make that choice does not infringe on their sovereign authority. (MTD/MSJ at 10.)

Plaintiffs counter each of Defendants' arguments and maintain that the harm they will suffer as a result of EO 14026 is not speculative. (Resp. at 4–10.) Plaintiffs cite

*Department of Commerce v. New York*, to advance their argument that they may rely "upon the predictable effect of Government action on the decisions of third parties" to establish standing. 139 S. Ct. 2551, 2566 (2019). Further, Plaintiffs observe, the Final Rule predicts that it will result in "transfers of income from employers to employees in the form of higher wage rates" to the tune of $1.7 billion per year over 10 years—moneys that the contracting companies will deduct from their state taxable incomes. 86 Fed. Reg. at 67,194. (*See* Resp. at 5.) According to Plaintiffs, the fact that decreases in tax revenues may be offset does not make the injury they allege speculative. (Resp. at 6.) *See New York v. DHS*, 969 F.3d 42, 60 (2d Cir. 2020) ("[T]he fact that an injury may be outweighed by other benefits . . . does not negate standing." (citation and quotation marks omitted)). Even "a dollar or two" of injury suffices for standing purposes. *Sprint v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). Plaintiffs note that the Final Rule cites a 2021 report by the Congressional Budget Office studying the impacts of a $15 federal minimum wage that estimates that such an increase would result in 1.4 million job losses. 86 Fed. Reg. at 67,212.

Plaintiffs cite *Massachusetts v. EPA* to advance the argument that harms to their quasi-sovereign interests confer "special solicitude" upon the Plaintiff states for the purposes of the Court's standing analysis. 549 U.S. 497, 520 (2007) ("Given … Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis."). Additionally, contrary to Defendants' argument that the decision whether to contract with the federal government and pay a $15 minimum wage or forgo such contracts is a choice belonging to the states as private market participants, Plaintiffs claim that the EO and Final Rule inflict sovereign injury by overriding their regulatory choice to set minimum wages below $15 per hour. (Resp. at 8.) In support of this argument, Plaintiffs cite this Court's decision in *Brnovich v. Biden*, where the court found standing, reasoning that "the federal government is not simply another contracting entity. It is both a contractor and a regulator, wielding immense coercive power." 562 F. Supp. 3d 123, 145 (D. Ariz. 2022). Plaintiffs note that *Brnovich*

is not an outlier—in every one of the federal contractor-vaccine mandate cases, courts found the states had standing to challenge the mandates. (Resp. at 9 (citations omitted).)

The Court finds that Plaintiffs have standing here. Absent an injunction, the States will have to choose between forfeiting significant federal contracts and paying contractors $15 per hour. This potential for injury confers standing on the Plaintiff states as to subcontractors, licensees, and permittees as well, as it is more than merely speculative that minimum wage increase may result in deductions from contracting companies' state taxable incomes and cause the states to incur unemployment insurance expenses. Even if such an injury is small, it is still sufficiently concrete and particularized for the purposes of standing. Because Plaintiffs have established they have standing, the Court will consider the merits of Plaintiffs' claims challenging the application of EO 14026 and the Final Rule to all covered contractors, including subcontractors, licensees, and permittees.

**B.     Defendants' Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment**

Plaintiffs' six claims for relief encompass four principal arguments: (1) EO 14026 and the Final Rule exceed the President's authority under the FPASA; (2) the EO and Final Rule are arbitrary and capricious in violation of the APA; (3) the FPASA violates the non-delegation doctrine; and (4) the EO and Final Rule are barred by the Spending Clause of the United States Constitution. (Compl. ¶¶ 103–55.) To qualify for preliminary injunctive relief on any of their claims, Plaintiffs must first establish they are likely to succeed on the merits. *Winter*, 555 U.S. at 20. Because Defendants filed a Response to Plaintiffs' Motion for Preliminary Injunction in the form of a Motion to Dismiss, the Court begins with its analysis of the latter motion and discusses the merits of Plaintiffs' claims in turn.

**1.     EO 14026 and the Final Rule Do Not Exceed the President's Authority Under the FPASA.**

Congress enacted the FPASA to provide the government with an "economical and efficient system" for, among other things, "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C.

§ 101. The Act grants the President authority to "prescribe policies and directives that the President considers necessary to carry out [the Act]." *Id*. § 121(a). Reviewing the FPASA's legislative history, the D.C. Circuit noted that Congress added the latter provision "to guarantee that Presidential policies and directives shall govern not merely guide the agencies under the FPASA." *Am. Fed'n of Labor & Cong. of Indust. Orgs. v. Kahn*, 618 F.2d 784, 788–89 (D.C. Cir. 1979) (en banc) (citation and quotation marks omitted).

As this Court and others have recognized, the FPASA's grant of presidential authority is broad, but it is not unqualified. *See, e.g.*, *Brnovich*, 562 F. Supp. 3d at 151. By the statute's terms, the President's policies must be "consistent" with the Act. 40 U.S.C. § 121(a). Courts reviewing challenges to policies issued pursuant to the FPASA therefore require "a sufficiently close nexus" to the statutory purposes of promoting "economy" and "efficiency" in federal contracting. *Kahn*, 618 F.2d at 792; *accord Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170–71 (4th Cir. 1981); *Contractors Ass'n of Eastern Pa. v. Sec'y of Labor*, 442 F.2d 159, 170–71 (3d Cir. 1971); *but see Georgia v. Biden*, 46 F.4th 1283, 1293–1301 (11th Cir. 2022) (op. of Grant, J.) (adopting a narrower interpretation of the FPASA under which the President's authority is limited to instructing subordinates on how to exercise their procurement related statutory authority). In conducting the nexus inquiry, most courts have defined "economy" and "efficiency" broadly. *E.g.*, *Kahn*, 618 F.2d at 789 ("'Economy' and 'efficiency' are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions."); *but see Kentucky v. Biden*, 23 F.4th 585, 605 (6th Cir. 2022) (holding that the President's authority under the Act is limited to policies "making *the government's* entry into contracts less duplicative and inefficient" (emphasis in original)).

Plaintiffs' first claim alleges that EO 14026 and the Final Rule fall outside the permissible bounds of the President's authority under the FPASA. (Compl. ¶¶ 103–19.) Plaintiffs make several arguments in support of this claim, including that the EO and Final Rule lack the requisite nexus to the goals of economy and efficiency in federal contracting.

1  (PI Mot. at 15–19; Resp. at 17–20.) Defendants argue that the nexus requirement is the

2  "key question" in this case and that it is satisfied here. (MTD/MSJ at 2, 10–21.)

3      In issuing EO 14026, the President stated that the order

4      promotes economy and efficiency in Federal procurement by increasing the

5      hourly minimum wage paid by the parties that contract with the Federal
       Government to $15.00 for those workers working on or in connection with a

6      Federal Government contract as described in . . . this order. Raising the
       minimum wage enhances worker productivity and generates higher-quality

7      work by boosting workers' health, morale, and effort; reducing absenteeism

8      and turnover; and lowering supervisory and training costs. Accordingly,
       ensuring that Federal contractors pay their workers an hourly wage of at least

9      $15.00 will bolster economy and efficiency in Federal procurement.

10

11  86 Fed. Reg. at 22,835. In issuing the Final Rule implementing EO 14026, the DOL

12  analyzed these benefits of increasing the minimum wage, including improving morale and

13  productivity and reducing employee turnover and absenteeism, as well as reducing poverty

14  and income inequality, although the DOL acknowledged that it did not quantify these

15  benefits "due to uncertainty and data limitations." *E.g.*, 86 Fed. Reg. at 67,212–15.

16      The Court finds there is a sufficiently close nexus between EO 14026 and the Final

17  Rule and the FPASA's goals of economy and efficiency in federal contracting. Here, the

18  President has rationally determined that increasing the minimum wages of contractors'

19  employees will lead to improvements in their productivity and the quality of their work,

20  and thereby benefit the government's contracting operations. "Such a strategy of seeking

21  the greatest advantage to the Government, both short- and long-term, is entirely consistent

22  with the congressional policies behind the FPASA." *Kahn*, 618 F.2d at 793. As Defendants

23  observe, presidents of both parties have exercised their authority under the FPASA to issue

24  orders pertaining to the compensation of contractors' employees. (MTD/MSJ at 10–11.)

25  *See, e.g.*, *Kahn*, 618 F.2d at 792–93 (upholding EO 12092 requiring contractors to comply

26  with noninflationary price and wage controls); *Contractors Ass'n*, 442 F.2d at 170–71

27  (upholding EO 11246 prohibiting contractors from discriminating on the basis of race,

28  creed, color, or national origin and requiring affirmative action as to rates of

compensation). As noted, each of the three most recent presidents have issued orders pertaining to contractors' minimum wages; President Trump narrowed, but did not rescind, the order issued by his predecessor, indicating that he understood setting minimum wages for contractors to be within the scope of his authority under the FPASA. *See* 83 Fed. Reg. at 25,341. While the President's view of his own statutory authority is not controlling, "when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect.'" *Kahn*, 618 F.2d at 790 (quoting *Bd. of Govs. of Fed. Reserve Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248 (1978)).

Plaintiffs note—and the DOL acknowledges, *see* 86 Fed. Reg. at 67,206—that EO 14026 and the Final Rule may lead to increased costs that get passed on to the government. (PI Mot. at 15–16.) Plaintiffs cite *Kahn* for the contravening proposition that "only programs which have the 'likely direct and immediate effect of *holding down* the Government's procurement costs'" have the requisite nexus to economy and efficiency. (*Id*. (quoting 618 F.2d at 793).) The Court notes the D.C. Circuit made this observation in upholding EO 12092 in *Kahn*, but as Defendants correctly point out, the quoted passage does not state the legal standard set forth in that case, which is substantially broader. It "recognizes that the Government generally must have some flexibility to seek the greatest advantage in various situations." 618 F.2d at 788–89. Indeed, the D.C. Circuit later observed that "there was a rather obvious case that [EO 12092] might in fact increase procurement costs (as it plainly did in the short run)." *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 367 (D.C. Cir. 2003). Moreover, the DOL stated it anticipates the benefits of EO 14026 will offset potential increased costs. *See, e.g.*, 86 Fed. Reg. at 67,152, 67,212–15. In *Kahn*, the D.C. Circuit credited a similar rationale in upholding the wage and price controls imposed by EO 12092, "accept[ing] the proposition that the order would induce companies to comply, thereby slowing inflation, so that 'the Government will face lower costs in the future.'" *Chao*, 325 F.3d at 366 (quoting *Kahn*, 618 F.2d at 792–93).

The Court is not persuaded that the DOL's analysis is too speculative, or the asserted benefits too attenuated, to establish the requisite nexus. (*See* PI Mot. at 16–19; Resp.

at 17-19.) The rationale supporting EO 14026 and the Final Rule are at least as compelling as those upon which courts have relied in upholding other executive orders. *See, e.g.*, *Chao*, 325 F.3d at 366–67 (upholding EO 13201, which required contractors to inform their employees of their rights not to join a union or pay certain union dues, based on President Bush's statement that "[w]hen workers are better informed of their rights . . . their productivity is enhanced"); *Chamber of Commerce of U.S. v. Napolitano*, 648 F. Supp. 2d 726, 736–38 (D. Md. 2009) (upholding EO 13465, which required contractors to use the e-verify system to verify their employees' eligibility to work in the United States, based on President Bush's statement that contractors that adopted e-verify would be "more efficient and dependable procurement sources" because they would be "less likely to face immigration enforcement actions"). Having concluded that the nexus requirement is met here, it is not the Court's function to "substitut[e] its policy determinations and fact finding ability for that of the President." *Napolitano*, 648 F. Supp. 2d at 738. Nor does the fact that EO 14026 also serves unrelated social and political goals vitiate that nexus. *See Am. Fed. of Gov. Emps., AFL-CIO v. Carmen*, 669 F.2d 815, 821 (D.C. Cir. 1981).

To support their claim, Plaintiffs point to decisions invalidating the contractor-vaccine mandate, including this Court's decision in *Brnovich*. (*E.g.*, PI Mot. at 18–19; Resp. at 18.) *Brnovich* is distinguishable. There, the asserted nexus to economy and efficiency in federal contracting ran through intermediate steps involving public health: The government asserted that the "overall effect" of the mandate "will be to decrease the spread of COVID-19, which will in turn decrease worker absence, save labor costs on net, and thereby improve efficiency in federal contracting." 562 F. Supp. 3d at 152 (quoting 86 Fed. Reg. at 63,421). The court reasoned that such a tenuous connection to the purposes of the FPASA would permit the government to regulate any number of public health concerns by asserting that, through improvements to public health, such measures indirectly decreased absenteeism and improved productivity. *Id*. By contrast, EO 14026 and the Final Rule pertain directly to the economic relationships between the government, its contractors and their employees, setting requirements for employees' wages—i.e., the "price" of their

labor—which in turn affects their productivity—i.e., the "quality" of their labor. Thus, the EO and Final Rule fit much more comfortably within the statutory goals of economy and efficiency as courts have broadly defined them. *See Kahn*, 618 F.2d at 789.

Nor is the Court persuaded that the major questions doctrine and the principles of constitutional avoidance and federalism compel Plaintiffs' narrow construction of the FPASA. (PI Mot. at 10–12; Resp. at 10–15.) The scope of the President's asserted authority here is not akin to the novel and "breathtaking" authority that concerned the court in *Brnovich*. *See* 562 F. Supp. 3d at 152–54 (quoting *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021)). Whereas the President had never "in the seventy years since the Procurement Act was enacted, ever used his authority under the Act to effectuate sweeping public health policies," *id.* at 153; *see also Kentucky*, 23 F.4th at 608 (characterizing the vaccine mandate as "the imposition of an irreversible medical procedure without precedent in the history of [FPASA's] application"), presidents of both political parties have issued orders like EO 14026 pertaining to the compensation of contractors' employees, including orders specifically setting requirements for their minimum wages.

This is not a case in which an agency has relied on an ancillary statutory provision to exercise novel regulatory powers, as in the Supreme Court cases applying the major questions doctrine cited by Plaintiffs. *See, e.g.*, *West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022) (finding the EPA's assertion of "unheralded power" to "substantially restructure the American energy market" in an "ancillary provision" of the Clean Air Act to represent a "transformative expansion in [its] regulatory authority" (citation and quotation marks omitted)); *Nat'l Fed. of Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022) (finding OSHA's assertion of authority to impose an employer-vaccine mandate that "encroach[ed] into the lives—and health—of a vast numbers of employees" "strikingly unlike the workplace regulations that OSHA has typically imposed"); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (finding the CDC's assertion of authority to impose a nationwide eviction moratorium under the Public Health Act "unprecedented" where "no regulation premised on it has even begun to approach the size

or scope of the eviction moratorium"). Rather, the President here relied on a broad statutory delegation to exercise proprietary authority in an area—general administrative control of the Executive Branch—over which he also enjoys inherent powers. *See, e.g.*, *NASA v. Nelson*, 562 U.S. 134, 148–50 (2011) (recognizing that the government "has a much freer hand in dealing 'with citizen employees than it does when it brings its sovereign power to bear on citizens at large'" (quoting *Engquist v. Oregon Dep't of Ag.*, 552 U.S. 591 (2008)).[1]

It is true that EO 14026 and the Final Rule affect a substantial number of workers and firms. Plaintiffs cite to the *Brnovich* court's discussion of the scope of the vaccine mandate that covered virtually all federal contractor employees—who comprise approximately one-fifth of the national workforce—and urge the Court to use the same yardstick to measure EO 14026 and the Final Rule. 562 F. Supp. 3d at 153. (*See* Resp. at 10; Tr. at 5–6.) Again, *Brnovich* is distinguishable. Here, the DOL estimated that 1.8 million employees work on covered contracts, or roughly one percent of the national workforce. *See* 86 Fed. Reg. at 67,198; U.S. Bureau of Labor Stats., *Employment Status of the Civilian Population By Sex and Age* (Dec. 2, 2022), https://www.bls.gov/news.release/empsit.t01.htm. The DOL estimated that of those 1.8 million workers, approximately 327,300 will see an increase in wages in the first year of implementation. 86 Fed. Reg. at 67,195. For comparison, the Supreme Court did not apply the major questions doctrine in *Biden v. Missouri*, where it granted a stay of lower court decisions invalidating a vaccine mandate affecting more than 10 million workers employed in facilities accepting federal Medicare and Medicaid funding. *See* 142 S. Ct. 647, 650 (2022). In terms of economic impact, the annual transfer from employers to employees projected here—$1.7 billon, which the DOL acknowledged may be an underestimate, 86 Fed. Reg. at 67,194—is far less than the $1 trillion reduction in GDP projected to result from the Clean Power Plan by 2040, *West Virginia*, 142 S. Ct. at 2605, or

---

[1] At oral argument, Plaintiffs' counsel noted the *Brnovich* court applied the major questions doctrine despite the Executive Branch's claim to proprietary authority in imposing the contractor-vaccine mandate. (Tr. at 41:19–21.) But the Court reads the decision in *Brnovich* as concerned with what the court viewed as misuse of such proprietary authority to impose what were, in fact, sweeping public health regulations. *See* 562 F. Supp. 3d at 153–55.

the $50 billion the Supreme Court found to be a "reasonable proxy" of the economic impact of the nationwide eviction moratorium. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489.

Nor does the federalism cannon compel Plaintiffs' narrow construction of the FPASA. Unlike the vaccine mandate, EO 14026 and the Final Rule do not encroach upon states' traditional police powers, which specifically include the power to require vaccination. *See Zucht v. King*, 260 U.S. 174, 176 (1922). As Defendants note, there is a history of federal involvement in regulating wages, and further, the government here is setting minimum wages only for those workers connected to federal contracting. (Reply at 10.) Nor do EO 14026 and the Final Rule conflict with the other federal statutes related to wage regulation cited by Plaintiffs. (Resp. at 20–23.) Those statutes are reasonably read— as the DOL has read them, *see* 86 Fed. Reg. at 67,129—to set floors for the wages of contractors' employees; they do not set forth "unambiguous commands" that wages cannot be higher than those wages prevailing locally. *See* 40 U.S.C. § 3142(b); 41 U.S.C. §§ 6502(1), 6703(1); *see also Bradford v. U.S. Dep't of Labor*, 582 F. Supp. 3d 819, 839 (D. Colo. 2022) (concluding the same), *appeal docketed*, No. 22-1023 (10th Cir. Jan. 28, 2022).

Finally, Plaintiffs' fourth claim alleges that even if the FPASA authorizes certain aspects of EO 14026 and the Final Rule, it does not authorize those aspects that extend beyond federal contracts to acquire goods and services. (Compl. ¶¶ 138–41.) Thus, Plaintiffs argue, EO 14026 and the Final Rule are invalid to the extent they set minimum wages for the employees of subcontractors, licensees, and permittees who are not directly involved in the government's acquisition of goods or services. (*See* PI Mot. at 12–15.)

With respect to subcontractors, Plaintiffs rely on the Fourth Circuit's holding in *Liberty Mutual* that the subcontractors in that case had "no direct connection to federal procurement." 639 F.2d at 171. (*See* Resp. at 20 n.4.) But *Liberty Mutual* is distinguishable. In that case, the plaintiffs were insurers that provided workers' compensation insurance to federal contractors but had not themselves signed any covered contracts with the federal government. 639 F.2d at 166–67, 171. Yet the insurers were still subject to the anti-

discrimination requirements of EO 11246 because the order applied to any employers of workers whose services were "necessary" to the performance of covered contracts. *Id.* at 166–67. The Fourth Circuit concluded that EO 11246 cast too wide of a net, drawing in subcontractors like the plaintiff insurers whose connection to federal procurement—blanket insurance policies that "cover[ed] employees working on both federal and nonfederal contracts without distinction between the two"—was "simply too attenuated." *Id.* at 171. Not so here. EO 14026 and the Final Rule apply only to the work of an employee "in connection with" a covered contract or subcontract if the employee spends at least 20% of his or her workweek performing such work and, even then, the employee is only entitled to receive the applicable minimum wage for the work spent in connection with such contract or subcontract. 29 C.F.R. §§ 23.40(f), 23.220(a). Further, Defendants persuasively argue that extending the minimum wage requirements to subcontractors is necessary to prevent government contractors from simply subcontracting out the bargained-for services to avoid paying the minimum wage. (MTD/MSJ at 21–22.)

With respect to federal licensees and permittees, Defendants argue that Plaintiffs failed to adequately allege in their Complaint that licensees and permittees fall outside the scope of the President's authority under the FPASA. (*Id.* at 23.) However, Plaintiffs correctly note that they alleged in their Complaint that the President's authority "cannot extend past contracts to acquire goods and services"—which would exclude licenses and permits. (Compl. ¶ 140.) That claim fails to give full effect to the text of the FPASA, which authorizes the President to issue policies consistent with the statutory goals of economy and efficiency in both "procuring"—i.e., acquiring—"*and supplying* property and nonpersonal services." 40 U.S.C. §§ 101, 121(a) (emphasis added). Defendants persuasively argue that the word "supplying" "extends the President's authority with respect to contractors from whom the federal government is not directly '[p]rocuring' goods or services, such as licensees and permittees with whom the government enters agreements for the purpose of '[s]upplying property and nonpersonal services' to the public." (MTD/MSJ at 23.) Plaintiffs offer no contrary interpretation to account for the

1    word "supplying." (*See* PI Mot. at 12–15; Resp. at 20 n.4.) Their theory that the President's

2    authority under the FPASA extends only to the acquisition of goods and services therefore

3    is unconvincing because it does not, as it must, give effect to all of the statute's terms. *See*

4    *Clark v. Rameker*, 573 U.S. 122, 131 (2014) ("[A] statute should be construed so that effect

5    is given to all its provisions, so that no part will be inoperative or superfluous.")[2]

6        In sum, the Court concludes that EO 14026 and the Final Rule do not exceed the

7    President's authority under the FPASA. Thus, Plaintiffs cannot prevail on their first and

8    fourth claims. Plaintiffs' second claim, which alleges that EO 14026 and the Final Rule

9    should be set aside under the provisions of the APA requiring the reviewing court to

10   invalidate agency action that is "not in accordance with law" or "in excess of statutory . . .

11   authority" (Compl. ¶¶ 120–26, quoting 5 U.S.C. § 706(2)(A), (C)), fails for the same

12   reasons. Further, neither the EO nor those aspects of the Final Rule that Plaintiffs challenge

13   in this case are substantively reviewable under the APA, as discussed in the next section.

14
15              **2.      EO 14026 and the Challenged Aspects of the Final Rule Are Not
                         Subject to Arbitrary-and-Capricious Review Under the APA.**

16       Plaintiffs' third claim alleges that EO 14026 and the Final Rule should be vacated

17   and/or enjoined under the provision of the APA requiring the reviewing court to set aside

18   "arbitrary and capricious" agency action. (Compl. ¶¶ 127–37 (quoting 5 U.S.C.

19   § 706(2)(A)).) Defendants respond that the President is not subject to the APA, and

20   therefore agency actions adopting choices made by him in the exercise of authority

21   _____
     [2] While Plaintiffs criticize Defendants' arguments regarding this claim as "only skeletally
22   developed," Plaintiffs responded to those arguments in a footnote. (Resp. at 20 n.4.) Amici
     curiae Pacific Legal Foundation, Arkansas Valley Adventure, LLC, and Colorado River
23   Outfitters Association, who are litigating the legality of the Final Rule and its application
     to a subcategory of permittees before the Tenth Circuit in *Bradford*, provided more
24   substantial briefing on this point. (*See* Doc. 28 at 4–9.) But even amici do not provide a
     sufficient interpretation in the brief they submitted to this Court that gives effect to the
25   word "supplying." The district court reached a similar conclusion in *Bradford*, finding that
     amici "ha[d] not shown that the government does not contract with them and other
26   outfitters to supply services on federal lands." *See* 582 F. Supp. 3d at 835. As noted, the
     Tenth Circuit enjoined enforcement of the Final Rule with respect to the subcategory of
27   permittees similarly situated to amici, but did not elaborate on its finding that they "have
     demonstrated an entitlement to relief from the Minimum Wage Order in their particular
28   circumstances." *Bradford*, No. 22-1023, Doc. 1011656538 at 2 (Feb. 17, 2022). As of the
     issuance of this Order, *Bradford* remains pending before that court.

delegated to him by Congress—such as those challenged by Plaintiffs—are not subject to arbitrary-and-capricious review. (MTD/MSJ at 29–33.) The Court agrees with Defendants.

EO 14026 is not reviewable under the APA. The APA provides for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In *Franklin v. Massachusetts*, the Supreme Court held that the President's actions are not subject to review under the APA in light of the statute's textual silence and the separation of powers concerns that would be implicated by reviewing exercises of the President's discretionary authority. 505 U.S. 788, 800–01 (1992). The Supreme Court reiterated this holding two years later in *Dalton v. Specter*, stating that "[t]he actions of the President . . . are not reviewable under the APA because, as we concluded in *Franklin*, the President is not an 'agency.'" 511 U.S. 462, 470 (1994) (citing 505 U.S. at 800–01). Plaintiffs cite to several sources of authority—which the Court discusses in more detail below—identifying limitations on the holdings of *Franklin* and *Dalton* with respect to the reviewability of agency actions implementing presidential orders. But these authorities do not establish that EO 14026 is subject to arbitrary-and-capricious review. They bear, if at all, on the reviewability of the DOL's implementation of the President's order.[3]

Defendants argue that the holdings of *Franklin* and *Dalton* apply equally to the Final Rule "to the extent it simply adopts discretionary choices made by the President, in the exercise of authority granted to him by Congress through the FPASA." (MTD/MSJ at 30.) Defendants observe that to hold otherwise would put the DOL in the "untenable position" of having both to follow the mandatory orders of the President and to engage in APA-required deliberation about whether to do just the opposite. (*See id.* at 31.) Defendants note that the aspects of the Final Rule that Plaintiffs have challenged—the selection of the $15 minimum hourly rate and the decision to rescind EO 13838—were choices made by the President based on authority delegated to him, not the DOL. (*Id.* (citing 86 Fed. Reg.

---

[3] To the extent Plaintiffs argue that *Franklin* and *Dalton* do not preclude judicial review of EO 14026 under the FPASA's non-statutory cause of action (Resp. at 26–27), they are correct. The Court conducted such review in the preceding section.

at 22,835–37).) Plaintiffs maintain the Final Rule is reviewable even to the extent it adopts decisions made by the President pursuant to his delegated authority. (Resp. at 27–29.)

Plaintiffs quote the D.C. Circuit's opinion in *Chamber of Commerce v. Reich* for the proposition that the existence of the "President's Executive Order hardly seems to insulate [Defendants' actions] from judicial review under the APA." (Resp. at 3 (quoting 74 F.3d 1322, 1327 (D.C. Cir. 1996).) But the D.C. Circuit did not rely on the APA as the basis for judicial review in that case because the plaintiffs did not raise an APA claim in their complaint. *See* 74 F.3d at 1327. Other courts have disagreed with what is therefore dicta in *Reich* and agreed with Defendants' position instead. *See, e.g.*, *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 n.6 (S.D. Tex. 2022) ("The court is convinced that the best reading of the APA in light of *Franklin* is to allow APA review only when the challenged action is discretionary." (citing William Powell, *Policing Executive Teamwork: Rescuing the APA from Presidential Administration*, 85 Mo. L. Rev. 71, 121 (2020)), *vacated and remanded on other grounds*, 30 F.4th 503 (5th Cir. 2022); *Tulare Cty. v. Bush*, 185 F. Supp. 2d 18, 29 (D.D.C. 2001) (holding that the APA does not apply to agency action "merely carrying out the directives of the President"). Plaintiffs point to the Ninth Circuit's opinion in *East Bay Sanctuary Covenant v. Trump*, which favorably cited the opinion in *Reich*. (Tr. at 12:14–13:11.) *See* 932 F.3d 742, 770 (9th Cir. 2018). In *East Bay Sanctuary*, however, it was the interplay between agency regulations and a presidential proclamation that together formed a "substantive rule of decision," which the court held reviewable under the APA. *See* 932 F.3d at 770. Here, by contrast, Plaintiffs challenge only those aspects of the Final Rule that are the product of the President's decision-making.

Plaintiffs next cite to an article by then-Professor Kagan, in which she wrote that "[w]hen the challenge is to an action delegated to an agency head but directed by the President, . . . the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2350–51 (2001). But as a district court in the District of Columbia explained, Professor Kagan's point was that "the

President's intervention does not insulate an agency action from judicial review when the authority was delegated by Congress *directly to the agency*." *Detroit Intern. Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 104 n.15 (D.D.C. 2016) (emphasis added), *aff'd as amended on denial of reh'g*, 883 F.3d 895 (D.C. Cir. 2018). That is not the situation here.

Perhaps the best case for Plaintiffs is *Gomez v. Trump*, in which a district court in the District of Columbia held that actions taken by the Secretary of State based on presidential proclamations were not precluded from APA review. 485 F. Supp. 3d 145, 176–78 (D.D.C. 2020). As an initial matter, *Gomez* is distinguishable because in that case the plaintiffs challenged agency action that "expanded the scope of the Proclamations," which the court found to be "a far greater step than the type of ministerial agency action . . . deemed indistinguishable from presidential action, and thus unreviewable." *Id.* at 178. To the extent *Gomez* more broadly concluded that APA review should be available even when an agency is merely carrying out decisions made by the President pursuant to his or her delegated authority, the Court respectfully disagrees. Not only would such a holding put agencies in an untenable position; it would threaten to render *Franklin* toothless "if challengers of presidential action can simply wait until one of the President's subordinates takes an implementing action and then obtain full APA review." Powell, *Policing Executive Teamwork* at 121.

In short, *Franklin* and *Dalton* preclude the Court from conducting arbitrary-and-capricious review under the APA of either EO 14026 or the Final Rule to the extent it implements decisions made by the President pursuant to his delegated authority under the FPASA. This forecloses relief on Plaintiffs' third claim.

### 3.     The FPASA Does Not Violate the Non-Delegation Doctrine.

Plaintiffs' fifth claim alleges that to the extent the FPASA is interpreted to authorize Defendants' imposition of the minimum wage requirements of EO 14026 and the Final Rule, the statute violates the non-delegation doctrine. (Compl. ¶¶ 142–47.) Plaintiffs urge the Court to adopt their narrow construction of the FPASA to avoid this constitutional problem (*e.g.*, PI Mot. at 11–12), but the Court declines to adopt this construction for the

reasons set forth above. The Court is likewise not persuaded that the FPASA violates the non-delegation doctrine to the extent it authorizes EO 14026 and the Final Rule.

Article I vests "[a]ll legislative Powers" in Congress. U.S. Const., art. I, § 1. "Accompanying that assignment of power to Congress is a bar on further delegation of . . . powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (citation and quotation marks omitted). However, "Congress may 'obtain[] the assistance of its coordinate Branches'—and, in particular, may confer substantial discretion on executive agencies to implement and enforce the laws." *Id*. (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized [to exercise the delegated authority] is directed to conform.'" *Id*. (quoting *Mistretta*, 488 U.S. at 372). The Supreme Court has made clear that these standards "are not demanding." *Id*. "Only twice in this country's history (and that in a single year) have we found a delegation excessive—in each case because 'Congress had failed to articulate *any* policy or standard' to confine discretion.'" *Id*. (quoting *Mistretta*, 488 U.S. at 416, and citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935)).

The FPASA sets out an "intelligible principle" to guide the President's exercise of authority. *See Gundy*, 139 S. Ct. at 2129. It authorizes the President to "prescribe policies and directives that the President considers necessary" to provide the government with "an economical and efficient system" for, among other things, "procuring and supplying property and nonpersonal services." 40 U.S.C. § 101, 121(a). Recognizing the "boundaries of [this] authority" imposed by the statute, *Gundy*, 139 S. Ct. at 2129, courts interpreting the FPASA require presidential policies to have a sufficiently close nexus to the statute's stated purposes. *See, e.g.*, *Kahn*, 618 F.2d at 792. Employing this interpretation above, the Court concludes that EO 14026 and the Final Rule meet this requirement. Under this interpretation, the statute is not an unconstitutional delegation of legislative power. *See id.* at 793 n.51; *accord City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901, 914–15

- 21 -

1    (10th Cir. 2004). This conclusion is bolstered by the fact that, while the President relied on

2    his powers under the FPASA in issuing EO 14026, the statute nonetheless implicates his

3    inherent powers under Article II to exercise managerial control of the Executive Branch.

4    *See, e.g.*, *Nelson*, 562 U.S. at 148–50. As Justice Gorsuch recognized in *Gundy*, "Congress

5    may assign the President broad authority regarding . . . matters where he enjoys his own

6    inherent Article II powers." 139 S. Ct. at 2141, 2144 (Gorsuch, J., dissenting).

7         Thus, the Court concludes that the FPASA does not violate the non-delegation

8    doctrine to the extent it authorizes Defendants' issuance of EO 14026 and the Final Rule.

9         **4.     EO 14026 and the Final Rule Do Not Violate the Spending Clause.**

10        Plaintiffs' sixth claim alleges that EO 14026 and the Final Rule violate the Spending

11   Clause. (Compl. ¶¶ 148–55.) This provision empowers Congress to "lay and collect Taxes,

12   Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and

13   general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. Plaintiffs note that while

14   the Spending Clause allows Congress—and only Congress—to provide conditional grants

15   to the States, the Supreme Court has held that "'if Congress desires to condition the States'

16   receipt of federal funds, it 'must do so unambiguously.'" *South Dakota v. Dole*, 483 U.S.

17   203, 207 (1987) (quoting *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17

18   (1981)). (*See* Compl. ¶ 151.) Plaintiffs observe that to the extent the FPASA authorizes the

19   President to condition the acceptance of federal contracting funds on the requirement that

20   States pay their employees a minimum wage of his choosing, it does so without providing

21   clear statutory notice of these terms of acceptance. (Compl. ¶ 154.) Thus, EO 14026 and

22   the Final Rule are invalid, the argument goes, insofar as they impose such unnoticed

23   conditions on the wages States pay their employees. (*Id.* ¶¶ 151–55.)

24        Defendants counter that Plaintiffs' argument ignores the differences between grants

25   and contracts and relies on Supreme Court caselaw that applies only to the former.

26   (MTD/MSJ at 33–35.) By contrast, EO 14026 and the Final Rule apply only to the latter,

27   requiring agencies to include a $15 minimum wage clause in certain "new contracts; new

28   contract-like instruments; new solicitations; extensions or renewals of existing contracts or

contract-like instruments; and exercises of options on existing contracts or contract-like instruments." 86 Fed. Reg. at 22,837. Plaintiffs argue that the reasoning of the Spending Clause jurisprudence applies equally in the contracting context. (Resp. at 24–25.) They note that in these cases, the Supreme Court analogized grants to contracts, requiring statutory notice of the conditions on accepting federal funds to ensure that "the States, as separate sovereigns, cannot be held to conditions they do not 'voluntarily and knowingly' agree to." (*Id.* at 24 (quoting *Pennhurst*, 451 U.S. at 17).) Plaintiffs argue that the "same reasoning applies *a fortiori*" and it would be "bizarre if the Supreme Court's *contract*-based analogy held only for grants and not actual contracts themselves." (*Id.* at 25.)

The reasoning of the Supreme Court's Spending Clause jurisprudence is that because conditions on federal grants are "in the nature of contracts," the legitimate exercise of Congress's spending power "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' . . . There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17 (citations omitted); *see also, e.g.*, *Cummings v. Premier Rehab Keller, P.L.C.*, 142 S. Ct. 1562, 1570 (2022) ("Recipients cannot 'knowingly accept' the deal with the Federal Government unless they would clearly understand . . . the obligations that would come along with doing so." (citation and quotation marks omitted)). But this reasoning does not apply to contracts. As Defendants point out, States receive notice of the terms of acceptance of federal contracting funds through the process of contracting. (MTD/MSJ at 34–35.) If they did not, there could be no mutual assent necessary for contract formation. *See* 1 *Williston on Contracts* § 3:6 (4th ed. 2022) (noting that for a contract to be enforceable, there must be agreement on essential terms). Defendants further contend that Plaintiffs cannot credibly claim they are "unaware of the conditions or [are] unable to ascertain what is expected of them," *Pennhurst*, 451 U.S. at 17, given that they "have been entering into contracts with the federal government for years subject to the minimum-wage standards of EO 13,658, which was issued by President Obama in 2014." (*Id.* at 35.) EO 14026 increases the minimum wage in new contracts and contract-like

instruments, but "it does not include surprising [contracting] States with post-acceptance or 'retroactive' conditions." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012) (quoting *Pennhurst*, 451 U.S. at 584).

In short, Plaintiffs cite no binding authority to support the proposition that the Spending Clause's clear notice requirement applies to federal contracts. The Court is persuaded by Defendants' arguments that such a requirement is unnecessary in the contracting context. District courts considering similar arguments under the Spending Clause have rejected them on similar grounds. *See Missouri v. Biden*, 576 F. Supp. 3d 622, 633 (D. Mo. 2021) (finding plaintiff States unlikely to succeed on argument that the contractor-vaccine mandate violates the Spending Clause); *Kentucky v. Biden*, 571 F. Supp. 3d 715, 727 n.9 (E.D. Ky. 2021) (same); *but see Florida v. Nelson*, 576 F. Supp. 3d 1017, 1038 (M.D. Fla. 2021) (finding the contractor-vaccine mandate likely "intrudes into a matter traditionally committed to the state" without constitutional authorization because Congress did not unambiguously authorize conditioning funds on acceptance of the vaccine requirement as necessary for Spending Clause to apply). Thus, Plaintiffs' sixth claim fails.

## C. Plaintiffs' Rule 56(d) Motion to Deny Summary Judgment and for Jurisdictional Discovery

Plaintiffs move under Federal Rule of Civil Procedure 56(d) to conduct jurisdictional discovery and to develop the record on their claim that the Final Rule rests on pretextual reasoning. (*See* Doc. 49.) Rule 56(d) allows a party responding to a summary judgment motion to request discovery when the party cannot yet "present facts essential to justify its opposition." But Rule 56(d) relief is not available if the Court does not consider Defendants' motion as a motion for summary judgment, which parties typically file much later in litigation. *See* Fed. R. Civ. P. 56(d). Here, the Court neither evaluated Defendants' motion under the summary judgment standard nor did it consider evidence at this stage of the litigation. Instead, the Court applied the Rule 12 standards to examine whether Plaintiffs stated legally sufficient claims in their complaint. Because the Court finds that

Plaintiffs did not do so, it grants Defendants' Motion to Dismiss, and need not consider it as a Motion for Summary Judgment. Accordingly, Plaintiffs' Rule 56(d) motion is denied.

**IT IS THEREFORE ORDERED** granting Defendants' Motion to Dismiss Or, In the Alternative, Motion for Summary Judgment (Doc. 40).

**IT IS FURTHER ORDERED** denying as moot Plaintiffs' Motion for Preliminary Injunction (Doc. 25) and Plaintiffs' Rule 56(d) Motion to Deny Summary Judgment Or For Jurisdictional Discovery (Doc. 49).

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and close this case.

Dated this 6th day of January, 2023.

Honorable John J. Tuchi
United States District Judge